IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE ANN FUGES, on behalf of herself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 2:09-CV-00699-LDD |
| v. | : | |
| | : | |
| SOUTHWEST FINANCIAL SERVICES, LTD., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

AND NOW, this _____ day of _____, 2011, upon consideration of Defendant's Motion for Summary Judgment, memorandum of law in support thereof, Statement of Material Facts which Defendant Contends are Not in Dispute, supporting appendix, and any response thereto, it is hereby ORDERED that Defendant's Motion is GRANTED, and that summary judgment is hereby entered in favor Southwest Financial Services, Ltd., and against Plaintiff on all claims.

BY THE COURT:

_____
Davis, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE ANN FUGES, on behalf of herself and all others similarly situated, | : : : | |
| Plaintiff, | : : | |
| v. | : : : | CIVIL ACTION NO. 2:09-CV-00699-LDD |
| SOUTHWEST FINANCIAL SERVICES, LTD., | : : | |
| Defendant. | : : : | |

## MOTION OF DEFENDANT SOUTHWEST FINANCIAL SERVICES, LTD. FOR SUMMARY JUDGMENT

Defendant, Southwest Financial Services, Ltd., hereby moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment. The grounds for this motion are set forth in the accompanying memorandum of law, the Statement of Material Facts which Defendant Contends are Not in Dispute, and Appendix of Supporting materials.

/s/ Darryl J. May
Darryl J. May
Mark J. Furletti
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

*Attorneys for Defendant*

Dated: August 1, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE ANN FUGES, on behalf of herself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 2:09-CV-00699- |
| v. | : | LDD |
| | : | |
| SOUTHWEST FINANCIAL SERVICES, LTD., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**STATEMENT OF MATERIAL FACTS WHICH
DEFENDANT CONTENDS ARE NOT IN DISPUTE**

Pursuant to this Court's Procedures (Motions Practices and Procedures, No. 6),

Defendant Southwest Financial Services, Ltd. ("Southwest") sets forth this Statement of Material

Facts Which Defendant Contends Are Not In Dispute in support of its Motion for Summary

Judgment.

**I.     THE SOUTHWEST CURRENT OWNER TITLE REPORT ON PLAINTIFF'S
PROPERTY**

1.     In late 2007, Plaintiff obtained a line of credit secured by her home at 952

Bridge Street in Philadelphia from PNC Bank ("PNC") with a credit limit of $25,000.  (Fuges

Resp. to Def.'s Interrog. No. 1, Appendix ("A") 23; Fuges Dep. 19:4, A104; FUGES-6, A75.)

2.     In the summer of 2008, Plaintiff applied for and was granted a $10,000

credit line increase, which brought her total credit line to $35,000.  (Fuges Resp. to Def.'s

Interrog. No. 1, A23; Fuges Dep. 18:25-19:10, A103-04.)

3.     In late 2008, Plaintiff sought to purchase a form of insurance for her line

of credit that would have made her loan payments or paid off her loan in the event that Plaintiff

became disabled or passed away.  (Fuges Resp. to Def.'s Interrog. No. 1, A23; Fuges Dep.

24:12-25:10, A107-08.)  PNC informed Plaintiff that she had to "reapply" for her line of credit to

obtain this insurance.  (Fuges Resp. to Def.'s Interrog. No. 1, A23; Fuges Dep. 27:8-10, A110.)

       4.     Plaintiff reapplied for her line of credit and, in addition to requesting

credit insurance, requested that her line be increased to $40,000.  (Fuges Resp. to Def.'s Interrog.

Nos. 1, A23, 3, A24 ; Fuges Dep. 21:14-22:21, A105-06, 27:8-28:13, A110-11.)

       5.     During the application process PNC told Plaintiff that her reapplication

would not be approved unless Plaintiff paid past-due 2008 Philadelphia real estate taxes owed on

952 Bridge Street, *i.e.*, the collateral for the loan.  (Fuges Resp. to Def.'s Interrog. No. 3, A24;

Fuges Dep. 29:5-7, A112.)

       6.     In Philadelphia, property taxes for any given year are due on March 31 of

the same year and, as such, 2008 Philadelphia property taxes were due on or before March 31,

2008.  (Schneider Dep. 43:8-9, A175; Mullucey Dep. 14:13-19, A157.)

       7.     Plaintiff told PNC that her real estate taxes were not past due, and she

ultimately requested that PNC provide her with the document on which it relied for its

information about taxes on her property.  (Fuges Resp. to Def.'s Interrog. No. 3, A24; Fuges

Dep. 45:15-46:2, A117-18.)  PNC gave her a copy of Southwest's report on Ms. Fuges' property.

(Fuges Resp. to Def.'s Interrog. No. 3, A24-26; Fuges Dep. 45:25-47:9, A117-19.)

       8.     The Southwest report, dated November 13, 2008, showed a balance due on

property taxes of $111.11.  (Ex. A to Second Amended Compl. ("SAC"), A17-18.)

       9.     Plaintiff had not paid the 2008 real estate taxes on her home in full by

November 13, 2008 because she had entered into an agreement with the City of Philadelphia to

pay those taxes in twelve equal monthly installments over the year.  (Fuges Dep. 35:13-37:5,

A114-16, 82:3, A126; FUGES-37, A82.)  A taxpayer's agreement with the City is a private

matter between the City and the taxpayer.  (Fuges Dep. 71:2-19, A124.)

   10. The Southwest report on Plaintiff's property also showed a judgment

entered against Robert W. Fuges, Plaintiff's son, in April 2004, and it showed that Plaintiff had

acquired the property from her late husband, Robert Edward Fuges, in April 2005 for $1.  (Ex. A

to SAC, A17-18; Fuges Dep. 52:3-25, A122.)  This information is accurate, as Plaintiff actually

acquired 952 Bridge Street from her husband in 2005 and Plaintiff's son actually had a judgment

entered against him in 2004.  (FUGES-24, A76, 28, A79, 29, A80, 31, A81; Fuges Dep. 52:3-

53:12, A122-23.)

   11. Although Plaintiff's son had paid the judgment debt, he did not, as

instructed by the judgment creditor, file the Praecipe to Satisfy Judgment he received to clear the

judgment from the public record.  (Fuges Dep. 91:3-94:2, A127-30; FUGES-26, A77, 27, A78.)

   12. At the time the judgment was entered against Plaintiff's son, he was living

at 952 Bridge Street and the related Notice of Judgment reflects this.  (FUGES-24, A76.)  Also at

this time, Plaintiff's husband was living at and owned 952 Bridge Street.  (FUGES-28, A79; SW-

189 to 191, A88-90; Fuges Dep. 34:12-20, A113, 73:21-25, A125.)

   13. The Southwest report that Plaintiff was provided by PNC showed

Southwest's name, mailing address, toll-free number, fax number and a Southwest employee's e-

mail address (which included Southwest's domain name, *i.e.*, sfsltd.com).  (Ex. A to SAC, A17-

18; Fuges Dep. 50:3-51:11, A120-21.)

   14. Despite having access to this information, Plaintiff never attempted to

contact Southwest about the report.  (Fuges Dep. 50:17-51:18, A120-21; Fuges Response to

Def.'s Interrog. No. 2, A24-26.)  To the extent her report was in need of correction, she simply

had no interest in contacting Southwest, explaining: "I wasn't going to do the work that somebody else [PNC] was getting paid to do." (Fuges Dep. 51:22-23, A121.)

15.     Although PNC never approved Plaintiff's reapplication, PNC ultimately provided her with the credit insurance for which PNC had required a reapplication. (Fuges Dep. 25:15-27:25, A108-10.)

16.     Plaintiff claims no harm from the denial of her re-application other than that the allegedly inaccurate information was reported to PNC. (Fuges Dep. 101:6-12, A131.)

## II.     SOUTHWEST'S CURRENT OWNER TITLE REPORT BUSINESS

17.     Southwest is in the business of selling reports called current owner title reports, or limited property reports ("Current Owner Reports"). (Schroeder Dep. 13:15-22, A185; Mullucey Dep. 7:13-14, A155.)

18.     A Current Owner Report is a type of title report that summarizes information from public records regarding a particular parcel of property. (Def.'s Resp. to Pl.'s Interrog. No. 12, A38-40; Schroeder Dep. 33:5-34:12, A187; Mullucey Dep. 7:17-19, A155; Hendricks Dep. 149:12-150:2, A144-45.)

19.     A Current Owner Report comprises information on four specific types of public records: deeds, mortgages, real estate taxes and liens. (Ex. A to SAC, A17-18.)

20.     A Current Owner Report is different from a full-blown title report (such as is provided in connection with the issuance of title insurance) in that it traces ownership of the parcel back to the most recent "good sale" (*i.e.*, a sale for good consideration) as opposed to back to the time the parcel was first deeded. (Mullucey Dep. 7:20-8:5, A155.)

21.     Ladner's Pennsylvania real estate law treatise describes a Current Owner Report and contrasts it with a full-blown title report as follows:

In practice, abstractors perform a number of search-type functions, but the most common are a "full" title search and a "present owner" title search.  The so-called full search goes back in time a set number of years.  Many title insurers have underwriting guidelines that require that a search go back in time to the first deed recorded longer ago than 60 years ago….For searches not involving title insurance, local custom and usage will determine the length of time into the past that a searcher should report.  ***The so-called present owner search seeks a report only about the period of time that the current owner has had the property. Second mortgage and home equity lenders who may assume the risk of liens or title defects in the chain of title before the current owner recorded a deed to the property commonly order these searches.***

*Ladner Pa. Real Estate Law* § 20.01 (R. Friedman 5th ed. 2006) (hereinafter "*Ladner*").

22.     Southwest's customers are banks that make home equity and second mortgage loans.  (Schroeder Dep. 15:8-9, A185; Mullucey Dep. 19:15-23, A158.)

23.     Southwest's customers rely on Current Owner Reports to determine if a parcel of real property that an applicant for credit has sought to use as collateral for a loan is encumbered or otherwise impaired and if the person pledging the collateral (not necessarily the applicant) has title to the property.  (Def.'s Resp. to Pl.'s Interrog. No. 12, A38-40; Mullucey Dep. 8:17-9:3, A155-56, 19:15-23, A158.)

24.     When a bank customer orders a Current Owner Report, Southwest directs a title abstractor to perform a title search on the subject property in the public records.  (Def.'s Resp. to Pl.'s Interrog. No. 12, A38-40; Schroeder Dep. 32:21-35:5, A186-87; Mullucey Dep. 31:11-14, A159.)  The information reported back to Southwest by the abstractor forms the basis of the title report.  (Schroeder Dep. 43:23-44:11, A188.)

25.     Southwest contracts with ARA-merican Property Reports, Inc. (previously "American Property Reports, Inc.") to provide title abstract services in Philadelphia.  (Mullucey Dep. 10:20-11:6, A156; SW149-SW153, A83-87.)

26.     The title abstractor searches the public records pertaining to the property, which records may be located in a courthouse, in a land records office or on a governmental entity's website.  (Schroeder Dep. 33:5-34:12, A187.)

27.     With respect to a Current Owner Report pertaining to a property located in Philadelphia County, the abstractor finds deed and mortgage data in land records located in Philadelphia's City Hall (Schneider Dep. 76:7-8, A177; Ryan Dep. 42:5-17, A161), real estate tax data on the website of the Philadelphia Office of Property Assessment (Ryan Dep. 44:4-45:24, A162-63) and lien data in records maintained by the Philadelphia Common Pleas Court and Municipal Court in Room 262 of City Hall (Schneider Dep. 29:17-31:4, A170-72, 32:21-33:1, A173-74).

28.     The only piece of information an abstractor needs to start a title search is a property address.  (Schneider Dep. 22:20-23:2, A167-68.)  No other piece of information is used to initiate a title search.  (Schneider Dep. 21:12-13, A166.)

29.     Lenders sometimes provide Southwest with the name of the consumer offering the property as collateral for the loan (the "Applicant"), as PNC did in the case of Ms. Fuges.  (*See* "In Re" field, Ex. A to SAC, A17.)

30.     However, to the extent an Applicant's name is supplied, it is not used by the person performing the search unless the lender instructs the abstractor to determine whether the Applicant's name appears "in title."  (Schneider Dep. 21:13-16, A166, 26:5-18, A169.)

31.     The property address relevant for the title search conducted by Southwest is the address of the property being offered as collateral, and not the address of the Applicant (if different).  (Schneider Dep. 83:23-85:24, A178-80.)

32.     If, *e.g.*, a daughter living in Maryland were to offer her parents' home in Pennsylvania as collateral for a second mortgage, the lender would order a Current Owner Report on the property in Pennsylvania.  (Schneider Dep. 84:19-85:24, A179-80.)  In such a case, any property the daughter owned in Maryland and any judgments entered against her anywhere (including any in Pennsylvania), would be of no consequence because they could not encumber the collateral, *i.e.*, her parent's property.  (Schneider Dep. 84:19-85:24, A179-80.)

33.     If a Southwest customer orders a Current Owner Report on 123 Main Street today, and another customer orders a Current Owner Report on the same address tomorrow, Southwest conducts two separate searches and generates two separate and distinct Current Owner Reports.  (Schroeder Dep. 47:22-48:6, A189.)

34.     Southwest does not use information from one Current Owner Report to create another report.  (Schroeder Dep. 47:22-48:6, A189.)

35.     Plaintiff's expert, Mr. Evan Hendricks, testified that he is not an expert on Current Owner Reports: "I'm not an expert on property reports."  (Hendricks Dep. 186:11-12, A148.)

36.     Current Owner Reports only include judgment liens, *i.e.,* judgments that have been entered of record and have become liens on real property.  (Schneider Dep. 74:4-8, A176) (explaining that abstractors search for "liens placed against the address").  And these are included only to the extent that they are ***unsatisfied*** (such that they encumber the subject property).  (Schroeder Dep. 61:24-62:4, A190.)

37.     This is confirmed by Southwest's agreement with PNC, which provides that Southwest's reports should only include "liens/judgments of record affecting real property."

(The PNC Agreement is confidential but has been provided to Plaintiff in discovery and, if the Court or Plaintiff believes it should be filed, Southwest will move to file under seal.)

38.     Plaintiff's expert testified that a typical CRA reports **satisfied** judgment liens because, although these do not encumber property, they evidence a consumer's inability or unwillingness to pay a lien in the past, which may be a consideration in making a credit-related decision.  (Hendricks Dep. 65:21-66:9, A136-37.)

39.     Plaintiff's expert testified that the lender from which Plaintiff sought credit, *i.e.*, PNC, would have ordered a credit report from Experian, Equifax or Trans Union ("the Big Three") on Plaintiff as part of the loan application process.  (Hendricks Dep. 82:14-83:11, A139.)

40.     Plaintiff's expert testified that this Big Three report would have included Plaintiff's Social Security Number (Hendricks Dep. 25:18-21, A133, 63:22-64:2, A136), payment history on various debts (64:3-13, A136) and previous addresses (68:25-69:1, A137).

41.     Because Current Owner Reports are generated on properties, they do not include a Social Security Number. (Ex. A to SAC, A17-18; Erbaugh Dep. 35:5-6, A99.)

42.     The public records that Southwest retrieves are not indexed by Social Security Number.  *See Ladner* §§ 20.02-20.03.

43.     Current Owner Reports do not include a consumer's payment history, employer, date of birth, account balances or prior addresses.  (Ex. A to SAC, A17-18.) Plaintiff's expert also testified to this fact.  (Hendricks Dep. 69:13-24, A137.)

44.     Plaintiff's expert asserted that, by reporting on an outstanding lien, the Current Owner Report provides a payment "history."  (Hendricks Dep. 64:3-19, A136, 70:3-15, A138.)

45.     But, Plaintiff's expert explains in his own book that a payment history is a "track record with various lenders" showing over a "length of time" payments made and missed. Evan Hendricks, Credit Scores & Credit Reports: How the System Really Works, What You Can Do 15-16 (1st ed. 2004); *see also* Federal Trade Commission, Facts For Consumers: Building a Better Credit Report, *available at* http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre03.shtm (explaining that a credit report includes the following information: "Payment history: Your accounts with different creditors are listed, showing how much credit has been extended and whether you've paid on time").

46.     Plaintiff's expert testified that those subject to the FCRA, such as the Big Three, maintain "files" on most of the adult population and prepare reports on consumers using the data in these files.  (Hendricks Dep. 108:8-109:13, A143.)

47.     He also testified that when a consumer applies for credit from a lender and that lender orders a credit report from a typical CRA, that CRA accesses its files and immediately produces a detailed report on the consumer based purely upon data already in its possession.  (Hendricks Dep. 108:8-109:13, A143.)

48.     Plaintiff's expert testified that the typical CRA is perpetually gathering and collecting information on the whole population and updating their files with this information. (Hendricks Dep. 109:7-13, A143.)

49.     Southwest does not maintain any "files" from which it creates Current Owner Reports and instead retrieves the pertinent public records information each time a report is ordered.  (Resp. to Pl.'s Interrog. No. 12, A38-40.)

50.     Plaintiff's expert testified that he mis-read a regulation interpreting the Real Estate Settlement Procedures Act, 24 C.F.R. § 3500.2(b), and failed to realize that the

regulation distinguished between title reports (§ 3500.2(b)(4)) and credit reports
(§ 3500.2(b)(7)).  (Hendricks Dep. 258:2-265:14, A152-53.)

       51.      Southwest employs customer service representatives who routinely assist
banks and others with questions about Current Owner Reports, including questions regarding
report accuracy.  (Cole Dep. 16:8-18, A92, 22:23-23:4, A93, 35:9-36:11, A94.)

       52.      Plaintiff's expert testified that no issue of his consumer reports newsletter,
*Privacy Times* (which he has continuously published every two weeks since 1981), includes a
single article or reference to title reports.  (Hendricks Dep. 89:8-18, A140, 94:9-13, A142;
Expert Report 15, A65.)  He also testified that he has never seen any articles or document
suggesting that the privacy principles codified in the FCRA should apply to title reports.
(Hendricks Dep. 164:22-166:3, A146-47.)

       53.      Plaintiff's expert testified that, in all of the times that he has spoken before
Congress and in all of his interactions with consumer advocates and policymakers, he never
heard anyone suggest that the FCRA should apply to title reports.  (Hendricks Dep. 89:19-90:5,
A140-41, 93:23-94:3, A141-42.)

       54.      Plaintiff's expert testified that he was unaware of any guidance from the
FTC regarding title reports.  (Hendricks Dep. 162:21-163:21, A146.)

       55.      Plaintiff's expert testified has never previously asserted or opined that
Current Owner Reports should be subject to the FCRA.  (Hendricks Dep. 94:4-19, A142.)

Respectfully submitted,


*/s/ Darryl J. May*
Darryl J. May
Mark J. Furletti
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

*Attorneys for Defendant*

Dated:  August 1, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE ANN FUGES, on behalf of herself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 2:09-CV-00699- |
| v. | : | LDD |
| | : | |
| SOUTHWEST FINANCIAL SERVICES, LTD., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Darryl J. May
Mark J. Furletti
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

*Attorneys for Defendant*

Dated:  August 1, 2011

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................ iii

I.      INTRODUCTION ............................................................................................ 1

II.     FACTUAL BACKGROUND & PROCEDURAL HISTORY ........................... 3

III.    ARGUMENT .................................................................................................... 4

        A.      The Standard For Entry Of Summary Judgment .................................. 4

        B.      All Of Plaintiff's Claims Must Be Dismissed Because The Uncontroverted
                Evidence Establishes That Southwest's Reports Are Not Subject To The
                FCRA ..................................................................................................... 4

                1.      Were There Any Doubt, The Dodd-Frank Act Establishes That
                        Products Like The Southwest Title Report Are Outside The Scope
                        Of The FCRA ............................................................................... 4

                        a.      Dodd-Frank creates a new regulator and gives it broad
                                powers to interpret and enforce the FCRA as to any
                                "financial product or service" ......................................... 5

                        b.      Dodd-Frank defines "[p]ublic records information
                                retrieval" as outside the scope of the "financial products or
                                services" subject to the Bureau's authority, and the
                                placement of this provision establishes that "[p]ublic
                                records information retrieval" is not subject to the FCRA ............ 6

                2.      Southwest Is Not a Consumer Reporting Agency Subject To The
                        FCRA Because It Reports On *Properties*, Not Consumers ..................... 11

                3.      Southwest Is Not A Consumer Reporting Agency Subject To The
                        FCRA Because It Does Not Maintain Files ............................................. 17

        C.      Even If Southwest Were Subject To The FCRA, Its Actions Were Not
                Willful And, As Such, It Is Not Liable for Statutory Damages ........................... 19

                1.      A Willful Violation Under *Safeco* Requires Conduct That Was
                        Clearly Unlawful At The Time It Occurred .............................................. 19

                2.      Neither The FCRA Nor Any Authoritative Guidance Comes Close
                        To Hinting At Coverage Of Companies That Issue Title Reports ............ 21

D.      Even If Southwest Were Subject To The FCRA, Plaintiff Suffered No
        Injury And Therefore Judgment Must Be Entered For Southwest On Her
        Negligence Claim.................................................................................. 23

E.      Plaintiff's Claims Under 15 U.S.C. § 1681h(c) Fail Because She Never
        Attempted to Contact Southwest ........................................................ 24

IV.   CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...................................................................................................4

*Barkho v. Homecomings Fin., LLC,*
   657 F. Supp. 2d 857 (E.D. Mich. 2009)....................................................................8

*Cahlin v. General Motors Acceptance Corp.,*
   936 F.2d 1151 (11th Cir. 1991) ...............................................................................23

*Cortez v. Trans Union, LLC,*
   617 F.3d 688 (3d Cir. 2010)................................................................................20, 24

*Experian Info. Solutions, Inc. v. Lifelock, Inc.,*
   633 F. Supp. 2d 1104 (C.D. Cal. 2009) ..................................................................12

*Fiscella v. Intelius, Inc.,*
   No. 3:10-cv-186, 2010 WL 2405650 (E.D. Va. June 10, 2010)............................17

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000).................................................................................................10

*Gagliardi v. Equifax Information Servs., LLC,*
   No. 09-1612, 2011 WL 337331 (W.D. Pa. Feb. 3, 2011).................................23, 25

*Harper v. Trans Union, LLC,*
   No. 04-3510, 2009 WL 415940 (E.D. Pa. Feb. 19, 2009) ......................................20

*Konter v. CSC Credit Servs., Inc.,*
   606 F. Supp. 2d 960 (W.D. Wis. 2009) ..................................................................20

*Krajewski v. Amer. Honda Fin. Corp.,*
   557 F. Supp. 2d 596 (E.D. Pa. 2008) ..........................................................19, 20, 22

*Lafferty v. St. Riel,*
   495 F.3d 72 (3d Cir. 2007)........................................................................................7

*Levine v. World Fin. Network Nat. Bank,*
   554 F.3d 1314 (11th Cir. 2009) ...................................................................19, 20, 22

*Murray v. New Cingular Wireless Servs., Inc.,*
   523 F.3d 719 (7th Cir. 2008) ...................................................................................20

*Nunnally v. Equifax Info. Servs., LLC*,
  451 F.3d 768 (11th Cir. 2006) ........................................................................17, 18

*Philbin v. Trans Union Corp.*,
  101 F.3d 957 (3d Cir. 1996).................................................................................23

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)............................................ *passim*

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
  444 U.S. 572 (1980)...............................................................................................7

*United States v. Cooper*,
  396 F.3d 308 (3d Cir. 2005).................................................................................11

*Wachovia Bank v. Schmidt*,
  546 U.S. 303 (2006)...............................................................................................7

## STATUTES

Bank Holding Company Act, 12 U.S.C. § 1843(k) ........................................................9

Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ............................................. *passim*

15 U.S.C. § 6809(3) ....................................................................................................22

Dodd-Frank Wall Street Reform and Comsumer Protection Act, Pub. L. No. 111-203,
  124 Stat. 1376 (2010)................................................................................. *passim*

42 Pa. C.S. § 4303(a) ...................................................................................................14

## OTHER AUTHORITIES

Black's Law Dictionary (9th ed. 2009).........................................................................12

Fed. R. Civ. P. 12(b)(6)..................................................................................................3

Fed. R. Civ. P. 56(a) ......................................................................................................4

Fed. R. Civ. P. 56(c)(2)..................................................................................................4

Federal Trade Commission, Facts For Consumers: Building a Better Credit Report,
  *available at* http://www.ftc.gov/bcp/edu/pubs/consumer/ ......................................15

Evan Hendricks, *Credit Scores & Credit Reports: How the System Really Works, What
  You Can Do* (1st ed. 2004)....................................................................................15

*Ladner Pa. Real Estate Law* (R. Friedman 5th ed. 2006)........................1, 12, 13, 14, 15

National Consumer Law Center, *Fair Credit Reporting* (7th ed. 2010).......................10

*Sutherland Statutes and Statutory Construction*..............................................................................7

Defendant, Southwest Financial Services, Ltd. ("Southwest"), by its undersigned counsel, hereby submits this memorandum of law in support of its Motion for Summary Judgment.

## I.     INTRODUCTION

Southwest is a title search company that sells to Pennsylvania mortgage lenders a type of title report commonly referred to as a current owner report or a limited property report. In describing such reports, the leading treatise on Pennsylvania real estate law, *Ladner Pennsylvania Real Estate Law* (formerly *Ladner on Conveyancing*), explains that they serve the same purpose as the more commonly-known full-blown title report performed in connection with the issuance of title insurance:

> In practice, abstractors perform a number of search-type functions, but the most common are a "full" title search and a "present owner" title search. The so-called full search goes back in time a set number of years. Many title insurers have underwriting guidelines that require that a search go back in time to the first deed recorded longer ago than 60 years ago. . . .  For searches not involving title insurance, local custom and usage will determine the length of time into the past that a searcher should report. ***The so-called present owner search seeks a report only about the period of time that the current owner has had the property. Second mortgage and home equity lenders who may assume the risk of liens or title defects in the chain of title before the current owner recorded a deed to the property commonly order these searches.***

*Ladner Pa. Real Estate Law* § 20.01 (R. Friedman 5th ed. 2006) ("*Ladner*") (emphasis added).

The issue in this case whether a company that performs a current owner search at the request of a mortgage lender, in order to confirm ownership of and any encumbrances on the collateral used to secure the loan, is subject to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*  In bringing this lawsuit, Plaintiff invites this Court to hold – for the first time, anywhere – that title reports, millions of which are ordered each year in connection with

purchase-money mortgages, refinancings and home equity loans, are subject to the FCRA.  This would be a breathtakingly unprecedented ruling.

This Court should refuse Plaintiff's invitation and grant Southwest's Motion for Summary Judgment.  The law is clear that Southwest's current owner title reports are not subject to the FCRA.  First, the Dodd-Frank financial reform bill that President Obama signed into law last summer expressly provides that the FCRA does not reach public record information retrieval services such as Southwest provides.  Second, apart from Dodd-Frank, the FCRA applies exclusively to reports *on consumers*.  The title reports that Southwest sells are on parcels of real property (or the titles thereto), not consumers.  They show whether the pledgor of the collateral (not necessarily the loan applicant) holds good title and whether there are any encumbrances; they do not report on the creditworthiness of the applicant.  Accordingly, title reports have never fallen within the ambit of the FCRA, *and no court has ever held otherwise*.  Finally, the FCRA applies to credit reporting agencies ("CRAs") that generate consumer reports from information maintained in the CRA's files.  Southwest does not prepare reports from information stored in files.  Instead, Southwest performs a new title search and generates a new title report each time it receives an order from one of its bank customers.

Even if Southwest's current owner title reports were found by this Court to be subject to the FCRA, it would be entitled to summary judgment on Plaintiff's claims for statutory damages because such damages require willfulness.  The Supreme Court has held that a violation of the FCRA cannot be willful where the statutory text of the FCRA is not "pellucidly" clear about a defendant's obligation and there is no on-point decision by a court of appeals or a formal interpretation by the Federal Trade Commission.  Nothing of the sort exists here.

And again, even if Southwest were subject to the FCRA, it is entitled to summary

2

judgment on Plaintiff's claim of negligent violations of the FCRA because she suffered no injury.  Finally, her § 1681h(c) claim that Southwest did not provide trained personnel to respond to inquiries depends on the Plaintiff having given notice of any alleged inaccuracy.  Here, Plaintiff consciously chose ***not*** to contact Southwest about her report for the simple reason that "I wasn't going to do the work that somebody else [the lender] was getting paid to do."

## II.     <u>FACTUAL BACKGROUND & PROCEDURAL HISTORY</u>

Southwest incorporates the Statement of Material Facts Which Defendant Contends Are Not In Dispute being filed pursuant to the Court's Motions Practices and Procedures.  Southwest will recite the facts relevant to each point of argument in the Argument section of this Memorandum.

Procedurally, on February 18, 2009, Plaintiff filed a putative class action lawsuit against Southwest for both willful and negligent violations of three sections of the FCRA: § 1681e(b), § 1681g and § 1681i.  [DE No. 1]  Southwest moved for dismissal of these claims under Fed. R. Civ. P. 12(b)(6) [DE No. 10], and this Court granted Southwest's motion as to the claims under § 1681g and § 1681i [DE No. 15].  Plaintiff filed an amended complaint on August 6, 2009, which omitted the two dismissed claims and added two new claims under § 1681h(c) and § 1681e(c).  [DE No.17]  Southwest moved to dismiss the two new claims and the existing claim under § 1681e(b) to the extent that it involved a willful violation [DE No. 19], and this Court denied Southwest's motion [DE No. 23].  After conducting discovery, Plaintiff filed a Second Amended Complaint ("SAC") and added three new claims under § 1681e(a), § 1681b and § 1681e(d).  Thus, in sum, Plaintiff claims that Southwest violated §§ 1681e(b), 1681h(c), 1681e(c), 1681e(a), 1681b and 1681e(d).  [DE No. 44]  At the mutual request of the parties, this Court agreed to consider the parties' motions for summary judgment before Plaintiff's motion for class certification.  [DE No. 46]  Accordingly, Southwest's motion for summary judgment is

now properly before the Court.

## III.   ARGUMENT

### A.   The Standard For Entry Of Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A court on a motion for summary judgment can decide that the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 243 (1986).  When a motion for summary judgment is made and supported, the burden shifts to the non-moving party to point to specific facts indicating that there is a genuine issue for trial. *Id.* at 248 ("a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.") (internal quotation marks and citation omitted). In pointing to such facts a party opposing summary judgment must point to materials in the record that can be presented in a form "that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

### B.   All Of Plaintiff's Claims Must Be Dismissed Because The Uncontroverted Evidence Establishes That Southwest's Reports Are Not Subject To The FCRA

#### 1.   Were There Any Doubt, The Dodd-Frank Act Establishes That Products Like The Southwest Title Report Are Outside The Scope Of The FCRA.

On July 21, 2010, President Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010).  (Because Dodd-Frank is not yet codified, section references will be to the Act itself, the pertinent sections of which are attached as Exh. A hereto.)  Dodd-Frank makes sweeping changes to the regulation of a broad range of consumer financial services, including consumer

reports.  Through these changes, Congress commanded that companies such as Southwest that

provide "public records information retrieval" services are not subject to the FCRA.  (As seen

below Southwest's activities have never been subject to the FCRA but Dodd-Frank powerfully

reinforces that conclusion.)  Accordingly, Plaintiff's contention that Southwest is a CRA subject

to the FCRA is directly contradicted by a recent Act of Congress.

> **a.  Dodd-Frank creates a new regulator and gives it broad powers to interpret and enforce the FCRA as to any "financial product or service"**

Among the most significant provisions of Dodd-Frank are those that create a new

regulatory agency called the Consumer Financial Protection Bureau (the "Bureau").  § 1011.

Dodd-Frank confers on the Bureau broad powers, including the authority to interpret and enforce

a host of laws that regulate consumer financial products or services.  § 1021.  (Prior to the

Bureau's creation, the power to interpret and enforce these laws was generally divided among

multiple federal agencies.  *See* 15 U.S.C. § 1681s (2010).)

One of the laws for which the Bureau has broad authority is the FCRA.[1]  *See*

§ 1002(12)(F) (defining the FCRA as among the many "enumerated consumer laws" that the

Bureau is charged with administering).  Specifically, the Bureau may "administer, enforce, and

otherwise implement" the FCRA, § 1022(a), supervise certain entities with respect to their

compliance with the FCRA, § 1024(b)(1)(A), mandate that all entities subject to the FCRA

provide specific disclosures to consumers, § 1032(a), and require that non-bank entities subject

to the FCRA register with the Bureau, § 1022(c)(7).

---

[1]    Dodd-Frank reserves to the Federal Trade Commission the rulemaking and enforcement authority for two discrete provisions of the FCRA: 15 U.S.C. § 1681m(e) (relating to identity theft) and § 1681w (relating to the disposal of consumer data).  *See* § 1002(12)(F).  Neither of these provisions are at issue in this case.

**b.      Dodd-Frank defines "[p]ublic records information retrieval" as outside the scope of the "financial products or services" subject to the Bureau's authority, and the placement of this provision establishes that "[p]ublic records information retrieval" is not subject to the FCRA**

Dodd-Frank's definition of "financial product or service" is lengthy (comprising nearly 1,200 words) and complex.  It reserves to the Bureau the exclusive or nearly-exclusive regulatory authority for what likely amounts to thousands of different products and services under nearly a score of federal consumer protection laws.  § 1002(12), (15).

For present purposes the definition has five important features: (1) a listing of ten specific activities that constitute a "financial product or service," § 1002(15)(A)(i)-(x) ("Enumerated Activities"); (2) in the ninth Enumerated Activity, a definition of the activities subject to the FCRA, § 1002(15)(A)(ix) (the "FCRA Activities"); (3) a listing of non-credit-related consumer reporting activities subject to the FCRA but excluded from the scope of FCRA Activities (the "FCRA Activities Exception"), § 1002(15)(A)(ix)(I)(cc); (4) a "catch-all" provision (the "Catch-all") that effectively permits the Bureau to reach activities that are not among the Enumerated Activities but that are otherwise financial in nature, § 1002(15)(A)(xi); and (5) a carve out provision (the "Carve Out") that excludes from the Catch-all provision certain activities, including public records information retrieval such as is at issue here, § 1002(15)(B)(i).  As explained below, by placing the retrieval of public records information in the Carve Out (as opposed to in the FCRA Activities Exception), Congress declared that this activity is not an FCRA Activity subject to the FCRA.  (As we proceed through a detailed analysis of the Dodd-Frank provisions, Southwest respectfully suggests that the Court may find it useful to consult the graphical representation of the pertinent statutory provisions found on the next page.)

**The Dodd-Frank Act's Definition of "Financial Product or Service" And Its Impact On "Public Records Information Retrieval"**

---

**Definition of "Financial Product or Service**," § 1002(15)(A)

**Enumerated Activities**, § 1002(15)(A)(i)-(x)
(i) extending credit
(ii) extending or brokering leases
(iii) performing real estate settlement services
(iv) taking deposits
(v) issuing stored value cards
(vi) cashing checks
(vii) processing payments
(viii) advising consumers about their finances
(ix) *engaging in activities subject to FCRA*
(x) collecting debts

**Catch-all**, § 1002(15)(A)(xi)
(xi) *engaging in other financial activities*

---

**FCRA Activities**,
§ 1002(15)(A)(ix)

"[C]ollecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service…"

---

**FCRA Activities Exception**,
§ 1002(15)(A)(ix)(I)(cc)

Providing reports for non-credit purposes, *e.g.*, for an employment decision, a government license or a residential lease or tenancy.

---

**Catch-all**, § 1002(15)(A)(xi)

Offering "such other financial product or service as may be defined by the Bureau…if the Bureau finds that such financial product or service is… conducted…to evade [the law]; or permissible for a bank or for a financial holding company to offer or to provide…and has, or likely will have, a material impact on consumers."

---

**Carve Out**, § 1002(15)(B)(i)

Providing the following services:
(I) identity authentication
(II) fraud or identify theft detection, prevention, or investigation
(III) document retrieval or delivery services
(IV) *public records information retrieval*
(V) anti-money laundering services.

Analysis of the five relevant provisions of Dodd-Frank discussed above and their effect on the meaning of the FCRA is guided by two canons of statutory construction. The first is that statutes such as Dodd-Frank and the FCRA that deal with the same subject matter (credit reporting) are *in pari materia* and should be read together as if they were one. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006) ("[U]nder the *in pari materia* canon, statutes addressing the same subject matter generally should be read 'as if they were one law. . . .'") (citations omitted); *Lafferty v. St. Riel*, 495 F.3d 72, 81-82 (3d Cir. 2007) (describing the "common canon of statutory construction that similar statutes are to be construed similarly. . .") (citations omitted). Application of this canon is particularly appropriate here because Dodd-Frank expressly references the FCRA and tracks its language. *See* § 1002(12), (15)(A)(ix).

The second canon of statutory construction relevant to the analysis is that a newly-enacted statute, such as Dodd-Frank, can clarify the meaning of a pre-existing statute, such as the FCRA, and provide strong evidence of the FCRA's meaning. *See* 2B *Sutherland Statutes and Statutory Construction* § 49:11 ("Where. . . a doubtful meaning [is] clarified by subsequent legislation, such. . . subsequent legislation is strong evidence of the legislative intent of the former statute."); *see also Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596 (1980) ("[W]hile the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight, and particularly so when the precise intent of the enacting Congress is obscure.") (citations and quotations omitted).

Turning back to the statutory text, it is not surprising that Dodd-Frank defines the term "financial product or service" to include, among many other things, FCRA Activities, especially given the Bureau's significant authority with respect to the FCRA:

> The term "financial product or service" means – . . . (ix) collecting, analyzing, maintaining, or providing consumer report information

7

> or other account information, including information relating to the
> credit history of consumers, used or expected to be used in
> connection with any decision regarding the offering or provision of
> a consumer financial product or service. . .

§ 1002(15)(A)(ix).  This portion of the definition of financial product or service combines and

tracks the FCRA's definitions of the two primary entities subject to the FCRA – consumer

reporting agencies and furnishers of information.  *Compare* § 1002(15)(A)(ix) *with* 15 U.S.C.

§ 1681a(f), (d) (defining a CRA as any person engaged in "assembling or evaluating consumer

credit information. . . on [a] consumer" relating to his or her "credit worthiness [or] credit

standing" and "which is used or expected to be used. . . for the purpose of serving as a factor in

establishing the consumer's eligibility for credit. . .") and *Barkho v. Homecomings Fin., LLC*,

657 F. Supp. 2d 857, 864 (E.D. Mich. 2009) ("A 'furnisher' of information is defined as an

'entity. . . which transmits information concerning a particular debt owed by a particular

customer to consumer reporting agencies.'") (quoting *Carney v. Experian Info. Solutions, Inc.*,

57 F. Supp. 2d 496, 501 (W.D. Tenn. 1999)).

   The wide array of regulatory powers conferred on the Bureau by Dodd-Frank are

limited to reports that bear on a consumer's creditworthiness and do not extend to reports with a

non-credit purpose, *i.e.*, a purpose other than "the offering or provision of a consumer financial

product or service." § 1002(15)(A)(ix).  This is so because the FCRA Activities Exception, a

subparagraph of § 1002(15)(A)(ix), provides that entities that, for example, perform employee

background checks or tenant screening, although subject to the FCRA, are not engaged in

offering a ***financial*** product or service:

> [The term "financial product or service" does not include]
> provid[ing] information that is used or expected to be used solely
> in any decision regarding the offering or provision of a product or
> service that is ***not*** a consumer financial product or service,
> including a decision for employment, government licensing, or a
> residential lease or tenancy involving a consumer. . . .

8

§ 1002(15)(A)(ix)(I)(cc) (emphasis added).  Accordingly, although *within* the scope of the FCRA, non-credit-type consumer reports generally fall *outside* the reach of the Bureau's broad regulatory powers pursuant to the FCRA Activities Exception provision.

The definition of financial product or service also includes a Catch-all provision that extends the Bureau's authority beyond the ten Enumerated Activities to "such *other* financial product or service" so long as it is one that could lawfully be offered by a bank or a bank holding company (that is, it is financial in nature)[2] or designed to evade the law. § 1002(15)(A)(xi) (emphasis added).  Congress' use of the term "other" in the Catch-all makes it clear that the Catch-all applies to financial products or services other than the Enumerated Activities in subsections (i) through (x).  As such, a product or service that falls within the scope of the Enumerated Activities (which includes the FCRA Activities) cannot be within the scope of the Catch-all.  Conversely, if an activity is encompassed within the Catch-all, it cannot be one of the Enumerated Activities.

Thus, in the context of consumer reporting, the Catch-all, standing alone, authorizes the Bureau to regulate any activity that is outside the scope of the FCRA (*i.e.*, not among the FCRA Activities) but that is financial in nature and involves potentially consumer-report-related activity.  Congress, however, limited the scope of the Catch-all with the Carve Out, § 1002(15)(B)(i).  The Carve Out excludes from the definition of "financial product or service" the following five report-related activities ("Carve-Out Activities"):

---

[2]      *See* Bank Holding Company Act, 12 U.S.C. § 1843(k) (permitting a bank holding company to "engage in any activity. . . that the Board. . . determines (by regulation or order) – (A) to be *financial in nature or incidental to such financial activity*; or (B) is complementary to a financial activity and does not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally.") (emphasis added).

(I)  Providing information products or services to a covered person
for identity authentication.
(II)  Providing information products or services for fraud or
identify theft detection, prevention, or investigation.
(III)  Providing document retrieval or delivery services.
(IV)  ***Providing public records information retrieval.***
(V)  Providing information products or services for anti-money
laundering activities.

§ 1002(15)(B)(i)(I)-(V) (emphasis added).  Interestingly, consumer advocates (and Plaintiff's

counsel in the instant case) have recently argued (without success) that many of these activities

should be subject to the FCRA.  *See, e.g.,* National Consumer Law Center, *Fair Credit Reporting*

§ 2.3.6.3.2 (7th ed. 2010) (arguing that lists of consumers who have used false Social Security

Numbers to defraud merchants should be considered consumer reports governed by the FCRA).

But the placement of these activities in the Carve Out belies this argument.

By classifying the Carve Out Activities as exceptions to the Catch-all, Congress

mandated that the Carve Out Activities constitute "***other*** financial products or services" that are

not among the Enumerated Activities.  That is, the Carve Out embodies Congress's

determination that the Carve Out Activities are outside the scope of the Enumerated Activities,

including the FCRA Activities.  And since the FCRA Activities comprise all activities covered

by the FCRA except those listed in the FCRA Activities Exception (*i.e.*, those related to non-

credit type reports such as tenant reports), the Carve Out Activities are clearly outside the scope

of the FCRA.  To read the language any other way would ignore the Supreme Court's

admonition to "interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if

possible, all parts into an harmonious whole."  *Food and Drug Admin. v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted).

That this result is compelled by the statutory language is reinforced by

considering an alternate placement of the Carve Out provision.  If Congress had included the

10

Carve Out provision as part of the FCRA Activities Exception, such placement would have shown that the Carve Out Activities were outside the Bureau's jurisdiction but otherwise subject to the FCRA.  But by placing the Carve Out Activities *outside* of the FCRA Activities Exception, Congress made clear that the Carve Out Activities are not subject to the FCRA. Otherwise, the Carve Out and Catch-all would have no significance, an improper outcome.  *See United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005) ("It is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous.").

It is beyond dispute that Southwest provides "public records information retrieval" for its bank clients.  Every bit of information that it retrieves is from public records. Indeed, Plaintiff directly avers in her complaint that "Defendant employs and relies upon various employees and agents for the purposes of compiling public records reports. . . ." (SAC ¶ 6.)  In enacting Dodd-Frank, Congress clarified that entities like Southwest that are engaged in this business are not subject to the FCRA.

### 2.  Southwest Is Not a Consumer Reporting Agency Subject To The FCRA Because It Reports On *Properties*, Not Consumers

Had Congress never enacted Dodd-Frank it would still be abundantly clear that Southwest is not subject to the FCRA, because its Current Owner Reports report on parcels of property, not consumers.  This is established beyond dispute by the content of Southwest's reports and the undisputed facts showing how they are created and used.  (*See* UF Nos. 18-28, 31-34, 36-37, 40-43.)[3]

---

[3]      Pursuant to the Court's Motions Practices and Procedures No. 6, Southwest is submitting a separate Statement of Material Facts Which Defendants Contend Are Not In Dispute. Each of the undisputed facts set forth there is supported by references to the evidentiary

(continued...)

The various sections of the FCRA under which Plaintiff brings her claims impose obligations on a "consumer reporting agency" (a "CRA").  The FCRA defines the term CRA, in relevant part, as "any person which, for monetary fees. . . , regularly engages in. . . the practice of assembling or evaluating consumer credit information or other information *on consumers* for the purpose of furnishing consumer reports to third parties. . . ."  15 U.S.C. § 1681a(f) (emphasis added).  And the FCRA defines the term "consumer" to mean "an individual."  *Id*. at § 1681a(c).  An "individual" is a person, not an entity without corporal form.  *See, e.g., Experian Info. Solutions, Inc. v. Lifelock, Inc.*, 633 F. Supp. 2d 1104, 1107-08 (C.D. Cal. 2009) (holding that companies and entities such as credit repair clinics are not "individuals" under § 1681a(c)).  Read together, the definitions of CRA and "consumer" limit the reach of FCRA to those providing reports "on" individual consumers.

The information in a Current Owner Report is not "on" a consumer, but is rather "on" the subject property, or more accurately, the property's title.  The *Ladner* treatise makes this point clear.  As noted *supra*, Southwest's Current Owner Reports are a species of title search.  A title search is "an examination of *the title of an owner of real estate* (usually a. . . prospective mortgagor) in order to determine whether it[, *i.e.*, the title,] is good and is free and clear of encumbrance."  *Ladner* § 20.01 (emphasis added); *see also* Black's Law Dictionary (9th ed. 2009) (defining "title search" as "[a]n examination of the public records to determine whether any defects or encumbrances exist in a given property's chain of title").  *Ladner* further explains that title searches are done for "purposes of verifying the existence of liens or encumbrances *against the title to the property* in situations when a lender wishes to secure a loan

---

(...continued)

record.  Accordingly, in this brief Southwest will not cite directly to the evidentiary record but to the pertinent undisputed fact(s) ("UF") in the Statement.

with a mortgage upon the property," and that the lender ordering the search "expects a title report from which. . . to know the lien priority *against a potential borrower's property*." *Ladner* § 20.01 (emphasis added).  Thus, title searches have nothing to do with an individual consumer's credit history or standing.

This is confirmed by the fact that the process for preparing a Current Owner Report commences with a single piece of information that is unrelated to a particular consumer – a property address.  (UF No. 28.)  No other piece of information is used to initiate a title search. (*Id*.)  Lenders may provide Southwest with the name of the consumer offering the property as collateral for the loan (the "Applicant"), as PNC did in the case of Plaintiff.  (UF No. 29.) However, to the extent the Applicant's name is supplied, it is not used by the person performing the search unless he or she has been instructed to halt the search if the Applicant's name does not appear "in title."  (UF No. 30.)  That would be the case when the Applicant does not have an ownership interest in the collateral.

Thus, the property address that is relevant for the title search is the address of the property being offered as collateral, not the address of the Applicant.  (UF No. 31.)  Accordingly, if a daughter living in Maryland were to offer her parents' home in Pennsylvania as collateral for a second mortgage, the lender would order a Current Owner Report on the property in Pennsylvania.  (UF No. 32.)  In such a case, any property the daughter owned in Maryland and any judgments entered against her anywhere (including any in Pennsylvania), would be of no consequence to the Southwest report because they could not encumber the collateral, *i.e.*, her parent's property.  (*Id*.)  (As shown below, that does not mean the bank would not learn of judgments against the daughter-Applicant – rather, it would learn of those through an actual credit report issued by an actual CRA, such as Experian.)

Plaintiff's expert, Evan Hendricks, asserted that because judgments are listed in the Current Owner Report and rendered against individual defendants (as opposed to parcels of real property), the Current Owner Report is necessarily "on" a consumer.  (Hendricks Dep. 41:4-42:15, Appendix ("A") 134-35.)  This assertion is flat out wrong, but not surprising given that Mr. Hendricks admitted that he is not an expert on property reports.  (*See* UF No. 35) ("I'm not an expert on property reports.").  While Plaintiff's expert is correct that a judgment is rendered against a person (although as illustrated by the facts of this case, not necessarily the Applicant), once the judgment is entered of record in the appropriate recording office it becomes a lien that encumbers real property owned by the judgment debtor in the county where the court is located. *See* 42 Pa. C.S. § 4303(a) ("Any judgment or other order of a court of common pleas for the payment of money shall be a lien upon real property. . . when it is entered of record in the office of the clerk of the court of common pleas of the county where the real property is situated. . . .").

The Current Owner Reports at issue in this case only includes judgment ***liens***, *i.e.*, judgments that have been entered of record and, as such, have become liens on real property. (*See* UF 36) (describing search of judgment lien database for judgment liens "placed against the address").  Moreover, the contract that Southwest has with PNC provides that Current Owner Reports should only include "liens/judgments ***of record affecting real property***." (emphasis added).[4]

Further proof that a Current Owner Report is not "on" a consumer is that lenders do not use them to evaluate a consumer's creditworthiness.  As *Ladner*, *supra*, explains, lenders

---

[4]     The Agreement is confidential.  To avoid the need to move to file it under seal, Southwest respectfully relies on the quoted passage without submitting the supporting document (which has been produced to Plaintiff in discovery).  If the Court or Plaintiff requests that the Agreement be filed Southwest will be pleased to do so under seal.

use Current Owner Reports solely to validate title and to find liens and other encumbrances.  By

stark contrast, because lenders do evaluate a consumer's creditworthiness before extending

credit, they order actual *consumer* reports from Experian, Equifax or Trans Union (the "Big

Three"), the three nationwide credit reporting agencies that collect credit information on nearly

all consumers in the United States.

       Plaintiff's expert conceded this critical fact, explaining that, as part of the loan

application process, the lender would have ordered a credit report *on Plaintiff* from one of the

Big Three.  (UF No. 39.)  He testified that this report would have included Plaintiff's (1) Social

Security Number, (2) payment history on various debts and (3) previous addresses.  (UF No. 40.)

And, as the Federal Trade Commission ("FTC") explains on a credit reporting website for

consumers, the Big Three report would have also included (4) employment information, (5)

Plaintiff's date of birth and (6) information about Plaintiff's outstanding balances with her

creditors.  *See* Federal Trade Commission, Facts For Consumers: Building a Better Credit

Report, *available at* http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre03.shtm.

       These six elements of information have at least two things in common: they

directly relate to Plaintiff (as opposed to a parcel of property), and none of them can be found on

a Southwest Current Owner Report.  Because Southwest reports are generated on properties, they

do not include a Social Security Number. (*See* UF No. 41.)  (The public records that Southwest

retrieves are not indexed by Social Security Number.  *See Ladner* §§ 20.02-20.03.)  Nor do

Current Owner Reports include a consumer's payment history,[5] employer, date of birth, account

---

[5]     Plaintiff's expert Mr. Hendricks asserted that, by providing information on an
outstanding lien, the Current Owner Report provides a payment "history."  (UF No. 44.)
It does no such thing.  As Mr. Hendricks makes this clear in his own self-published book,
a payment history is a "track record with various lenders" showing over a "length of
time" payments made and missed.  Evan Hendricks, *Credit Scores & Credit Reports:*

(continued...)

balances or prior addresses.  (*See* UF No. 43.)

The adverse consequences of subjecting Current Owner Reports to the FCRA are enormous.  First and foremost, since a Current Owner Report is merely an abbreviated title search, the logical conclusion of Plaintiff's position is that every title report (including full title searches) generated in the United States is subject to the FCRA.  This would be a patently absurd result, and shows the absurdity of Plaintiff's effort to shoehorn Current Owner title reports into the FCRA.  Second, if title reports of any type are subject to the FCRA, then pursuant to 15 U.S.C. § 1681c(a) the reports could not include certain information on mortgages, liens or other encumbrances after seven years.  Accordingly, if a search on a property worth $100,000 turned up an eight-year-old unsatisfied judgment lien for $60,000, the FCRA would prohibit its inclusion on the title report.  For obvious reasons, lenders could not rely on a title report that purposefully excludes encumbrances because of their age.  Finally, if the FCRA applies to title reports, it is far from clear who might be a "consumer" eligible for the law's protections.  Does a prior owner against whom a judgment lien was recorded (whose lien was not discharged in a *bona fide* sale for value) have the right to dispute information on the report?  If an Applicant offers another's property as collateral, does the Applicant have any rights under the FCRA as to

---

(...continued)

*How the System Really Works, What You Can Do* 15-16 (1st ed. 2004).  A title search shows only that at the point in time of the search there is an outstanding judgment or tax lien that affects the property.

This is highlighted by a stark difference in the way that judgment liens are treated in a credit report versus a title report.  As would be expected, judgment liens listed on a Current Owner Reports are only those that remain ***unsatisfied*** and therefore encumber the subject property.  (UF No. 36.)  A typical CRA report, by vivid contrast, also shows ***satisfied*** judgment liens because, although they do not encumber property, they evidence a consumer's inability or unwillingness to pay a lien in the past, which bears on a consumer's creditworthiness.  (UF No. 38.)

the report?  *See Fiscella v. Intelius, Inc.*, No. 3:10-cv-186, 2010 WL 2405650 (E.D. Va. June 10, 2010) (holding that consumer's rights under FCRA are limited to information in a consumer report that is specific to him).  These (and countless other) issues illustrate how, in seeking to apply the FCRA to Southwest, Plaintiff is trying to force a round peg into a square hole, with calamitous consequences.

Current Owner Reports are reports "on" parcels of real property, not consumers, as evidenced by the property-related information they ***do*** contain, the consumer-specific information they ***do not*** contain and how they are used.  They are not subject to the FCRA.

### 3.    Southwest Is Not A Consumer Reporting Agency Subject To The FCRA Because It Does Not Maintain Files

A third, independent basis on which summary judgment should be granted in Southwest's favor is that Southwest is not a CRA because it does not maintain "files" on consumers.  When Southwest receives an order for a Current Owner Report, it does not reach into a pre-existing data repository and retrieve previously-collected public records related to a particular address.  Instead, for each and every order, Southwest collects the public records information afresh.  (UF Nos. 33-34.)

The FCRA defines a "file" as "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored."  15 U.S.C. § 1681a(g) (emphasis added).  A "file" is different than a "consumer report."  *See Nunnally v. Equifax Info. Servs., LLC*, 451 F.3d 768, 773 (11th Cir. 2006) ("To conflate the meaning of 'consumer report' with 'file' would make the terms redundant.").  A "file" comprises all of the data maintained and continuously updated by the CRA from which reports are generated.  *See* 15 U.S.C. § 1681i(a)(6)(B)(ii) (explaining that when a consumer requests a reinvestigation, a CRA must provide the consumer with "a consumer report that is ***based upon***

17

*the consumer's file as that file is revised. . .").*  In contrast, a "consumer report" is snapshot of

what is in the file; it is "based upon" or derivative of the "file."  *Id.*; *see also Nunnally*, 451 F.3d

at 772-72 (explaining that a report is a derivative of the file).

As Plaintiff's expert explained, typical CRAs maintain "files" on most of the

adult population and prepare reports on consumers using the data in these files.  (UF No. 46.)

Accordingly, when a consumer applies for credit from a lender and that lender orders a credit

report from a CRA, the CRA accesses its files and immediately produces a detailed report on the

consumer based purely upon data already in its possession.  (UF No. 47.)  So that it can provide

up-to-date information on a particular consumer at a moment's notice, CRAs are perpetually

gathering and collecting information on the whole population and updating their files with this

information.  (UF No. 48.)

By contrast, Southwest does not maintain any "files" from which it creates

reports.  (UF No. 49.)  When a lender orders a Current Owner Report, Southwest sends an order

to an abstractor to search the relevant public records.  (UF No. 24.)  This person sends back the

results of his or her search, and Southwest creates a report based on this information.  (*Id.*)  If

one bank orders a report on 123 Main Street today, and another bank orders a report on the same

address tomorrow, Southwest conducts two separate searches and generates two separate and

distinct reports.  (UF No. 33.)  It does not use information from one report to create a later report.

(UF No. 34.)

Since Southwest does not maintain files of consumer information and instead

creates a Current Owner Report each time it receives an order, it does not maintain files and is

not subject to the FCRA.

18

**C.      Even If Southwest Were Subject To The FCRA, Its Actions Were Not Willful
And, As Such, It Is Not Liable for Statutory Damages**

Plaintiff asserts that Southwest's alleged violations of the FCRA were "willful"

(SAC ¶ 62) and that, as a result, she is entitled to statutory damages of $100 to $1,000 per class

member (SAC ¶ 63(b)).  But even if Southwest were found by this Court to be subject to the

FCRA, its actions do not come close to being willful because such finding would be the very first

time that any legal authority would have held that title reports are consumer reports subject to the

FCRA.  Squarely applicable Supreme Court authority precludes a finding of willfulness absent

an appellate or formal regulatory decision on the disputed issue, and such regulatory authority or

appellate decision simply does not exist.

**1.      A Willful Violation Under *Safeco* Requires Conduct That Was
Clearly Unlawful At The Time It Occurred**

In *Safeco Ins. Co. of Am. v. Burr*, the Supreme Court held that, even when a court

finds a clear violation of the FCRA, there can be no willful violation of the FCRA unless the

defendant's conduct was "objectively unreasonable" in light of "legal rules that were 'clearly

established' at the time."  551 U.S. 47, 69-70 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202

(2001)).  Thus, the defendant is entitled to summary judgment on a claim for a willful violation

unless the conduct at issue was clearly unlawful as established by either "pellucid statutory text"

or an "authoritative" interpretation of that text by a federal court of appeals or the FTC.  *Id.* at

70; *see also Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314, 1318-19 (11th Cir. 2009);

*Krajewski v. Amer. Honda Fin. Corp.*, 557 F. Supp. 2d 596, 617-18 (E.D. Pa. 2008).

To establish a willful violation of the FCRA, a plaintiff must prove that the

defendant acted in "reckless disregard" of its duty under the statute.  *Safeco*, 551 U.S. at 68-70.

*Safeco* set forth a stringent test designed to ensure that defendants are not faced with the

potentially annihilating damages available in willfulness actions unless "the company ran a risk

of violating the law substantially greater than the risk associated with a reading [of the FCRA] that was merely careless." 551 U.S. at 69. The test presents a pure question of law that may be decided on a motion for summary judgment. *Safeco*, 551 U.S. at 70 n.20. *See Levine*, 554 F.3d at 1319; *see also Konter v. CSC Credit Servs., Inc.*, 606 F. Supp. 2d 960, 970-72 (W.D. Wis. 2009) (holding on summary judgment motion that defendant did not act willfully under FCRA); *Krajewski*, 557 F. Supp. 2d at 618 (same); *Harper v. Trans Union, LLC*, No. 04-3510, 2009 WL 415940 (E.D. Pa. Feb. 19, 2009) (same).[6] So long as the defendant's position that its conduct was lawful "could reasonably have found support in the courts," the defendant is entitled to summary judgment. *Safeco*, 551 U.S. at 70 n.20.

The *Safeco* test is objective and does not depend in any way on the defendant's state of mind. *See Levine*, 554 F.3d at 1319 ("*Safeco* instructs us not to consider the subjective intent of [the defendant].").  Accordingly, even "evidence of subjective bad faith" cannot support a willfulness finding when there is an "objectively reasonable" interpretation of the FCRA under which the conduct at issue was lawful. *Safeco*, 551 U.S. at 70 n.20; *Murray v. New Cingular*

---

[6]    *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010), illustrates that the question whether conduct is done in reckless disregard of clear law is a question of law for the court. There, Trans Union, which for obvious reasons has long recognized that it is subject to the FCRA, argued that information linking a particular consumer to terrorism on a traditional consumer report (entitled "TRANSUNION CREDIT REPORT") was not clearly subject to the FCRA. *Id*. at 699, 706-08. The Third Circuit did not find the issue to be a close one and held that, as a matter of law, the FCRA is pellucidly clear about its application to all information on a consumer report, including terrorist alerts. *Id*. at 722. As to the separate inquiry of whether Trans Union acted willfully in dealing with plaintiff, the court of appeals went on to uphold the jury's conclusion that Trans Union acted willfully by completely ignoring the plaintiff's repeated pleas to not report her as a terrorist. *Id*. By contrast, the FCRA is not pellucidly clear that it reaches Current Owner Reports; in fact, as established *supra*, the opposite is true. Accordingly, under *Safeco* and *Cortez*, not only may this case be decided on summary judgment, but summary judgment must be entered in favor of Southwest because there is no authority providing that title reports are subject to the FCRA.

*Wireless Servs., Inc.*, 523 F.3d 719, 726-27 (7th Cir. 2008) (noting that willfulness standard is "objective" and any inquiry into whether defendant "kn[ew] it was violating the Act" is "erroneous in light of Safeco").

### 2.   Neither The FCRA Nor Any Authoritative Guidance Comes Close To Hinting At Coverage Of Companies That Issue Title Reports

As discussed at length in Section III.B., *supra*, it is hard to imagine how the FCRA could be more pellucid about its ***not*** applying to a company that produces title reports. That discussion will not be repeated here.  Rather, what is critical is that because, at the least, the text of the FCRA is not pellucidly clear in favor of Plaintiff's position, Plaintiff must identify an on-point appellate decision or authoritative FTC guidance, or else summary judgment must be entered against her.

That she cannot do.  There is simply nothing from the federal circuit courts or the FTC holding that title reports of any sort are subject to the FCRA.  Moreover, to Southwest's knowledge there is not even a single decision by ***any*** court anywhere in the United States holding that a title report is subject to the FCRA.  Nor is there even ***informal*** FTC guidance on point.

Any question about the above is dispelled by Plaintiff's own expert, Evan Hendricks who has been following the credit reporting industry for 30 years, has written a book and many articles about credit reporting and has testified before Congress on credit reporting numerous times.  Mr. Hendricks has never ***written or even seen an article suggesting that title reports are subject to the FCRA***.  (UF Nos. 51-52.)  Strikingly, Mr. Hendricks testified that***, apart from this case, he has never heard anyone, anywhere, including in Congress or at the FTC, suggest such a proposition***.  (UF Nos. 53-54.)

In the absence of any guidance regarding title reports, Plaintiff's expert opined that Southwest should have been on notice of its purported coverage under the FCRA by drawing

inferences from various FCRA-related developments over the past 20 years that have nothing to do with title reports.  (*See* Plaintiff's Expert Report 5-12, A55-62.)  As an initial matter, it is not enough under *Safeco* to merely rattle off a series of unrelated events.  Either the text of the FCRA, an opinion by a federal court of appeals or authoritative guidance from the FTC must speak to the precise issue.  *See Safeco*, 551 U.S. at 69 (specifically framing the issue that neither the pellucid text of the FCRA nor any authoritative guidance addressed); *Levine*, 554 F.3d at 1318 (same); *Krajewski*, 557 F. Supp. 2d at 618 (same).  There is no such statutory text or opinion here.

Indeed, Plaintiff's Expert Report actually confirms that on the subject of title reports there is a "dearth of guidance," *Safeco*, 551 U.S. at 70, because Mr. Hendricks would have undoubtedly trumpeted any development remotely related to such reports, had there been any.  Instead, he offers purported warning signs whose connection to title reports could not be more non-existent.  He claims, without explanation, that an action by the FTC against companies that sold "individual medical profiles, including prescription drug purchase histories," should have put Southwest on notice about title reports being subject to the FCRA.  (Expert Report 8-9, A58-59.)  He claims the same as to the Gramm-Leach-Bliley Act (Expert Report 11-12, A61-62), a privacy law whose coverage is in no way contingent upon coverage under the FCRA.  *See* 15 U.S.C. § 6809(3) (defining entities to which law applies as those engaged in "financial activities").

Plaintiff's Expert Report also asserts that various developments involving companies that sell so-called "trimerge reports" (reports that combine information from each of the Big Three into one) should have put companies selling title reports on notice.  (Expert Report 5-13, A55-63; Hendricks Dep. 241:3-248:3, A149-51.)  But since these are nothing other than

combined Big Three reports that nobody would ever dispute being consumer reports under the FCRA, these developments have absolutely no bearing on Southwest's situation.

Space limitations preclude discussion of Mr. Hendricks' other purported  warning signs but they are either just as far-fetched or just plain wrong – such as in the case of a purported clue contained in the Real Estate Settlement Procedures Act ("RESPA"), where Mr. Hendricks was forced to admit he simply mis-read the RESPA regulation.  (UF No. 50.)  In sum, Mr. Hendricks, by admitting that there is no authority of any kind for the proposition that reports on collateral pledged for a loan are subject to the FCRA – while concocting far-afield warning signs that have nothing to do with property reports – himself answered the willfulness question dispositively:  Southwest is entitled to summary judgment under *Safeco*.

> **D.     Even If Southwest Were Subject To The FCRA, Plaintiff Suffered No Injury And Therefore Judgment Must Be Entered For Southwest On Her Negligence Claim**

Southwest is also entitled to summary judgment on Plaintiff's claim that it *negligently* violated the FCRA (SAC ¶ 62) because Plaintiff suffered no damage as a result of Southwest's alleged violations.  The FCRA provides that "[a]ny person who is negligent in failing to comply with [the law]…is liable…[for] any actual damages sustained by the consumer as a result of the failure."  15 U.S.C. § 1681o(a)(1).  In the absence of any actual damages, there can be no negligent violation of the statute.  *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996) (explaining that an element of a negligent violation is that "the consumer suffered injury"); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991) ("We need not reach the substance of Cahlin's FCRA claims against TRW because we find that he has utterly failed to produce any evidence tending to show that he was damaged as a result of an allegedly inaccurate TRW credit report."); *Gagliardi v. Equifax Information Servs., LLC*, No. 09-1612, 2011 WL 337331, at *12 (W.D. Pa. Feb. 3, 2011) ("Even if Gagliardi could show that

his statutory rights were violated, he would be unable to demonstrate that he sustained damages 'as a result of' Equifax's failure to comply with the FCRA.").

Plaintiff testified that the sole reason she submitted her application to PNC was to obtain credit insurance for an existing credit line.  (UF No. 4.)  She obtained this insurance even though her application was denied.  (UF No. 15.)  She explicitly testified that she suffered no damage other than that the allegedly inaccurate information was reported to PNC.  (UF No. 16.)  In short, Plaintiff obtained the insurance she was seeking and does not even claim any other harm as a result of the alleged inaccuracies in the Current Owner Report.  Accordingly, judgment on her negligent violation claim must be entered for Southwest.

**E.      Plaintiff's Claims Under 15 U.S.C. § 1681h(c) Fail Because She Never Attempted to Contact Southwest**

Even apart from Southwest being entitled to complete summary judgment on all claims for the numerous reasons stated above, if *arguendo* the Southwest Current Owner Report was a credit report for which any claim under the FCRA could go forward, one particular claim warrants special mention because it highlights how radically different this case is from a true FCRA case like *Cortez*, *supra*, where the plaintiff repeatedly tried to correct negative personal information about her (in *Cortez*, that she was a potential terrorist) but the CRA does not respond.

Plaintiff's § 1681(h)(c) claim is that Southwest did not make trained personnel available to respond to consumer inquiries or complaints.  The plain language of § 1681h(c) imposes the requirement of making trained personnel available not in a hypothetical situation, but in the context of a concrete question from an actual consumer.  *See id*. at § 1681h(c) ("Any consumer reporting agency shall provide trained personnel ***to explain to the consumer*** any information furnished to him pursuant to section 1681g of this title.") (emphasis added).

24

Accordingly, in the absence of an inquiry from a consumer, the obligations of § 1681h(c) are not triggered.  *See Gagliardi*, 2011 WL 337331, at *11 ("Since the record contains no evidence suggesting that [plaintiff] properly contacted the trained personnel employed by Equifax, no reasonable trier of fact could conclude that Equifax violated § 1681h(c).").

The facts here are striking.  It is undisputed that Plaintiff never attempted to contact Southwest.  (UF No. 14.)  This was not because Plaintiff did not have Southwest's contact information; to the contrary, Plaintiff testified that she had Southwest's phone number, fax number and email address.  (UF No. 13.)  Rather, when asked why she never contacted Southwest, Plaintiff proclaimed "***I wasn't going to do the work that somebody else [the lender] was getting paid to do.***"  (UF No. 14) (emphasis added).

## IV.  CONCLUSION

For the foregoing reasons, Defendant Southwest Financial Services, Ltd. respectfully requests that summary judgment be entered in its favor and against Plaintiff, with costs and such other relief as authorized by law.

Respectfully submitted,

*/s/ Darryl J. May*
Darryl J. May
Mark J. Furletti
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

Dated:  August 1, 2011                    *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused true and correct copies of the foregoing

Defendant Southwest Financial Services, Ltd.'s Motion for Summary Judgment, memorandum

of law in support thereof, Statement of Material Facts which Defendant Contends are Not in

Dispute, and supporting appendix to be served by ECF filing upon:

> John Soumilas
> Francis & Mailman, P.C.
> Land Title Building, 19th Floor
> 100 S. Broad Street
> Philadelphia, PA 19110
> jsoumilas@consumerlawfirm.com

> */s/ Mark J. Furletti*
> Mark J. Furletti

Dated: August 1, 2011