# EXHIBIT A

(15 U.S.C. 80a-24(f)) shall be deposited into the Reserve Fund.

"(B) LIMITATIONS.—For any 1 fiscal year—

"(i) the amount deposited in the Fund may not exceed $50,000,000; and

"(ii) the balance in the Fund may not exceed $100,000,000.

"(C) EXCESS FEES.—Any amounts in excess of the limitations described in subparagraph (B) that the Commission collects from registration fees under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)) or section 24(f) of the Investment Company Act of 1940 (15 U.S.C. 80a-24(f)) shall be deposited in the General Fund of the Treasury of the United States and shall not be available for obligation by the Commission.

"(3) USE OF AMOUNTS IN RESERVE FUND.—The Commission may obligate amounts in the Reserve Fund, not to exceed a total of $100,000,000 in any 1 fiscal year, as the Commission determines is necessary to carry out the functions of the Commission. Any amounts in the reserve fund shall remain available until expended. Not later than 10 days after the date on which the Commission obligates amounts under this paragraph, the Commission shall notify Congress of the date, amount, and purpose of the obligation.

"(4) RULE OF CONSTRUCTION.—Amounts collected and deposited in the Reserve Fund shall not be construed to be Government funds or appropriated monies and shall not be subject to apportionment for the purpose of chapter 15 of title 31, United States Code, or under any other authority.".

(2) EFFECTIVE DATE.—The amendment made by this subsection shall take effect on October 1, 2011.

# TITLE X—BUREAU OF CONSUMER FINANCIAL PROTECTION

**SEC. 1001. SHORT TITLE.**

This title may be cited as the "Consumer Financial Protection Act of 2010".

**SEC. 1002. DEFINITIONS.**

Except as otherwise provided in this title, for purposes of this title, the following definitions shall apply:

(1) AFFILIATE.—The term "affiliate" means any person that controls, is controlled by, or is under common control with another person.

(2) BUREAU.—The term "Bureau" means the Bureau of Consumer Financial Protection.

(3) BUSINESS OF INSURANCE.—The term "business of insurance" means the writing of insurance or the reinsuring of risks by an insurer, including all acts necessary to such writing or reinsuring and the activities relating to the writing of insurance or the reinsuring of risks conducted by persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons.

H. R. 4173—581

(4) CONSUMER.—The term "consumer" means an individual or an agent, trustee, or representative acting on behalf of an individual.

(5) CONSUMER FINANCIAL PRODUCT OR SERVICE.—The term "consumer financial product or service" means any financial product or service that is described in one or more categories under—

(A) paragraph (15) and is offered or provided for use by consumers primarily for personal, family, or household purposes; or

(B) clause (i), (iii), (ix), or (x) of paragraph (15)(A), and is delivered, offered, or provided in connection with a consumer financial product or service referred to in subparagraph (A).

(6) COVERED PERSON.—The term "covered person" means—

(A) any person that engages in offering or providing a consumer financial product or service; and

(B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person.

(7) CREDIT.—The term "credit" means the right granted by a person to a consumer to defer payment of a debt, incur debt and defer its payment, or purchase property or services and defer payment for such purchase.

(8) DEPOSIT-TAKING ACTIVITY.—The term "deposit-taking activity" means—

(A) the acceptance of deposits, maintenance of deposit accounts, or the provision of services related to the acceptance of deposits or the maintenance of deposit accounts;

(B) the acceptance of funds, the provision of other services related to the acceptance of funds, or the maintenance of member share accounts by a credit union; or

(C) the receipt of funds or the equivalent thereof, as the Bureau may determine by rule or order, received or held by a covered person (or an agent for a covered person) for the purpose of facilitating a payment or transferring funds or value of funds between a consumer and a third party.

(9) DESIGNATED TRANSFER DATE.—The term "designated transfer date" means the date established under section 1062.

(10) DIRECTOR.—The term "Director" means the Director of the Bureau.

(11) ELECTRONIC CONDUIT SERVICES.—The term "electronic conduit services"—

(A) means the provision, by a person, of electronic data transmission, routing, intermediate or transient storage, or connections to a telecommunications system or network; and

(B) does not include a person that provides electronic conduit services if, when providing such services, the person—

(i) selects or modifies the content of the electronic data;

(ii) transmits, routes, stores, or provides connections for electronic data, including financial data, in a manner that such financial data is differentiated from other types of data of the same form that such

person transmits, routes, or stores, or with respect to which, provides connections; or

(iii) is a payee, payor, correspondent, or similar party to a payment transaction with a consumer.

(12) ENUMERATED CONSUMER LAWS.—Except as otherwise specifically provided in section 1029, subtitle G or subtitle H, the term "enumerated consumer laws" means—

(A) the Alternative Mortgage Transaction Parity Act of 1982 (12 U.S.C. 3801 et seq.);

(B) the Consumer Leasing Act of 1976 (15 U.S.C. 1667 et seq.);

(C) the Electronic Fund Transfer Act (15 U.S.C. 1693 et seq.), except with respect to section 920 of that Act;

(D) the Equal Credit Opportunity Act (15 U.S.C. 1691 et seq.);

(E) the Fair Credit Billing Act (15 U.S.C. 1666 et seq.);

(F) the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.), except with respect to sections 615(e) and 628 of that Act (15 U.S.C. 1681m(e), 1681w);

(G) the Home Owners Protection Act of 1998 (12 U.S.C. 4901 et seq.);

(H) the Fair Debt Collection Practices Act (15 U.S.C. 1692 et seq.);

(I) subsections (b) through (f) of section 43 of the Federal Deposit Insurance Act (12 U.S.C. 1831t(c)–(f));

(J) sections 502 through 509 of the Gramm-Leach-Bliley Act (15 U.S.C. 6802–6809) except for section 505 as it applies to section 501(b);

(K) the Home Mortgage Disclosure Act of 1975 (12 U.S.C. 2801 et seq.);

(L) the Home Ownership and Equity Protection Act of 1994 (15 U.S.C. 1601 note);

(M) the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2601 et seq.);

(N) the S.A.F.E. Mortgage Licensing Act of 2008 (12 U.S.C. 5101 et seq.);

(O) the Truth in Lending Act (15 U.S.C. 1601 et seq.);

(P) the Truth in Savings Act (12 U.S.C. 4301 et seq.);

(Q) section 626 of the Omnibus Appropriations Act, 2009 (Public Law 111–8); and

(R) the Interstate Land Sales Full Disclosure Act (15 U.S.C. 1701).

(13) FAIR LENDING.—The term "fair lending" means fair, equitable, and nondiscriminatory access to credit for consumers.

(14) FEDERAL CONSUMER FINANCIAL LAW.—The term "Federal consumer financial law" means the provisions of this title, the enumerated consumer laws, the laws for which authorities are transferred under subtitles F and H, and any rule or order prescribed by the Bureau under this title, an enumerated consumer law, or pursuant to the authorities transferred under subtitles F and H. The term does not include the Federal Trade Commission Act.

(15) FINANCIAL PRODUCT OR SERVICE.—

(A) IN GENERAL.—The term "financial product or service" means—

H. R. 4173—583

(i) extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit (other than solely extending commercial credit to a person who originates consumer credit transactions);

(ii) extending or brokering leases of personal or real property that are the functional equivalent of pur-chase finance arrangements, if—

(I) the lease is on a non-operating basis;

(II) the initial term of the lease is at least 90 days; and

(III) in the case of a lease involving real prop-erty, at the inception of the initial lease, the trans-action is intended to result in ownership of the leased property to be transferred to the lessee, subject to standards prescribed by the Bureau;

(iii) providing real estate settlement services, except such services excluded under subparagraph (C), or performing appraisals of real estate or personal property;

(iv) engaging in deposit-taking activities, transmit-ting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer;

(v) selling, providing, or issuing stored value or payment instruments, except that, in the case of a sale of, or transaction to reload, stored value, only if the seller exercises substantial control over the terms or conditions of the stored value provided to the con-sumer where, for purposes of this clause—

(I) a seller shall not be found to exercise substantial control over the terms or conditions of the stored value if the seller is not a party to the contract with the consumer for the stored value product, and another person is principally responsible for establishing the terms or conditions of the stored value; and

(II) advertising the nonfinancial goods or serv-ices of the seller on the stored value card or device is not in itself an exercise of substantial control over the terms or conditions;

(vi) providing check cashing, check collection, or check guaranty services;

(vii) providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data, including payments made through an online banking system or mobile telecommunications network, except that a person shall not be deemed to be a covered person with respect to financial data processing solely because the person—

H. R. 4173—584

(I) is a merchant, retailer, or seller of any nonfinancial good or service who engages in financial data processing by transmitting or storing payments data about a consumer exclusively for purpose of initiating payments instructions by the consumer to pay such person for the purchase of, or to complete a commercial transaction for, such nonfinancial good or service sold directly by such person to the consumer; or

(II) provides access to a host server to a person for purposes of enabling that person to establish and maintain a website;

(viii) providing financial advisory services (other than services relating to securities provided by a person regulated by the Commission or a person regulated by a State securities Commission, but only to the extent that such person acts in a regulated capacity) to consumers on individual financial matters or relating to proprietary financial products or services (other than by publishing any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation, including publishing market data, news, or data analytics or investment information or recommendations that are not tailored to the individual needs of a particular consumer), including—

(I) providing credit counseling to any consumer; and

(II) providing services to assist a consumer with debt management or debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure;

(ix) collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service, except to the extent that—

(I) a person—

(aa) collects, analyzes, or maintains information that relates solely to the transactions between a consumer and such person;

(bb) provides the information described in item (aa) to an affiliate of such person; or

(cc) provides information that is used or expected to be used solely in any decision regarding the offering or provision of a product or service that is not a consumer financial product or service, including a decision for employment, government licensing, or a residential lease or tenancy involving a consumer; and

(II) the information described in subclause (I)(aa) is not used by such person or affiliate in connection with any decision regarding the offering or provision of a consumer financial product or

service to the consumer, other than credit described in section 1027(a)(2)(A);

(x) collecting debt related to any consumer financial product or service; and

(xi) such other financial product or service as may be defined by the Bureau, by regulation, for purposes of this title, if the Bureau finds that such financial product or service is—

(I) entered into or conducted as a subterfuge or with a purpose to evade any Federal consumer financial law; or

(II) permissible for a bank or for a financial holding company to offer or to provide under any provision of a Federal law or regulation applicable to a bank or a financial holding company, and has, or likely will have, a material impact on consumers.

(B) RULE OF CONSTRUCTION.—

(i) IN GENERAL.—For purposes of subparagraph (A)(xi)(II), and subject to clause (ii) of this subparagraph, the following activities provided to a covered person shall not, for purposes of this title, be considered incidental or complementary to a financial activity permissible for a financial holding company to engage in under any provision of a Federal law or regulation applicable to a financial holding company:

(I) Providing information products or services to a covered person for identity authentication.

(II) Providing information products or services for fraud or identify theft detection, prevention, or investigation.

(III) Providing document retrieval or delivery services.

(IV) Providing public records information retrieval.

(V) Providing information products or services for anti-money laundering activities.

(ii) LIMITATION.—Nothing in clause (i) may be construed as modifying or limiting the authority of the Bureau to exercise any—

(I) examination or enforcement powers authority under this title with respect to a covered person or service provider engaging in an activity described in subparagraph (A)(ix); or

(II) powers authorized by this title to prescribe rules, issue orders, or take other actions under any enumerated consumer law or law for which the authorities are transferred under subtitle F or H.

(C) EXCLUSIONS.—The term "financial product or service" does not include—

(i) the business of insurance; or

(ii) electronic conduit services.

(16) FOREIGN EXCHANGE.—The term "foreign exchange" means the exchange, for compensation, of currency of the United States or of a foreign government for currency of another government.

H. R. 4173—586

(17) INSURED CREDIT UNION.—The term "insured credit union" has the same meaning as in section 101 of the Federal Credit Union Act (12 U.S.C. 1752).

(18) PAYMENT INSTRUMENT.—The term "payment instrument" means a check, draft, warrant, money order, traveler's check, electronic instrument, or other instrument, payment of funds, or monetary value (other than currency).

(19) PERSON.—The term "person" means an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity.

(20) PERSON REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION.—The term "person regulated by the Commodity Futures Trading Commission" means any person that is registered, or required by statute or regulation to be registered, with the Commodity Futures Trading Commission, but only to the extent that the activities of such person are subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act.

(21) PERSON REGULATED BY THE COMMISSION.—The term "person regulated by the Commission" means a person who is—

(A) a broker or dealer that is required to be registered under the Securities Exchange Act of 1934;

(B) an investment adviser that is registered under the Investment Advisers Act of 1940;

(C) an investment company that is required to be registered under the Investment Company Act of 1940, and any company that has elected to be regulated as a business development company under that Act;

(D) a national securities exchange that is required to be registered under the Securities Exchange Act of 1934;

(E) a transfer agent that is required to be registered under the Securities Exchange Act of 1934;

(F) a clearing corporation that is required to be registered under the Securities Exchange Act of 1934;

(G) any self-regulatory organization that is required to be registered with the Commission;

(H) any nationally recognized statistical rating organization that is required to be registered with the Commission;

(I) any securities information processor that is required to be registered with the Commission;

(J) any municipal securities dealer that is required to be registered with the Commission;

(K) any other person that is required to be registered with the Commission under the Securities Exchange Act of 1934; and

(L) any employee, agent, or contractor acting on behalf of, registered with, or providing services to, any person described in any of subparagraphs (A) through (K), but only to the extent that any person described in any of subparagraphs (A) through (K), or the employee, agent, or contractor of such person, acts in a regulated capacity.

(22) PERSON REGULATED BY A STATE INSURANCE REGULATOR.—The term "person regulated by a State insurance regulator" means any person that is engaged in the business of

H. R. 4173—587

insurance and subject to regulation by any State insurance regulator, but only to the extent that such person acts in such capacity.

(23) PERSON THAT PERFORMS INCOME TAX PREPARATION ACTIVITIES FOR CONSUMERS.—The term "person that performs income tax preparation activities for consumers" means—

(A) any tax return preparer (as defined in section 7701(a)(36) of the Internal Revenue Code of 1986), regardless of whether compensated, but only to the extent that the person acts in such capacity;

(B) any person regulated by the Secretary under section 330 of title 31, United States Code, but only to the extent that the person acts in such capacity; and

(C) any authorized IRS e-file Providers (as defined for purposes of section 7216 of the Internal Revenue Code of 1986), but only to the extent that the person acts in such capacity.

(24) PRUDENTIAL REGULATOR.—The term "prudential regulator" means—

(A) in the case of an insured depository institution or depository institution holding company (as defined in section 3 of the Federal Deposit Insurance Act), or subsidiary of such institution or company, the appropriate Federal banking agency, as that term is defined in section 3 of the Federal Deposit Insurance Act; and

(B) in the case of an insured credit union, the National Credit Union Administration.

(25) RELATED PERSON.—The term "related person"—

(A) shall apply only with respect to a covered person that is not a bank holding company (as that term is defined in section 2 of the Bank Holding Company Act of 1956), credit union, or depository institution;

(B) shall be deemed to mean a covered person for all purposes of any provision of Federal consumer financial law; and

(C) means—

(i) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person;

(ii) any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis) who materially participates in the conduct of the affairs of such covered person; and

(iii) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in any—

(I) violation of any provision of law or regulation; or

(II) breach of a fiduciary duty.

(26) SERVICE PROVIDER.—

(A) IN GENERAL.—The term "service provider" means any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that—

(i) participates in designing, operating, or maintaining the consumer financial product or service; or

(ii) processes transactions relating to the consumer financial product or service (other than unknowingly or incidentally transmitting or processing financial data in a manner that such data is undifferentiated from other types of data of the same form as the person transmits or processes).

(B) EXCEPTIONS.—The term "service provider" does not include a person solely by virtue of such person offering or providing to a covered person—

(i) a support service of a type provided to businesses generally or a similar ministerial service; or

(ii) time or space for an advertisement for a consumer financial product or service through print, newspaper, or electronic media.

(C) RULE OF CONSTRUCTION.—A person that is a service provider shall be deemed to be a covered person to the extent that such person engages in the offering or provision of its own consumer financial product or service.

(27) STATE.—The term "State" means any State, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, Guam, American Samoa, or the United States Virgin Islands or any federally recognized Indian tribe, as defined by the Secretary of the Interior under section 104(a) of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a–1(a)).

(28) STORED VALUE.—

(A) IN GENERAL.—The term "stored value" means funds or monetary value represented in any electronic format, whether or not specially encrypted, and stored or capable of storage on electronic media in such a way as to be retrievable and transferred electronically, and includes a prepaid debit card or product, or any other similar product, regardless of whether the amount of the funds or monetary value may be increased or reloaded.

(B) EXCLUSION.—Notwithstanding subparagraph (A), the term "stored value" does not include a special purpose card or certificate, which shall be defined for purposes of this paragraph as funds or monetary value represented in any electronic format, whether or not specially encrypted, that is—

(i) issued by a merchant, retailer, or other seller of nonfinancial goods or services;

(ii) redeemable only for transactions with the merchant, retailer, or seller of nonfinancial goods or services or with an affiliate of such person, which affiliate itself is a merchant, retailer, or seller of nonfinancial goods or services;

(iii) issued in a specified amount that, except in the case of a card or product used solely for telephone services, may not be increased or reloaded;

(iv) purchased on a prepaid basis in exchange for payment; and

H. R. 4173—589

(v) honored upon presentation to such merchant, retailer, or seller of nonfinancial goods or services or an affiliate of such person, which affiliate itself is a merchant, retailer, or seller of nonfinancial goods or services, only for any nonfinancial goods or services.

(29) TRANSMITTING OR EXCHANGING FUNDS.—The term "transmitting or exchanging funds" means receiving currency, monetary value, or payment instruments from a consumer for the purpose of exchanging or transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or through other businesses that facilitate third-party transfers within the United States or to or from the United States.

# Subtitle A—Bureau of Consumer Financial Protection

**SEC. 1011. ESTABLISHMENT OF THE BUREAU OF CONSUMER FINAN-CIAL PROTECTION.**

(a) BUREAU ESTABLISHED.—There is established in the Federal Reserve System, an independent bureau to be known as the "Bureau of Consumer Financial Protection", which shall regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws. The Bureau shall be considered an Executive agency, as defined in section 105 of title 5, United States Code. Except as otherwise provided expressly by law, all Federal laws dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Bureau.

(b) DIRECTOR AND DEPUTY DIRECTOR.—

(1) IN GENERAL.—There is established the position of the Director, who shall serve as the head of the Bureau.

(2) APPOINTMENT.—Subject to paragraph (3), the Director shall be appointed by the President, by and with the advice and consent of the Senate.

(3) QUALIFICATION.—The President shall nominate the Director from among individuals who are citizens of the United States.

(4) COMPENSATION.—The Director shall be compensated at the rate prescribed for level II of the Executive Schedule under section 5313 of title 5, United States Code.

(5) DEPUTY DIRECTOR.—There is established the position of Deputy Director, who shall—

(A) be appointed by the Director; and

(B) serve as acting Director in the absence or unavailability of the Director.

(c) TERM.—

(1) IN GENERAL.—The Director shall serve for a term of 5 years.

(2) EXPIRATION OF TERM.—An individual may serve as Director after the expiration of the term for which appointed, until a successor has been appointed and qualified.

(3) REMOVAL FOR CAUSE.—The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office.

H. R. 4173—590

(d) SERVICE RESTRICTION.—No Director or Deputy Director may hold any office, position, or employment in any Federal reserve bank, Federal home loan bank, covered person, or service provider during the period of service of such person as Director or Deputy Director.

(e) OFFICES.—The principal office of the Bureau shall be in the District of Columbia. The Director may establish regional offices of the Bureau, including in cities in which the Federal reserve banks, or branches of such banks, are located, in order to carry out the responsibilities assigned to the Bureau under the Federal consumer financial laws.

**SEC. 1012. EXECUTIVE AND ADMINISTRATIVE POWERS.**

(a) POWERS OF THE BUREAU.—The Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including—

(1) the establishment of rules for conducting the general business of the Bureau, in a manner not inconsistent with this title;

(2) to bind the Bureau and enter into contracts;

(3) directing the establishment and maintenance of divisions or other offices within the Bureau, in order to carry out the responsibilities under the Federal consumer financial laws, and to satisfy the requirements of other applicable law;

(4) to coordinate and oversee the operation of all administrative, enforcement, and research activities of the Bureau;

(5) to adopt and use a seal;

(6) to determine the character of and the necessity for the obligations and expenditures of the Bureau;

(7) the appointment and supervision of personnel employed by the Bureau;

(8) the distribution of business among personnel appointed and supervised by the Director and among administrative units of the Bureau;

(9) the use and expenditure of funds;

(10) implementing the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions; and

(11) performing such other functions as may be authorized or required by law.

(b) DELEGATION OF AUTHORITY.—The Director of the Bureau may delegate to any duly authorized employee, representative, or agent any power vested in the Bureau by law.

(c) AUTONOMY OF THE BUREAU.—

(1) COORDINATION WITH THE BOARD OF GOVERNORS.—Notwithstanding any other provision of law applicable to the supervision or examination of persons with respect to Federal consumer financial laws, the Board of Governors may delegate to the Bureau the authorities to examine persons subject to the jurisdiction of the Board of Governors for compliance with the Federal consumer financial laws.

(2) AUTONOMY.—Notwithstanding the authorities granted to the Board of Governors under the Federal Reserve Act, the Board of Governors may not—

(A) intervene in any matter or proceeding before the Director, including examinations or enforcement actions, unless otherwise specifically provided by law;

H. R. 4173—591

(B) appoint, direct, or remove any officer or employee of the Bureau; or

(C) merge or consolidate the Bureau, or any of the functions or responsibilities of the Bureau, with any division or office of the Board of Governors or the Federal reserve banks.

(3) RULES AND ORDERS.—No rule or order of the Bureau shall be subject to approval or review by the Board of Governors. The Board of Governors may not delay or prevent the issuance of any rule or order of the Bureau.

(4) RECOMMENDATIONS AND TESTIMONY.—No officer or agency of the United States shall have any authority to require the Director or any other officer of the Bureau to submit legislative recommendations, or testimony or comments on legislation, to any officer or agency of the United States for approval, comments, or review prior to the submission of such recommendations, testimony, or comments to the Congress, if such recommendations, testimony, or comments to the Congress include a statement indicating that the views expressed therein are those of the Director or such officer, and do not necessarily reflect the views of the Board of Governors or the President.

(5) CLARIFICATION OF AUTONOMY OF THE BUREAU IN LEGAL PROCEEDINGS.—The Bureau shall not be liable under any provision of law for any action or inaction of the Board of Governors, and the Board of Governors shall not be liable under any provision of law for any action or inaction of the Bureau.

**SEC. 1013. ADMINISTRATION.**

(a) PERSONNEL.—

(1) APPOINTMENT.—

(A) IN GENERAL.—The Director may fix the number of, and appoint and direct, all employees of the Bureau, in accordance with the applicable provisions of title 5, United States Code.

(B) EMPLOYEES OF THE BUREAU.—The Director is authorized to employ attorneys, compliance examiners, compliance supervision analysts, economists, statisticians, and other employees as may be deemed necessary to conduct the business of the Bureau. Unless otherwise provided expressly by law, any individual appointed under this section shall be an employee as defined in section 2105 of title 5, United States Code, and subject to the provisions of such title and other laws generally applicable to the employees of an Executive agency.

(C) WAIVER AUTHORITY.—

(i) IN GENERAL.—In making any appointment under subparagraph (A), the Director may waive the requirements of chapter 33 of title 5, United States Code, and the regulations implementing such chapter, to the extent necessary to appoint employees on terms and conditions that are consistent with those set forth in section 11(l) of the Federal Reserve Act (12 U.S.C. 248(l)), while providing for—

(I) fair, credible, and transparent methods of establishing qualification requirements for, recruitment for, and appointments to positions;

H. R. 4173—592

(II) fair and open competition and equitable treatment in the consideration and selection of individuals to positions;

(III) fair, credible, and transparent methods of assigning, reassigning, detailing, transferring, and promoting employees.

(ii) VETERANS PREFERENCES.—In implementing this subparagraph, the Director shall comply with the provisions of section 2302(b)(11), regarding veterans' preference requirements, in a manner consistent with that in which such provisions are applied under chapter 33 of title 5, United States Code. The authority under this subparagraph to waive the requirements of that chapter 33 shall expire 5 years after the date of enactment of this Act.

(2) COMPENSATION.—Notwithstanding any otherwise applicable provision of title 5, United States Code, concerning compensation, including the provisions of chapter 51 and chapter 53, the following provisions shall apply with respect to employees of the Bureau:

(A) The rates of basic pay for all employees of the Bureau may be set and adjusted by the Director.

(B) The Director shall at all times provide compensation (including benefits) to each class of employees that, at a minimum, are comparable to the compensation and benefits then being provided by the Board of Governors for the corresponding class of employees.

(C) All such employees shall be compensated (including benefits) on terms and conditions that are consistent with the terms and conditions set forth in section 11(l) of the Federal Reserve Act (12 U.S.C. 248(l)).

(3) BUREAU PARTICIPATION IN FEDERAL RESERVE SYSTEM RETIREMENT PLAN AND FEDERAL RESERVE SYSTEM THRIFT PLAN.—

(A) EMPLOYEE ELECTION.—Employees appointed to the Bureau may elect to participate in either—

(i) both the Federal Reserve System Retirement Plan and the Federal Reserve System Thrift Plan, under the same terms on which such participation is offered to employees of the Board of Governors who participate in such plans and under the terms and conditions specified under section 1064(i)(1)(C); or

(ii) the Civil Service Retirement System under chapter 83 of title 5, United States Code, or the Federal Employees Retirement System under chapter 84 of title 5, United States Code, if previously covered under one of those Federal employee retirement systems.

(B) ELECTION PERIOD.—Bureau employees shall make an election under this paragraph not later than 1 year after the date of appointment by, or transfer under subtitle F to, the Bureau. Participation in, and benefit accruals under, any other retirement plan established or maintained by the Federal Government shall end not later than the date on which participation in, and benefit accruals under, the Federal Reserve System Retirement Plan and Federal Reserve System Thrift Plan begin.

H. R. 4173—593

(C) EMPLOYER CONTRIBUTION.—The Bureau shall pay an employer contribution to the Federal Reserve System Retirement Plan, in the amount established as an employer contribution under the Federal Employees Retirement System, as established under chapter 84 of title 5, United States Code, for each Bureau employee who elects to participate in the Federal Reserve System Retirement Plan. The Bureau shall pay an employer contribution to the Federal Reserve System Thrift Plan for each Bureau employee who elects to participate in such plan, as required under the terms of such plan.

(D) CONTROLLED GROUP STATUS.—The Bureau is the same employer as the Federal Reserve System (as comprised of the Board of Governors and each of the 12 Federal reserve banks prior to the date of enactment of this Act) for purposes of subsections (b), (c), (m), and (o) of section 414 of the Internal Revenue Code of 1986, (26 U.S.C. 414).

(4) LABOR-MANAGEMENT RELATIONS.—Chapter 71 of title 5, United States Code, shall apply to the Bureau and the employees of the Bureau.

(5) AGENCY OMBUDSMAN.—

(A) ESTABLISHMENT REQUIRED.—Not later than 180 days after the designated transfer date, the Bureau shall appoint an ombudsman.

(B) DUTIES OF OMBUDSMAN.—The ombudsman appointed in accordance with subparagraph (A) shall—

(i) act as a liaison between the Bureau and any affected person with respect to any problem that such party may have in dealing with the Bureau, resulting from the regulatory activities of the Bureau; and

(ii) assure that safeguards exist to encourage complainants to come forward and preserve confidentiality.

(b) SPECIFIC FUNCTIONAL UNITS.—

(1) RESEARCH.—The Director shall establish a unit whose functions shall include researching, analyzing, and reporting on—

(A) developments in markets for consumer financial products or services, including market areas of alternative consumer financial products or services with high growth rates and areas of risk to consumers;

(B) access to fair and affordable credit for traditionally underserved communities;

(C) consumer awareness, understanding, and use of disclosures and communications regarding consumer financial products or services;

(D) consumer awareness and understanding of costs, risks, and benefits of consumer financial products or services;

(E) consumer behavior with respect to consumer financial products or services, including performance on mortgage loans; and

(F) experiences of traditionally underserved consumers, including un-banked and under-banked consumers.

H. R. 4173—594

(2) COMMUNITY AFFAIRS.—The Director shall establish a unit whose functions shall include providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities.

(3) COLLECTING AND TRACKING COMPLAINTS.—

(A) IN GENERAL.—The Director shall establish a unit whose functions shall include establishing a single, toll-free telephone number, a website, and a database or utilizing an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services. The Director shall coordinate with the Federal Trade Commission or other Federal agencies to route complaints to such agencies, where appropriate.

(B) ROUTING CALLS TO STATES.—To the extent practicable, State agencies may receive appropriate complaints from the systems established under subparagraph (A), if—

(i) the State agency system has the functional capacity to receive calls or electronic reports routed by the Bureau systems;

(ii) the State agency has satisfied any conditions of participation in the system that the Bureau may establish, including treatment of personally identifiable information and sharing of information on complaint resolution or related compliance procedures and resources; and

(iii) participation by the State agency includes measures necessary to provide for protection of personally identifiable information that conform to the standards for protection of the confidentiality of personally identifiable information and for data integrity and security that apply to the Federal agencies described in subparagraph (D).

(C) REPORTS TO THE CONGRESS.—The Director shall present an annual report to Congress not later than March 31 of each year on the complaints received by the Bureau in the prior year regarding consumer financial products and services. Such report shall include information and analysis about complaint numbers, complaint types, and, where applicable, information about resolution of complaints.

(D) DATA SHARING REQUIRED.—To facilitate preparation of the reports required under subparagraph (C), supervision and enforcement activities, and monitoring of the market for consumer financial products and services, the Bureau shall share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies, subject to the standards applicable to Federal agencies for protection of the confidentiality of personally identifiable information and for data security and integrity. The prudential regulators, the Federal Trade Commission, and other Federal agencies shall share data relating to consumer complaints regarding consumer financial products and services with the Bureau, subject to the standards applicable to Federal agencies

H. R. 4173—595

for protection of confidentiality of personally identifiable information and for data security and integrity.

(c) OFFICE OF FAIR LENDING AND EQUAL OPPORTUNITY.—

(1) ESTABLISHMENT.—The Director shall establish within the Bureau the Office of Fair Lending and Equal Opportunity.

(2) FUNCTIONS.—The Office of Fair Lending and Equal Opportunity shall have such powers and duties as the Director may delegate to the Office, including—

(A) providing oversight and enforcement of Federal laws intended to ensure the fair, equitable, and nondiscriminatory access to credit for both individuals and communities that are enforced by the Bureau, including the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act;

(B) coordinating fair lending efforts of the Bureau with other Federal agencies and State regulators, as appropriate, to promote consistent, efficient, and effective enforcement of Federal fair lending laws;

(C) working with private industry, fair lending, civil rights, consumer and community advocates on the promotion of fair lending compliance and education; and

(D) providing annual reports to Congress on the efforts of the Bureau to fulfill its fair lending mandate.

(3) ADMINISTRATION OF OFFICE.—There is established the position of Assistant Director of the Bureau for Fair Lending and Equal Opportunity, who—

(A) shall be appointed by the Director; and

(B) shall carry out such duties as the Director may delegate to such Assistant Director.

(d) OFFICE OF FINANCIAL EDUCATION.—

(1) ESTABLISHMENT.—The Director shall establish an Office of Financial Education, which shall be responsible for developing and implementing initiatives intended to educate and empower consumers to make better informed financial decisions.

(2) OTHER DUTIES.—The Office of Financial Education shall develop and implement a strategy to improve the financial literacy of consumers that includes measurable goals and objectives, in consultation with the Financial Literacy and Education Commission, consistent with the National Strategy for Financial Literacy, through activities including providing opportunities for consumers to access—

(A) financial counseling, including community-based financial counseling, where practicable;

(B) information to assist with the evaluation of credit products and the understanding of credit histories and scores;

(C) savings, borrowing, and other services found at mainstream financial institutions;

(D) activities intended to—

(i) prepare the consumer for educational expenses and the submission of financial aid applications, and other major purchases;

(ii) reduce debt; and

(iii) improve the financial situation of the consumer;

H. R. 4173—596

(E) assistance in developing long-term savings strategies; and

(F) wealth building and financial services during the preparation process to claim earned income tax credits and Federal benefits.

(3) COORDINATION.—The Office of Financial Education shall coordinate with other units within the Bureau in carrying out its functions, including—

(A) working with the Community Affairs Office to implement the strategy to improve financial literacy of consumers; and

(B) working with the research unit established by the Director to conduct research related to consumer financial education and counseling.

(4) REPORT.—Not later than 24 months after the designated transfer date, and annually thereafter, the Director shall submit a report on its financial literacy activities and strategy to improve financial literacy of consumers to—

(A) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) the Committee on Financial Services of the House of Representatives.

(5) MEMBERSHIP IN FINANCIAL LITERACY AND EDUCATION COMMISSION.—Section 513(c)(1) of the Financial Literacy and Education Improvement Act (20 U.S.C. 9702(c)(1)) is amended—

(A) in subparagraph (B), by striking "and" at the end;

(B) by redesignating subparagraph (C) as subparagraph (D); and

(C) by inserting after subparagraph (B) the following new subparagraph:

"(C) the Director of the Bureau of Consumer Financial Protection; and".

(6) CONFORMING AMENDMENT.—Section 513(d) of the Financial Literacy and Education Improvement Act (20 U.S.C. 9702(d)) is amended by adding at the end the following: "The Director of the Bureau of Consumer Financial Protection shall serve as the Vice Chairman.".

(7) STUDY AND REPORT ON FINANCIAL LITERACY PROGRAM.—

(A) IN GENERAL.—The Comptroller General of the United States shall conduct a study to identify—

(i) the feasibility of certification of persons providing the programs or performing the activities described in paragraph (2), including recognizing outstanding programs, and developing guidelines and resources for community-based practitioners, including—

(I) a potential certification process and standards for certification;

(II) appropriate certifying entities;

(III) resources required for funding such a process; and

(IV) a cost-benefit analysis of such certification;

(ii) technological resources intended to collect, analyze, evaluate, or promote financial literacy and counseling programs;

H. R. 4173—597

(iii) effective methods, tools, and strategies intended to educate and empower consumers about personal finance management; and

(iv) recommendations intended to encourage the development of programs that effectively improve financial education outcomes and empower consumers to make better informed financial decisions based on findings.

(B) REPORT.—Not later than 1 year after the date of enactment of this Act, the Comptroller General of the United States shall submit a report on the results of the study conducted under this paragraph to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.

(e) OFFICE OF SERVICE MEMBER AFFAIRS.—

(1) IN GENERAL.—The Director shall establish an Office of Service Member Affairs, which shall be responsible for developing and implementing initiatives for service members and their families intended to—

(A) educate and empower service members and their families to make better informed decisions regarding consumer financial products and services;

(B) coordinate with the unit of the Bureau established under subsection (b)(3), in order to monitor complaints by service members and their families and responses to those complaints by the Bureau or other appropriate Federal or State agency; and

(C) coordinate efforts among Federal and State agencies, as appropriate, regarding consumer protection measures relating to consumer financial products and services offered to, or used by, service members and their families.

(2) COORDINATION.—

(A) REGIONAL SERVICES.—The Director is authorized to assign employees of the Bureau as may be deemed necessary to conduct the business of the Office of Service Member Affairs, including by establishing and maintaining the functions of the Office in regional offices of the Bureau located near military bases, military treatment facilities, or other similar military facilities.

(B) AGREEMENTS.—The Director is authorized to enter into memoranda of understanding and similar agreements with the Department of Defense, including any branch or agency as authorized by the department, in order to carry out the business of the Office of Service Member Affairs.

(3) DEFINITION.—As used in this subsection, the term "service member" means any member of the United States Armed Forces and any member of the National Guard or Reserves.

(f) TIMING.—The Office of Fair Lending and Equal Opportunity, the Office of Financial Education, and the Office of Service Member Affairs shall each be established not later than 1 year after the designated transfer date.

(g) OFFICE OF FINANCIAL PROTECTION FOR OLDER AMERICANS.—

(1) ESTABLISHMENT.—Before the end of the 180-day period beginning on the designated transfer date, the Director shall

H. R. 4173—598

establish the Office of Financial Protection for Older Americans, the functions of which shall include activities designed to facilitate the financial literacy of individuals who have attained the age of 62 years or more (in this subsection, referred to as "seniors") on protection from unfair, deceptive, and abusive practices and on current and future financial choices, including through the dissemination of materials to seniors on such topics.

(2) ASSISTANT DIRECTOR.—The Office of Financial Protection for Older Americans (in this subsection referred to as the "Office") shall be headed by an assistant director.

(3) DUTIES.—The Office shall—

(A) develop goals for programs that provide seniors financial literacy and counseling, including programs that—

(i) help seniors recognize warning signs of unfair, deceptive, or abusive practices, protect themselves from such practices;

(ii) provide one-on-one financial counseling on issues including long-term savings and later-life economic security; and

(iii) provide personal consumer credit advocacy to respond to consumer problems caused by unfair, deceptive, or abusive practices;

(B) monitor certifications or designations of financial advisors who advise seniors and alert the Commission and State regulators of certifications or designations that are identified as unfair, deceptive, or abusive;

(C) not later than 18 months after the date of the establishment of the Office, submit to Congress and the Commission any legislative and regulatory recommendations on the best practices for—

(i) disseminating information regarding the legitimacy of certifications of financial advisers who advise seniors;

(ii) methods in which a senior can identify the financial advisor most appropriate for the senior's needs; and

(iii) methods in which a senior can verify a financial advisor's credentials;

(D) conduct research to identify best practices and effective methods, tools, technology and strategies to educate and counsel seniors about personal finance management with a focus on—

(i) protecting themselves from unfair, deceptive, and abusive practices;

(ii) long-term savings; and

(iii) planning for retirement and long-term care;

(E) coordinate consumer protection efforts of seniors with other Federal agencies and State regulators, as appropriate, to promote consistent, effective, and efficient enforcement; and

(F) work with community organizations, non-profit organizations, and other entities that are involved with educating or assisting seniors (including the National Education and Resource Center on Women and Retirement Planning).

H. R. 4173—599

### SEC. 1014. CONSUMER ADVISORY BOARD.

(a) ESTABLISHMENT REQUIRED.—The Director shall establish a Consumer Advisory Board to advise and consult with the Bureau in the exercise of its functions under the Federal consumer financial laws, and to provide information on emerging practices in the consumer financial products or services industry, including regional trends, concerns, and other relevant information.

(b) MEMBERSHIP.—In appointing the members of the Consumer Advisory Board, the Director shall seek to assemble experts in consumer protection, financial services, community development, fair lending and civil rights, and consumer financial products or services and representatives of depository institutions that primarily serve underserved communities, and representatives of communities that have been significantly impacted by higher-priced mortgage loans, and seek representation of the interests of covered persons and consumers, without regard to party affiliation. Not fewer than 6 members shall be appointed upon the recommendation of the regional Federal Reserve Bank Presidents, on a rotating basis.

(c) MEETINGS.—The Consumer Advisory Board shall meet from time to time at the call of the Director, but, at a minimum, shall meet at least twice in each year.

(d) COMPENSATION AND TRAVEL EXPENSES.—Members of the Consumer Advisory Board who are not full-time employees of the United States shall—

(1) be entitled to receive compensation at a rate fixed by the Director while attending meetings of the Consumer Advisory Board, including travel time; and

(2) be allowed travel expenses, including transportation and subsistence, while away from their homes or regular places of business.

### SEC. 1015. COORDINATION.

The Bureau shall coordinate with the Commission, the Commodity Futures Trading Commission, the Federal Trade Commission, and other Federal agencies and State regulators, as appropriate, to promote consistent regulatory treatment of consumer financial and investment products and services.

### SEC. 1016. APPEARANCES BEFORE AND REPORTS TO CONGRESS.

(a) APPEARANCES BEFORE CONGRESS.—The Director of the Bureau shall appear before the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services and the Committee on Energy and Commerce of the House of Representatives at semi-annual hearings regarding the reports required under subsection (b).

(b) REPORTS REQUIRED.—The Bureau shall, concurrent with each semi-annual hearing referred to in subsection (a), prepare and submit to the President and to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services and the Committee on Energy and Commerce of the House of Representatives, a report, beginning with the session following the designated transfer date. The Bureau may also submit such report to the Committee on Commerce, Science, and Transportation of the Senate.

(c) CONTENTS.—The reports required by subsection (b) shall include—

H. R. 4173—600

(1) a discussion of the significant problems faced by consumers in shopping for or obtaining consumer financial products or services;

(2) a justification of the budget request of the previous year;

(3) a list of the significant rules and orders adopted by the Bureau, as well as other significant initiatives conducted by the Bureau, during the preceding year and the plan of the Bureau for rules, orders, or other initiatives to be undertaken during the upcoming period;

(4) an analysis of complaints about consumer financial products or services that the Bureau has received and collected in its central database on complaints during the preceding year;

(5) a list, with a brief statement of the issues, of the public supervisory and enforcement actions to which the Bureau was a party during the preceding year;

(6) the actions taken regarding rules, orders, and supervisory actions with respect to covered persons which are not credit unions or depository institutions;

(7) an assessment of significant actions by State attorneys general or State regulators relating to Federal consumer financial law;

(8) an analysis of the efforts of the Bureau to fulfill the fair lending mission of the Bureau; and

(9) an analysis of the efforts of the Bureau to increase workforce and contracting diversity consistent with the procedures established by the Office of Minority and Women Inclusion.

## SEC. 1017. FUNDING; PENALTIES AND FINES.

(a) TRANSFER OF FUNDS FROM BOARD OF GOVERNORS.—

(1) IN GENERAL.—Each year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year).

(2) FUNDING CAP.—

(A) IN GENERAL.—Notwithstanding paragraph (1), and in accordance with this paragraph, the amount that shall be transferred to the Bureau in each fiscal year shall not exceed a fixed percentage of the total operating expenses of the Federal Reserve System, as reported in the Annual Report, 2009, of the Board of Governors, equal to—

(i) 10 percent of such expenses in fiscal year 2011;

(ii) 11 percent of such expenses in fiscal year 2012; and

(iii) 12 percent of such expenses in fiscal year 2013, and in each year thereafter.

(B) ADJUSTMENT OF AMOUNT.—The dollar amount referred to in subparagraph (A)(iii) shall be adjusted

H. R. 4173—601

annually, using the percent increase, if any, in the employ-
ment cost index for total compensation for State and local
government workers published by the Federal Government,
or the successor index thereto, for the 12-month period
ending on September 30 of the year preceding the transfer.

(C) REVIEWABILITY.—Notwithstanding any other provi-
sion in this title, the funds derived from the Federal
Reserve System pursuant to this subsection shall not be
subject to review by the Committees on Appropriations
of the House of Representatives and the Senate.

(3) TRANSITION PERIOD.—Beginning on the date of enact-
ment of this Act and until the designated transfer date, the
Board of Governors shall transfer to the Bureau the amount
estimated by the Secretary needed to carry out the authorities
granted to the Bureau under Federal consumer financial law,
from the date of enactment of this Act until the designated
transfer date.

(4) BUDGET AND FINANCIAL MANAGEMENT.—

(A) FINANCIAL OPERATING PLANS AND FORECASTS.—The
Director shall provide to the Director of the Office of
Management and Budget copies of the financial operating
plans and forecasts of the Director, as prepared by the
Director in the ordinary course of the operations of the
Bureau, and copies of the quarterly reports of the financial
condition and results of operations of the Bureau, as pre-
pared by the Director in the ordinary course of the oper-
ations of the Bureau.

(B) FINANCIAL STATEMENTS.—The Bureau shall prepare
annually a statement of—

(i) assets and liabilities and surplus or deficit;
(ii) income and expenses; and
(iii) sources and application of funds.

(C) FINANCIAL MANAGEMENT SYSTEMS.—The Bureau
shall implement and maintain financial management sys-
tems that comply substantially with Federal financial
management systems requirements and applicable Federal
accounting standards.

(D) ASSERTION OF INTERNAL CONTROLS.—The Director
shall provide to the Comptroller General of the United
States an assertion as to the effectiveness of the internal
controls that apply to financial reporting by the Bureau,
using the standards established in section 3512(c) of title
31, United States Code.

(E) RULE OF CONSTRUCTION.—This subsection may not
be construed as implying any obligation on the part of
the Director to consult with or obtain the consent or
approval of the Director of the Office of Management and
Budget with respect to any report, plan, forecast, or other
information referred to in subparagraph (A) or any jurisdic-
tion or oversight over the affairs or operations of the
Bureau.

(F) FINANCIAL STATEMENTS.—The financial statements
of the Bureau shall not be consolidated with the financial
statements of either the Board of Governors or the Federal
Reserve System.

(5) AUDIT OF THE BUREAU.—

H. R. 4173—602

(A) IN GENERAL.—The Comptroller General shall annually audit the financial transactions of the Bureau in accordance with the United States generally accepted government auditing standards, as may be prescribed by the Comptroller General of the United States. The audit shall be conducted at the place or places where accounts of the Bureau are normally kept. The representatives of the Government Accountability Office shall have access to the personnel and to all books, accounts, documents, papers, records (including electronic records), reports, files, and all other papers, automated data, things, or property belonging to or under the control of or used or employed by the Bureau pertaining to its financial transactions and necessary to facilitate the audit, and such representatives shall be afforded full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians. All such books, accounts, documents, records, reports, files, papers, and property of the Bureau shall remain in possession and custody of the Bureau. The Comptroller General may obtain and duplicate any such books, accounts, documents, records, working papers, automated data and files, or other information relevant to such audit without cost to the Comptroller General, and the right of access of the Comptroller General to such information shall be enforceable pursuant to section 716(c) of title 31, United States Code.

(B) REPORT.—The Comptroller General shall submit to the Congress a report of each annual audit conducted under this subsection. The report to the Congress shall set forth the scope of the audit and shall include the statement of assets and liabilities and surplus or deficit, the statement of income and expenses, the statement of sources and application of funds, and such comments and information as may be deemed necessary to inform Congress of the financial operations and condition of the Bureau, together with such recommendations with respect thereto as the Comptroller General may deem advisable. A copy of each report shall be furnished to the President and to the Bureau at the time submitted to the Congress.

(C) ASSISTANCE AND COSTS.—For the purpose of conducting an audit under this subsection, the Comptroller General may, in the discretion of the Comptroller General, employ by contract, without regard to section 3709 of the Revised Statutes of the United States (41 U.S.C. 5), professional services of firms and organizations of certified public accountants for temporary periods or for special purposes. Upon the request of the Comptroller General, the Director of the Bureau shall transfer to the Government Accountability Office from funds available, the amount requested by the Comptroller General to cover the full costs of any audit and report conducted by the Comptroller General. The Comptroller General shall credit funds transferred to the account established for salaries and expenses of the Government Accountability Office, and such amount shall be available upon receipt and without fiscal year limitation to cover the full costs of the audit and report.

(b) CONSUMER FINANCIAL PROTECTION FUND.—

H. R. 4173—603

(1) SEPARATE FUND IN FEDERAL RESERVE ESTABLISHED.—
There is established in the Federal Reserve a separate fund,
to be known as the "Bureau of Consumer Financial Protection
Fund" (referred to in this section as the "Bureau Fund"). The
Bureau Fund shall be maintained and established at a Federal
reserve bank, in accordance with such requirements as the
Board of Governors may impose.

(2) FUND RECEIPTS.—All amounts transferred to the Bureau
under subsection (a) shall be deposited into the Bureau Fund.

(3) INVESTMENT AUTHORITY.—

(A) AMOUNTS IN BUREAU FUND MAY BE INVESTED.—
The Bureau may request the Board of Governors to direct
the investment of the portion of the Bureau Fund that
is not, in the judgment of the Bureau, required to meet
the current needs of the Bureau.

(B) ELIGIBLE INVESTMENTS.—Investments authorized
by this paragraph shall be made in obligations of the
United States or obligations that are guaranteed as to
principal and interest by the United States, with maturities
suitable to the needs of the Bureau Fund, as determined
by the Bureau.

(C) INTEREST AND PROCEEDS CREDITED.—The interest
on, and the proceeds from the sale or redemption of, any
obligations held in the Bureau Fund shall be credited to
the Bureau Fund.

(c) USE OF FUNDS.—

(1) IN GENERAL.—Funds obtained by, transferred to, or
credited to the Bureau Fund shall be immediately available
to the Bureau and under the control of the Director, and shall
remain available until expended, to pay the expenses of the
Bureau in carrying out its duties and responsibilities. The
compensation of the Director and other employees of the Bureau
and all other expenses thereof may be paid from, obtained
by, transferred to, or credited to the Bureau Fund under this
section.

(2) FUNDS THAT ARE NOT GOVERNMENT FUNDS.—Funds
obtained by or transferred to the Bureau Fund shall not be
construed to be Government funds or appropriated monies.

(3) AMOUNTS NOT SUBJECT TO APPORTIONMENT.—Notwith-
standing any other provision of law, amounts in the Bureau
Fund and in the Civil Penalty Fund established under sub-
section (d) shall not be subject to apportionment for purposes
of chapter 15 of title 31, United States Code, or under any
other authority.

(d) PENALTIES AND FINES.—

(1) ESTABLISHMENT OF VICTIMS RELIEF FUND.—There is
established in the Federal Reserve a separate fund, to be known
as the "Consumer Financial Civil Penalty Fund" (referred to
in this section as the "Civil Penalty Fund"). The Civil Penalty
Fund shall be maintained and established at a Federal reserve
bank, in accordance with such requirements as the Board of
Governors may impose. If the Bureau obtains a civil penalty
against any person in any judicial or administrative action
under Federal consumer financial laws, the Bureau shall
deposit into the Civil Penalty Fund, the amount of the penalty
collected.

H. R. 4173—604

(2) PAYMENT TO VICTIMS.—Amounts in the Civil Penalty Fund shall be available to the Bureau, without fiscal year limitation, for payments to the victims of activities for which civil penalties have been imposed under the Federal consumer financial laws. To the extent that such victims cannot be located or such payments are otherwise not practicable, the Bureau may use such funds for the purpose of consumer education and financial literacy programs.

(e) AUTHORIZATION OF APPROPRIATIONS; ANNUAL REPORT.—

(1) DETERMINATION REGARDING NEED FOR APPROPRIATED FUNDS.—

(A) IN GENERAL.—The Director is authorized to determine that sums available to the Bureau under this section will not be sufficient to carry out the authorities of the Bureau under Federal consumer financial law for the upcoming year.

(B) REPORT REQUIRED.—When making a determination under subparagraph (A), the Director shall prepare a report regarding the funding of the Bureau, including the assets and liabilities of the Bureau, and the extent to which the funding needs of the Bureau are anticipated to exceed the level of the amount set forth in subsection (a)(2). The Director shall submit the report to the President and to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives.

(2) AUTHORIZATION OF APPROPRIATIONS.—If the Director makes the determination and submits the report pursuant to paragraph (1), there are hereby authorized to be appropriated to the Bureau, for the purposes of carrying out the authorities granted in Federal consumer financial law, $200,000,000 for each of fiscal years 2010, 2011, 2012, 2013, and 2014.

(3) APPORTIONMENT.—Notwithstanding any other provision of law, the amounts in paragraph (2) shall be subject to apportionment under section 1517 of title 31, United States Code, and restrictions that generally apply to the use of appropriated funds in title 31, United States Code, and other laws.

(4) ANNUAL REPORT.—The Director shall prepare and submit a report, on an annual basis, to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives regarding the financial operating plans and forecasts of the Director, the financial condition and results of operations of the Bureau, and the sources and application of funds of the Bureau, including any funds appropriated in accordance with this subsection.

**SEC. 1018. EFFECTIVE DATE.**

This subtitle shall become effective on the date of enactment of this Act.

# Subtitle B—General Powers of the Bureau

**SEC. 1021. PURPOSE, OBJECTIVES, AND FUNCTIONS.**

(a) PURPOSE.—The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets

H. R. 4173—605

for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.

(b) OBJECTIVES.—The Bureau is authorized to exercise its authorities under Federal consumer financial law for the purposes of ensuring that, with respect to consumer financial products and services—

(1) consumers are provided with timely and understandable information to make responsible decisions about financial transactions;

(2) consumers are protected from unfair, deceptive, or abusive acts and practices and from discrimination;

(3) outdated, unnecessary, or unduly burdensome regulations are regularly identified and addressed in order to reduce unwarranted regulatory burdens;

(4) Federal consumer financial law is enforced consistently, without regard to the status of a person as a depository institution, in order to promote fair competition; and

(5) markets for consumer financial products and services operate transparently and efficiently to facilitate access and innovation.

(c) FUNCTIONS.—The primary functions of the Bureau are—

(1) conducting financial education programs;

(2) collecting, investigating, and responding to consumer complaints;

(3) collecting, researching, monitoring, and publishing information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers and the proper functioning of such markets;

(4) subject to sections 1024 through 1026, supervising covered persons for compliance with Federal consumer financial law, and taking appropriate enforcement action to address violations of Federal consumer financial law;

(5) issuing rules, orders, and guidance implementing Federal consumer financial law; and

(6) performing such support activities as may be necessary or useful to facilitate the other functions of the Bureau.

**SEC. 1022. RULEMAKING AUTHORITY.**

(a) IN GENERAL.—The Bureau is authorized to exercise its authorities under Federal consumer financial law to administer, enforce, and otherwise implement the provisions of Federal consumer financial law.

(b) RULEMAKING, ORDERS, AND GUIDANCE.—

(1) GENERAL AUTHORITY.—The Director may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof.

(2) STANDARDS FOR RULEMAKING.—In prescribing a rule under the Federal consumer financial laws—

(A) the Bureau shall consider—

(i) the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule; and

H. R. 4173—606

(ii) the impact of proposed rules on covered persons, as described in section 1026, and the impact on consumers in rural areas;

(B) the Bureau shall consult with the appropriate prudential regulators or other Federal agencies prior to proposing a rule and during the comment process regarding consistency with prudential, market, or systemic objectives administered by such agencies; and

(C) if, during the consultation process described in subparagraph (B), a prudential regulator provides the Bureau with a written objection to the proposed rule of the Bureau or a portion thereof, the Bureau shall include in the adopting release a description of the objection and the basis for the Bureau decision, if any, regarding such objection, except that nothing in this clause shall be construed as altering or limiting the procedures under section 1023 that may apply to any rule prescribed by the Bureau.

(3) EXEMPTIONS.—

(A) IN GENERAL.—The Bureau, by rule, may conditionally or unconditionally exempt any class of covered persons, service providers, or consumer financial products or services, from any provision of this title, or from any rule issued under this title, as the Bureau determines necessary or appropriate to carry out the purposes and objectives of this title, taking into consideration the factors in subparagraph (B).

(B) FACTORS.—In issuing an exemption, as permitted under subparagraph (A), the Bureau shall, as appropriate, take into consideration—

(i) the total assets of the class of covered persons;

(ii) the volume of transactions involving consumer financial products or services in which the class of covered persons engages; and

(iii) existing provisions of law which are applicable to the consumer financial product or service and the extent to which such provisions provide consumers with adequate protections.

(4) EXCLUSIVE RULEMAKING AUTHORITY.—

(A) IN GENERAL.—Notwithstanding any other provisions of Federal law and except as provided in section 1061(b)(5), to the extent that a provision of Federal consumer financial law authorizes the Bureau and another Federal agency to issue regulations under that provision of law for purposes of assuring compliance with Federal consumer financial law and any regulations thereunder, the Bureau shall have the exclusive authority to prescribe rules subject to those provisions of law.

(B) DEFERENCE.—Notwithstanding any power granted to any Federal agency or to the Council under this title, and subject to section 1061(b)(5)(E), the deference that a court affords to the Bureau with respect to a determination by the Bureau regarding the meaning or interpretation of any provision of a Federal consumer financial law shall be applied as if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law.

(c) MONITORING.—

H. R. 4173—607

(1) IN GENERAL.—In order to support its rulemaking and other functions, the Bureau shall monitor for risks to consumers in the offering or provision of consumer financial products or services, including developments in markets for such products or services.

(2) CONSIDERATIONS.—In allocating its resources to perform the monitoring required by this section, the Bureau may consider, among other factors—

(A) likely risks and costs to consumers associated with buying or using a type of consumer financial product or service;

(B) understanding by consumers of the risks of a type of consumer financial product or service;

(C) the legal protections applicable to the offering or provision of a consumer financial product or service, including the extent to which the law is likely to adequately protect consumers;

(D) rates of growth in the offering or provision of a consumer financial product or service;

(E) the extent, if any, to which the risks of a consumer financial product or service may disproportionately affect traditionally underserved consumers; or

(F) the types, number, and other pertinent characteristics of covered persons that offer or provide the consumer financial product or service.

(3) SIGNIFICANT FINDINGS.—

(A) IN GENERAL.—The Bureau shall publish not fewer than 1 report of significant findings of its monitoring required by this subsection in each calendar year, beginning with the first calendar year that begins at least 1 year after the designated transfer date.

(B) CONFIDENTIAL INFORMATION.—The Bureau may make public such information obtained by the Bureau under this section as is in the public interest, through aggregated reports or other appropriate formats designed to protect confidential information in accordance with paragraphs (4), (6), (8), and (9).

(4) COLLECTION OF INFORMATION.—

(A) IN GENERAL.—In conducting any monitoring or assessment required by this section, the Bureau shall have the authority to gather information from time to time regarding the organization, business conduct, markets, and activities of covered persons and service providers.

(B) METHODOLOGY.—In order to gather information described in subparagraph (A), the Bureau may—

(i) gather and compile information from a variety of sources, including examination reports concerning covered persons or service providers, consumer complaints, voluntary surveys and voluntary interviews of consumers, surveys and interviews with covered persons and service providers, and review of available databases; and

(ii) require covered persons and service providers participating in consumer financial services markets to file with the Bureau, under oath or otherwise, in such form and within such reasonable period of time as the Bureau may prescribe by rule or order, annual

H. R. 4173—608

or special reports, or answers in writing to specific questions, furnishing information described in paragraph (4), as necessary for the Bureau to fulfill the monitoring, assessment, and reporting responsibilities imposed by Congress.

(C) LIMITATION.—The Bureau may not use its authorities under this paragraph to obtain records from covered persons and service providers participating in consumer financial services markets for purposes of gathering or analyzing the personally identifiable financial information of consumers.

(5) LIMITED INFORMATION GATHERING.—In order to assess whether a nondepository is a covered person, as defined in section 1002, the Bureau may require such nondepository to file with the Bureau, under oath or otherwise, in such form and within such reasonable period of time as the Bureau may prescribe by rule or order, annual or special reports, or answers in writing to specific questions.

(6) CONFIDENTIALITY RULES.—

(A) RULEMAKING.—The Bureau shall prescribe rules regarding the confidential treatment of information obtained from persons in connection with the exercise of its authorities under Federal consumer financial law.

(B) ACCESS BY THE BUREAU TO REPORTS OF OTHER REGULATORS.—

(i) EXAMINATION AND FINANCIAL CONDITION REPORTS.—Upon providing reasonable assurances of confidentiality, the Bureau shall have access to any report of examination or financial condition made by a prudential regulator or other Federal agency having jurisdiction over a covered person or service provider, and to all revisions made to any such report.

(ii) PROVISION OF OTHER REPORTS TO THE BUREAU.—In addition to the reports described in clause (i), a prudential regulator or other Federal agency having jurisdiction over a covered person or service provider may, in its discretion, furnish to the Bureau any other report or other confidential supervisory information concerning any insured depository institution, credit union, or other entity examined by such agency under authority of any provision of Federal law.

(C) ACCESS BY OTHER REGULATORS TO REPORTS OF THE BUREAU.—

(i) EXAMINATION REPORTS.—Upon providing reasonable assurances of confidentiality, a prudential regulator, a State regulator, or any other Federal agency having jurisdiction over a covered person or service provider shall have access to any report of examination made by the Bureau with respect to such person, and to all revisions made to any such report.

(ii) PROVISION OF OTHER REPORTS TO OTHER REGULATORS.—In addition to the reports described in clause (i), the Bureau may, in its discretion, furnish to a prudential regulator or other agency having jurisdiction over a covered person or service provider any

H. R. 4173—609

other report or other confidential supervisory informa-
tion concerning such person examined by the Bureau
under the authority of any other provision of Federal
law.
(7) REGISTRATION.—
(A) IN GENERAL.—The Bureau may prescribe rules
regarding registration requirements applicable to a covered
person, other than an insured depository institution,
insured credit union, or related person.
(B) REGISTRATION INFORMATION.—Subject to rules pre-
scribed by the Bureau, the Bureau may publicly disclose
registration information to facilitate the ability of con-
sumers to identify covered persons that are registered with
the Bureau.
(C) CONSULTATION WITH STATE AGENCIES.—In devel-
oping and implementing registration requirements under
this paragraph, the Bureau shall consult with State agen-
cies regarding requirements or systems (including coordi-
nated or combined systems for registration), where appro-
priate.
(8) PRIVACY CONSIDERATIONS.—In collecting information
from any person, publicly releasing information held by the
Bureau, or requiring covered persons to publicly report informa-
tion, the Bureau shall take steps to ensure that proprietary,
personal, or confidential consumer information that is protected
from public disclosure under section 552(b) or 552a of title
5, United States Code, or any other provision of law, is not
made public under this title.
(9) CONSUMER PRIVACY.—
(A) IN GENERAL.—The Bureau may not obtain from
a covered person or service provider any personally identifi-
able financial information about a consumer from the finan-
cial records of the covered person or service provider,
except—
(i) if the financial records are reasonably described
in a request by the Bureau and the consumer provides
written permission for the disclosure of such informa-
tion by the covered person or service provider to the
Bureau; or
(ii) as may be specifically permitted or required
under other applicable provisions of law and in accord-
ance with the Right to Financial Privacy Act of 1978
(12 U.S.C. 3401 et seq.).
(B) TREATMENT OF COVERED PERSON OR SERVICE PRO-
VIDER.—With respect to the application of any provision
of the Right to Financial Privacy Act of 1978, to a disclosure
by a covered person or service provider subject to this
subsection, the covered person or service provider shall
be treated as if it were a "financial institution", as defined
in section 1101 of that Act (12 U.S.C. 3401).
(d) ASSESSMENT OF SIGNIFICANT RULES.—
(1) IN GENERAL.—The Bureau shall conduct an assessment
of each significant rule or order adopted by the Bureau under
Federal consumer financial law. The assessment shall address,
among other relevant factors, the effectiveness of the rule or
order in meeting the purposes and objectives of this title and
the specific goals stated by the Bureau. The assessment shall

H. R. 4173—610

reflect available evidence and any data that the Bureau reasonably may collect.

(2) REPORTS.—The Bureau shall publish a report of its assessment under this subsection not later than 5 years after the effective date of the subject rule or order.

(3) PUBLIC COMMENT REQUIRED.—Before publishing a report of its assessment, the Bureau shall invite public comment on recommendations for modifying, expanding, or eliminating the newly adopted significant rule or order.

**SEC. 1023. REVIEW OF BUREAU REGULATIONS.**

(a) REVIEW OF BUREAU REGULATIONS.—On the petition of a member agency of the Council, the Council may set aside a final regulation prescribed by the Bureau, or any provision thereof, if the Council decides, in accordance with subsection (c), that the regulation or provision would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk.

(b) PETITION.—

(1) PROCEDURE.—An agency represented by a member of the Council may petition the Council, in writing, and in accordance with rules prescribed pursuant to subsection (f), to stay the effectiveness of, or set aside, a regulation if the member agency filing the petition—

(A) has in good faith attempted to work with the Bureau to resolve concerns regarding the effect of the rule on the safety and soundness of the United States banking system or the stability of the financial system of the United States; and

(B) files the petition with the Council not later than 10 days after the date on which the regulation has been published in the Federal Register.

(2) PUBLICATION.—Any petition filed with the Council under this section shall be published in the Federal Register and transmitted contemporaneously with filing to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.

(c) STAYS AND SET ASIDES.—

(1) STAY.—

(A) IN GENERAL.—Upon the request of any member agency, the Chairperson of the Council may stay the effectiveness of a regulation for the purpose of allowing appropriate consideration of the petition by the Council.

(B) EXPIRATION.—A stay issued under this paragraph shall expire on the earlier of—

(i) 90 days after the date of filing of the petition under subsection (b); or

(ii) the date on which the Council makes a decision under paragraph (3).

(2) NO ADVERSE INFERENCE.—After the expiration of any stay imposed under this section, no inference shall be drawn regarding the validity or enforceability of a regulation which was the subject of the petition.

(3) VOTE.—

(A) IN GENERAL.—The decision to issue a stay of, or set aside, any regulation under this section shall be made

H. R. 4173—611

only with the affirmative vote in accordance with subparagraph (B) of ⅔ of the members of the Council then serving.

(B) AUTHORIZATION TO VOTE.—A member of the Council may vote to stay the effectiveness of, or set aside, a final regulation prescribed by the Bureau only if the agency or department represented by that member has—

(i) considered any relevant information provided by the agency submitting the petition and by the Bureau; and

(ii) made an official determination, at a public meeting where applicable, that the regulation which is the subject of the petition would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk.

(4) DECISIONS TO SET ASIDE.—

(A) EFFECT OF DECISION.—A decision by the Council to set aside a regulation prescribed by the Bureau, or provision thereof, shall render such regulation, or provision thereof, unenforceable.

(B) TIMELY ACTION REQUIRED.—The Council may not issue a decision to set aside a regulation, or provision thereof, which is the subject of a petition under this section after the expiration of the later of—

(i) 45 days following the date of filing of the petition, unless a stay is issued under paragraph (1); or

(ii) the expiration of a stay issued by the Council under this section.

(C) SEPARATE AUTHORITY.—The issuance of a stay under this section does not affect the authority of the Council to set aside a regulation.

(5) DISMISSAL DUE TO INACTION.—A petition under this section shall be deemed dismissed if the Council has not issued a decision to set aside a regulation, or provision thereof, within the period for timely action under paragraph (4)(B).

(6) PUBLICATION OF DECISION.—Any decision under this subsection to issue a stay of, or set aside, a regulation or provision thereof shall be published by the Council in the Federal Register as soon as practicable after the decision is made, with an explanation of the reasons for the decision.

(7) RULEMAKING PROCEDURES INAPPLICABLE.—The notice and comment procedures under section 553 of title 5, United States Code, shall not apply to any decision under this section of the Council to issue a stay of, or set aside, a regulation.

(8) JUDICIAL REVIEW OF DECISIONS BY THE COUNCIL.—A decision by the Council to set aside a regulation prescribed by the Bureau, or provision thereof, shall be subject to review under chapter 7 of title 5, United States Code.

(d) APPLICATION OF OTHER LAW.—Nothing in this section shall be construed as altering, limiting, or restricting the application of any other provision of law, except as otherwise specifically provided in this section, including chapter 5 and chapter 7 of title 5, United States Code, to a regulation which is the subject of a petition filed under this section.

(e) SAVINGS CLAUSE.—Nothing in this section shall be construed as limiting or restricting the Bureau from engaging in a rulemaking in accordance with applicable law.

H. R. 4173—612

(f) IMPLEMENTING RULES.—The Council shall prescribe procedural rules to implement this section.

**SEC. 1024. SUPERVISION OF NONDEPOSITORY COVERED PERSONS.**

(a) SCOPE OF COVERAGE.—

(1) APPLICABILITY.—Notwithstanding any other provision of this title, and except as provided in paragraph (3), this section shall apply to any covered person who—

(A) offers or provides origination, brokerage, or servicing of loans secured by real estate for use by consumers primarily for personal, family, or household purposes, or loan modification or foreclosure relief services in connection with such loans;

(B) is a larger participant of a market for other consumer financial products or services, as defined by rule in accordance with paragraph (2);

(C) the Bureau has reasonable cause to determine, by order, after notice to the covered person and a reasonable opportunity for such covered person to respond, based on complaints collected through the system under section 1013(b)(3) or information from other sources, that such covered person is engaging, or has engaged, in conduct that poses risks to consumers with regard to the offering or provision of consumer financial products or services;

(D) offers or provides to a consumer any private education loan, as defined in section 140 of the Truth in Lending Act (15 U.S.C. 1650), notwithstanding section 1027(a)(2)(A) and subject to section 1027(a)(2)(C); or

(E) offers or provides to a consumer a payday loan.

(2) RULEMAKING TO DEFINE COVERED PERSONS SUBJECT TO THIS SECTION.—The Bureau shall consult with the Federal Trade Commission prior to issuing a rule, in accordance with paragraph (1)(B), to define covered persons subject to this section. The Bureau shall issue its initial rule not later than 1 year after the designated transfer date.

(3) RULES OF CONSTRUCTION.—

(A) CERTAIN PERSONS EXCLUDED.—This section shall not apply to persons described in section 1025(a) or 1026(a).

(B) ACTIVITY LEVELS.—For purposes of computing activity levels under paragraph (1) or rules issued thereunder, activities of affiliated companies (other than insured depository institutions or insured credit unions) shall be aggregated.

(b) SUPERVISION.—

(1) IN GENERAL.—The Bureau shall require reports and conduct examinations on a periodic basis of persons described in subsection (a)(1) for purposes of—

(A) assessing compliance with the requirements of Federal consumer financial law;

(B) obtaining information about the activities and compliance systems or procedures of such person; and

(C) detecting and assessing risks to consumers and to markets for consumer financial products and services.

(2) RISK-BASED SUPERVISION PROGRAM.—The Bureau shall exercise its authority under paragraph (1) in a manner designed to ensure that such exercise, with respect to persons described in subsection (a)(1), is based on the assessment by the Bureau

H. R. 4173—613

of the risks posed to consumers in the relevant product markets and geographic markets, and taking into consideration, as applicable—

(A) the asset size of the covered person;

(B) the volume of transactions involving consumer financial products or services in which the covered person engages;

(C) the risks to consumers created by the provision of such consumer financial products or services;

(D) the extent to which such institutions are subject to oversight by State authorities for consumer protection; and

(E) any other factors that the Bureau determines to be relevant to a class of covered persons.

(3) COORDINATION.—To minimize regulatory burden, the Bureau shall coordinate its supervisory activities with the supervisory activities conducted by prudential regulators and the State bank regulatory authorities, including establishing their respective schedules for examining persons described in subsection (a)(1) and requirements regarding reports to be submitted by such persons.

(4) USE OF EXISTING REPORTS.—The Bureau shall, to the fullest extent possible, use—

(A) reports pertaining to persons described in subsection (a)(1) that have been provided or required to have been provided to a Federal or State agency; and

(B) information that has been reported publicly.

(5) PRESERVATION OF AUTHORITY.—Nothing in this title may be construed as limiting the authority of the Director to require reports from persons described in subsection (a)(1), as permitted under paragraph (1), regarding information owned or under the control of such person, regardless of whether such information is maintained, stored, or processed by another person.

(6) REPORTS OF TAX LAW NONCOMPLIANCE.—The Bureau shall provide the Commissioner of Internal Revenue with any report of examination or related information identifying possible tax law noncompliance.

(7) REGISTRATION, RECORDKEEPING AND OTHER REQUIREMENTS FOR CERTAIN PERSONS.—

(A) IN GENERAL.—The Bureau shall prescribe rules to facilitate supervision of persons described in subsection (a)(1) and assessment and detection of risks to consumers.

(B) RECORDKEEPING.—The Bureau may require a person described in subsection (a)(1), to generate, provide, or retain records for the purposes of facilitating supervision of such persons and assessing and detecting risks to consumers.

(C) REQUIREMENTS CONCERNING OBLIGATIONS.—The Bureau may prescribe rules regarding a person described in subsection (a)(1), to ensure that such persons are legitimate entities and are able to perform their obligations to consumers. Such requirements may include background checks for principals, officers, directors, or key personnel and bonding or other appropriate financial requirements.

H. R. 4173—614

(D) CONSULTATION WITH STATE AGENCIES.—In developing and implementing requirements under this paragraph, the Bureau shall consult with State agencies regarding requirements or systems (including coordinated or combined systems for registration), where appropriate.

(c) ENFORCEMENT AUTHORITY.—

(1) THE BUREAU TO HAVE ENFORCEMENT AUTHORITY.— Except as provided in paragraph (3) and section 1061, with respect to any person described in subsection (a)(1), to the extent that Federal law authorizes the Bureau and another Federal agency to enforce Federal consumer financial law, the Bureau shall have exclusive authority to enforce that Federal consumer financial law.

(2) REFERRAL.—Any Federal agency authorized to enforce a Federal consumer financial law described in paragraph (1) may recommend in writing to the Bureau that the Bureau initiate an enforcement proceeding, as the Bureau is authorized by that Federal law or by this title.

(3) COORDINATION WITH THE FEDERAL TRADE COMMISSION.—

(A) IN GENERAL.—The Bureau and the Federal Trade Commission shall negotiate an agreement for coordinating with respect to enforcement actions by each agency regarding the offering or provision of consumer financial products or services by any covered person that is described in subsection (a)(1), or service providers thereto. The agreement shall include procedures for notice to the other agency, where feasible, prior to initiating a civil action to enforce any Federal law regarding the offering or provision of consumer financial products or services.

(B) CIVIL ACTIONS.—Whenever a civil action has been filed by, or on behalf of, the Bureau or the Federal Trade Commission for any violation of any provision of Federal law described in subparagraph (A), or any regulation prescribed under such provision of law—

(i) the other agency may not, during the pendency of that action, institute a civil action under such provision of law against any defendant named in the complaint in such pending action for any violation alleged in the complaint; and

(ii) the Bureau or the Federal Trade Commission may intervene as a party in any such action brought by the other agency, and, upon intervening—

(I) be heard on all matters arising in such enforcement action; and

(II) file petitions for appeal in such actions.

(C) AGREEMENT TERMS.—The terms of any agreement negotiated under subparagraph (A) may modify or supersede the provisions of subparagraph (B).

(D) DEADLINE.—The agencies shall reach the agreement required under subparagraph (A) not later than 6 months after the designated transfer date.

(d) EXCLUSIVE RULEMAKING AND EXAMINATION AUTHORITY.— Notwithstanding any other provision of Federal law and except as provided in section 1061, to the extent that Federal law authorizes the Bureau and another Federal agency to issue regulations or guidance, conduct examinations, or require reports from a person described in subsection (a)(1) under such law for purposes of

H. R. 4173—615

assuring compliance with Federal consumer financial law and any regulations thereunder, the Bureau shall have the exclusive authority to prescribe rules, issue guidance, conduct examinations, require reports, or issue exemptions with regard to a person described in subsection (a)(1), subject to those provisions of law.

(e) SERVICE PROVIDERS.—A service provider to a person described in subsection (a)(1) shall be subject to the authority of the Bureau under this section, to the same extent as if such service provider were engaged in a service relationship with a bank, and the Bureau were an appropriate Federal banking agency under section 7(c) of the Bank Service Company Act (12 U.S.C. 1867(c)). In conducting any examination or requiring any report from a service provider subject to this subsection, the Bureau shall coordinate with the appropriate prudential regulator, as applicable.

(f) PRESERVATION OF FARM CREDIT ADMINISTRATION AUTHORITY.—No provision of this title may be construed as modifying, limiting, or otherwise affecting the authority of the Farm Credit Administration.

SEC. 1025. SUPERVISION OF VERY LARGE BANKS, SAVINGS ASSOCIATIONS, AND CREDIT UNIONS.

(a) SCOPE OF COVERAGE.—This section shall apply to any covered person that is—

(1) an insured depository institution with total assets of more than $10,000,000,000 and any affiliate thereof; or

(2) an insured credit union with total assets of more than $10,000,000,000 and any affiliate thereof.

(b) SUPERVISION.—

(1) IN GENERAL.—The Bureau shall have exclusive authority to require reports and conduct examinations on a periodic basis of persons described in subsection (a) for purposes of—

(A) assessing compliance with the requirements of Federal consumer financial laws;

(B) obtaining information about the activities subject to such laws and the associated compliance systems or procedures of such persons; and

(C) detecting and assessing associated risks to consumers and to markets for consumer financial products and services.

(2) COORDINATION.—To minimize regulatory burden, the Bureau shall coordinate its supervisory activities with the supervisory activities conducted by prudential regulators and the State bank regulatory authorities, including consultation regarding their respective schedules for examining such persons described in subsection (a) and requirements regarding reports to be submitted by such persons.

(3) USE OF EXISTING REPORTS.—The Bureau shall, to the fullest extent possible, use—

(A) reports pertaining to a person described in subsection (a) that have been provided or required to have been provided to a Federal or State agency; and

(B) information that has been reported publicly.

(4) PRESERVATION OF AUTHORITY.—Nothing in this title may be construed as limiting the authority of the Director to require reports from a person described in subsection (a), as permitted under paragraph (1), regarding information owned

H. R. 4173—616

or under the control of such person, regardless of whether such information is maintained, stored, or processed by another person.

(5) REPORTS OF TAX LAW NONCOMPLIANCE.—The Bureau shall provide the Commissioner of Internal Revenue with any report of examination or related information identifying possible tax law noncompliance.

(c) PRIMARY ENFORCEMENT AUTHORITY.—

(1) THE BUREAU TO HAVE PRIMARY ENFORCEMENT AUTHORITY.—To the extent that the Bureau and another Federal agency are authorized to enforce a Federal consumer financial law, the Bureau shall have primary authority to enforce that Federal consumer financial law with respect to any person described in subsection (a).

(2) REFERRAL.—Any Federal agency, other than the Federal Trade Commission, that is authorized to enforce a Federal consumer financial law may recommend, in writing, to the Bureau that the Bureau initiate an enforcement proceeding with respect to a person described in subsection (a), as the Bureau is authorized to do by that Federal consumer financial law.

(3) BACKUP ENFORCEMENT AUTHORITY OF OTHER FEDERAL AGENCY.—If the Bureau does not, before the end of the 120-day period beginning on the date on which the Bureau receives a recommendation under paragraph (2), initiate an enforcement proceeding, the other agency referred to in paragraph (2) may initiate an enforcement proceeding, including performing follow up supervisory and support functions incidental thereto, to assure compliance with such proceeding.

(d) SERVICE PROVIDERS.—A service provider to a person described in subsection (a) shall be subject to the authority of the Bureau under this section, to the same extent as if the Bureau were an appropriate Federal banking agency under section 7(c) of the Bank Service Company Act 12 U.S.C. 1867(c). In conducting any examination or requiring any report from a service provider subject to this subsection, the Bureau shall coordinate with the appropriate prudential regulator.

(e) SIMULTANEOUS AND COORDINATED SUPERVISORY ACTION.—

(1) EXAMINATIONS.—A prudential regulator and the Bureau shall, with respect to each insured depository institution, insured credit union, or other covered person described in subsection (a) that is supervised by the prudential regulator and the Bureau, respectively—

(A) coordinate the scheduling of examinations of the insured depository institution, insured credit union, or other covered person described in subsection (a);

(B) conduct simultaneous examinations of each insured depository institution or insured credit union, unless such institution requests examinations to be conducted separately;

(C) share each draft report of examination with the other agency and permit the receiving agency a reasonable opportunity (which shall not be less than a period of 30 days after the date of receipt) to comment on the draft report before such report is made final; and

H. R. 4173—617

(D) prior to issuing a final report of examination or taking supervisory action, take into consideration concerns, if any, raised in the comments made by the other agency.

(2) COORDINATION WITH STATE BANK SUPERVISORS.—The Bureau shall pursue arrangements and agreements with State bank supervisors to coordinate examinations, consistent with paragraph (1).

(3) AVOIDANCE OF CONFLICT IN SUPERVISION.—

(A) REQUEST.—If the proposed supervisory determinations of the Bureau and a prudential regulator (in this section referred to collectively as the "agencies") are conflicting, an insured depository institution, insured credit union, or other covered person described in subsection (a) may request the agencies to coordinate and present a joint statement of coordinated supervisory action.

(B) JOINT STATEMENT.—The agencies shall provide a joint statement under subparagraph (A), not later than 30 days after the date of receipt of the request of the insured depository institution, credit union, or covered person described in subsection (a).

(4) APPEALS TO GOVERNING PANEL.—

(A) IN GENERAL.—If the agencies do not resolve the conflict or issue a joint statement required by subparagraph (B), or if either of the agencies takes or attempts to take any supervisory action relating to the request for the joint statement without the consent of the other agency, an insured depository institution, insured credit union, or other covered person described in subsection (a) may institute an appeal to a governing panel, as provided in this subsection, not later than 30 days after the expiration of the period during which a joint statement is required to be filed under paragraph (3)(B).

(B) COMPOSITION OF GOVERNING PANEL.—The governing panel for an appeal under this paragraph shall be composed of—

(i) a representative from the Bureau and a representative of the prudential regulator, both of whom—

(I) have not participated in the material supervisory determinations under appeal; and

(II) do not directly or indirectly report to the person who participated materially in the supervisory determinations under appeal; and

(ii) one individual representative, to be determined on a rotating basis, from among the Board of Governors, the Corporation, the National Credit Union Administration, and the Office of the Comptroller of the Currency, other than any agency involved in the subject dispute.

(C) CONDUCT OF APPEAL.—In an appeal under this paragraph—

(i) the insured depository institution, insured credit union, or other covered person described in subsection (a)—

(I) shall include in its appeal all the facts and legal arguments pertaining to the matter; and

H. R. 4173—618

(II) may, through counsel, employees, or representatives, appear before the governing panel in person or by telephone; and
(ii) the governing panel—
(I) may request the insured depository institution, insured credit union, or other covered person described in subsection (a), the Bureau, or the prudential regulator to produce additional information relevant to the appeal; and
(II) by a majority vote of its members, shall provide a final determination, in writing, not later than 30 days after the date of filing of an informationally complete appeal, or such longer period as the panel and the insured depository institution, insured credit union, or other covered person described in subsection (a) may jointly agree.
(D) PUBLIC AVAILABILITY OF DETERMINATIONS.—A governing panel shall publish all information contained in a determination by the governing panel, with appropriate redactions of information that would be subject to an exemption from disclosure under section 552 of title 5, United States Code.
(E) PROHIBITION AGAINST RETALIATION.—The Bureau and the prudential regulators shall prescribe rules to provide safeguards from retaliation against the insured depository institution, insured credit union, or other covered person described in subsection (a) instituting an appeal under this paragraph, as well as their officers and employees.
(F) LIMITATION.—The process provided in this paragraph shall not apply to a determination by a prudential regulator to appoint a conservator or receiver for an insured depository institution or a liquidating agent for an insured credit union, as the case may be, or a decision to take action pursuant to section 38 of the Federal Deposit Insurance Act (12 U.S.C. 1831o) or section 212 of the Federal Credit Union Act (112 U.S.C. 1790a), as applicable.
(G) EFFECT ON OTHER AUTHORITY.—Nothing in this section shall modify or limit the authority of the Bureau to interpret, or take enforcement action under, any Federal consumer financial law, or the authority of a prudential regulator to interpret or take enforcement action under any other provision of Federal law for safety and soundness purposes.

**SEC. 1026. OTHER BANKS, SAVINGS ASSOCIATIONS, AND CREDIT UNIONS.**

(a) SCOPE OF COVERAGE.—This section shall apply to any covered person that is—
(1) an insured depository institution with total assets of $10,000,000,000 or less; or
(2) an insured credit union with total assets of $10,000,000,000 or less.
(b) REPORTS.—The Director may require reports from a person described in subsection (a), as necessary to support the role of the Bureau in implementing Federal consumer financial law, to

H. R. 4173—619

support its examination activities under subsection (c), and to assess and detect risks to consumers and consumer financial markets.

(1) USE OF EXISTING REPORTS.—The Bureau shall, to the fullest extent possible, use—

(A) reports pertaining to a person described in subsection (a) that have been provided or required to have been provided to a Federal or State agency; and

(B) information that has been reported publicly.

(2) PRESERVATION OF AUTHORITY.—Nothing in this subsection may be construed as limiting the authority of the Director from requiring from a person described in subsection (a), as permitted under paragraph (1), information owned or under the control of such person, regardless of whether such information is maintained, stored, or processed by another person.

(3) REPORTS OF TAX LAW NONCOMPLIANCE.—The Bureau shall provide the Commissioner of Internal Revenue with any report of examination or related information identifying possible tax law noncompliance.

(c) EXAMINATIONS.—

(1) IN GENERAL.—The Bureau may, at its discretion, include examiners on a sampling basis of the examinations performed by the prudential regulator to assess compliance with the requirements of Federal consumer financial law of persons described in subsection (a).

(2) AGENCY COORDINATION.—The prudential regulator shall—

(A) provide all reports, records, and documentation related to the examination process for any institution included in the sample referred to in paragraph (1) to the Bureau on a timely and continual basis;

(B) involve such Bureau examiner in the entire examination process for such person; and

(C) consider input of the Bureau concerning the scope of an examination, conduct of the examination, the contents of the examination report, the designation of matters requiring attention, and examination ratings.

(d) ENFORCEMENT.—

(1) IN GENERAL.—Except for requiring reports under subsection (b), the prudential regulator is authorized to enforce the requirements of Federal consumer financial laws and, with respect to a covered person described in subsection (a), shall have exclusive authority (relative to the Bureau) to enforce such laws .

(2) COORDINATION WITH PRUDENTIAL REGULATOR.—

(A) REFERRAL.—When the Bureau has reason to believe that a person described in subsection (a) has engaged in a material violation of a Federal consumer financial law, the Bureau shall notify the prudential regulator in writing and recommend appropriate action to respond.

(B) RESPONSE.—Upon receiving a recommendation under subparagraph (A), the prudential regulator shall provide a written response to the Bureau not later than 60 days thereafter.

(e) SERVICE PROVIDERS.—A service provider to a substantial number of persons described in subsection (a) shall be subject to the authority of the Bureau under section 1025 to the same

H. R. 4173—620

extent as if the Bureau were an appropriate Federal bank agency under section 7(c) of the Bank Service Company Act (12 U.S.C. 1867(c)). When conducting any examination or requiring any report from a service provider subject to this subsection, the Bureau shall coordinate with the appropriate prudential regulator.

**SEC. 1027. LIMITATIONS ON AUTHORITIES OF THE BUREAU; PRESERVA-TION OF AUTHORITIES.**

(a) EXCLUSION FOR MERCHANTS, RETAILERS, AND OTHER SELLERS OF NONFINANCIAL GOODS OR SERVICES.—

(1) SALE OR BROKERAGE OF NONFINANCIAL GOOD OR SERVICE.—The Bureau may not exercise any rulemaking, super-visory, enforcement or other authority under this title with respect to a person who is a merchant, retailer, or seller of any nonfinancial good or service and is engaged in the sale or brokerage of such nonfinancial good or service, except to the extent that such person is engaged in offering or providing any consumer financial product or service, or is otherwise sub-ject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H.

(2) OFFERING OR PROVISION OF CERTAIN CONSUMER FINAN-CIAL PRODUCTS OR SERVICES IN CONNECTION WITH THE SALE OR BROKERAGE OF NONFINANCIAL GOOD OR SERVICE.—

(A) IN GENERAL.—Except as provided in subparagraph (B), and subject to subparagraph (C), the Bureau may not exercise any rulemaking, supervisory, enforcement, or other authority under this title with respect to a merchant, retailer, or seller of nonfinancial goods or services, but only to the extent that such person—

(i) extends credit directly to a consumer, in a case in which the good or service being provided is not itself a consumer financial product or service (other than credit described in this subparagraph), exclusively for the purpose of enabling that consumer to purchase such nonfinancial good or service directly from the merchant, retailer, or seller;

(ii) directly, or through an agreement with another person, collects debt arising from credit extended as described in clause (i); or

(iii) sells or conveys debt described in clause (i) that is delinquent or otherwise in default.

(B) APPLICABILITY.—Subparagraph (A) does not apply to any credit transaction or collection of debt, other than as described in subparagraph (C)(i), arising from a trans-action described in subparagraph (A)—

(i) in which the merchant, retailer, or seller of nonfinancial goods or services assigns, sells or other-wise conveys to another person such debt owed by the consumer (except for a sale of debt that is delin-quent or otherwise in default, as described in subpara-graph (A)(iii));

(ii) in which the credit extended significantly exceeds the market value of the nonfinancial good or service provided, or the Bureau otherwise finds that the sale of the nonfinancial good or service is done as a subterfuge, so as to evade or circumvent the provisions of this title; or

H. R. 4173—621

(iii) in which the merchant, retailer, or seller of nonfinancial goods or services regularly extends credit and the credit is subject to a finance charge.

(C) LIMITATIONS.—

(i) IN GENERAL.—Notwithstanding subparagraph (B), subparagraph (A) shall apply with respect to a merchant, retailer, or seller of nonfinancial goods or services that is not engaged significantly in offering or providing consumer financial products or services.

(ii) EXCEPTION.—Subparagraph (A) and clause (i) of this subparagraph do not apply to any merchant, retailer, or seller of nonfinancial goods or services—

(I) if such merchant, retailer, or seller of nonfinancial goods or services is engaged in a transaction described in subparagraph (B)(i) or (B)(ii); or

(II) to the extent that such merchant, retailer, or seller is subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H, but the Bureau may exercise such authority only with respect to that law.

(D) RULES.—

(i) AUTHORITY OF OTHER AGENCIES.—No provision of this title shall be construed as modifying, limiting, or superseding the supervisory or enforcement authority of the Federal Trade Commission or any other agency (other than the Bureau) with respect to credit extended, or the collection of debt arising from such extension, directly by a merchant or retailer to a consumer exclusively for the purpose of enabling that consumer to purchase nonfinancial goods or services directly from the merchant or retailer.

(ii) SMALL BUSINESSES.—A merchant, retailer, or seller of nonfinancial goods or services that would otherwise be subject to the authority of the Bureau solely by virtue of the application of subparagraph (B)(iii) shall be deemed not to be engaged significantly in offering or providing consumer financial products or services under subparagraph (C)(i), if such person—

(I) only extends credit for the sale of nonfinancial goods or services, as described in subparagraph (A)(i);

(II) retains such credit on its own accounts (except to sell or convey such debt that is delinquent or otherwise in default); and

(III) meets the relevant industry size threshold to be a small business concern, based on annual receipts, pursuant to section 3 of the Small Business Act (15 U.S.C. 632) and the implementing rules thereunder.

(iii) INITIAL YEAR.—A merchant, retailer, or seller of nonfinancial goods or services shall be deemed to meet the relevant industry size threshold described in clause (ii)(III) during the first year of operations of that business concern if, during that year, the

H. R. 4173—622

receipts of that business concern reasonably are expected to meet that size threshold.

(iv) OTHER STANDARDS FOR SMALL BUSINESS.—With respect to a merchant, retailer, or seller of nonfinancial goods or services that is a classified on a basis other than annual receipts for the purposes of section 3 of the Small Business Act (15 U.S.C. 632) and the implementing rules thereunder, such merchant, retailer, or seller shall be deemed to meet the relevant industry size threshold described in clause (ii)(III) if such merchant, retailer, or seller meets the relevant industry size threshold to be a small business concern based on the number of employees, or other such applicable measure, established under that Act.

(E) EXCEPTION FROM STATE ENFORCEMENT.—To the extent that the Bureau may not exercise authority under this subsection with respect to a merchant, retailer, or seller of nonfinancial goods or services, no action by a State attorney general or State regulator with respect to a claim made under this title may be brought under subsection 1042(a), with respect to an activity described in any of clauses (i) through (iii) of subparagraph (A) by such merchant, retailer, or seller of nonfinancial goods or services.

(b) EXCLUSION FOR REAL ESTATE BROKERAGE ACTIVITIES.—

(1) REAL ESTATE BROKERAGE ACTIVITIES EXCLUDED.—Without limiting subsection (a), and except as permitted in paragraph (2), the Bureau may not exercise any rulemaking, supervisory, enforcement, or other authority under this title with respect to a person that is licensed or registered as a real estate broker or real estate agent, in accordance with State law, to the extent that such person—

(A) acts as a real estate agent or broker for a buyer, seller, lessor, or lessee of real property;

(B) brings together parties interested in the sale, purchase, lease, rental, or exchange of real property;

(C) negotiates, on behalf of any party, any portion of a contract relating to the sale, purchase, lease, rental, or exchange of real property (other than in connection with the provision of financing with respect to any such transaction); or

(D) offers to engage in any activity, or act in any capacity, described in subparagraph (A), (B), or (C).

(2) DESCRIPTION OF ACTIVITIES.—The Bureau may exercise rulemaking, supervisory, enforcement, or other authority under this title with respect to a person described in paragraph (1) when such person is—

(A) engaged in an activity of offering or providing any consumer financial product or service, except that the Bureau may exercise such authority only with respect to that activity; or

(B) otherwise subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H, but the Bureau may exercise such authority only with respect to that law.

(c) EXCLUSION FOR MANUFACTURED HOME RETAILERS AND MODULAR HOME RETAILERS.—

H. R. 4173—623

(1) IN GENERAL.—The Director may not exercise any rule-making, supervisory, enforcement, or other authority over a person to the extent that—

(A) such person is not described in paragraph (2); and

(B) such person—

(i) acts as an agent or broker for a buyer or seller of a manufactured home or a modular home;

(ii) facilitates the purchase by a consumer of a manufactured home or modular home, by negotiating the purchase price or terms of the sales contract (other than providing financing with respect to such transaction); or

(iii) offers to engage in any activity described in clause (i) or (ii).

(2) DESCRIPTION OF ACTIVITIES.—A person is described in this paragraph to the extent that such person is engaged in the offering or provision of any consumer financial product or service or is otherwise subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H.

(3) DEFINITIONS.—For purposes of this subsection, the following definitions shall apply:

(A) MANUFACTURED HOME.—The term "manufactured home" has the same meaning as in section 603 of the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C. 5402).

(B) MODULAR HOME.—The term "modular home" means a house built in a factory in 2 or more modules that meet the State or local building codes where the house will be located, and where such modules are transported to the building site, installed on foundations, and completed.

(d) EXCLUSION FOR ACCOUNTANTS AND TAX PREPARERS.—

(1) IN GENERAL.—Except as permitted in paragraph (2), the Bureau may not exercise any rulemaking, supervisory, enforcement, or other authority over—

(A) any person that is a certified public accountant, permitted to practice as a certified public accounting firm, or certified or licensed for such purpose by a State, or any individual who is employed by or holds an ownership interest with respect to a person described in this subparagraph, when such person is performing or offering to perform—

(i) customary and usual accounting activities, including the provision of accounting, tax, advisory, or other services that are subject to the regulatory authority of a State board of accountancy or a Federal authority; or

(ii) other services that are incidental to such customary and usual accounting activities, to the extent that such incidental services are not offered or provided—

(I) by the person separate and apart from such customary and usual accounting activities; or

(II) to consumers who are not receiving such customary and usual accounting activities; or

H. R. 4173—624

(B) any person, other than a person described in subparagraph (A) that performs income tax preparation activities for consumers.

(2) DESCRIPTION OF ACTIVITIES.—

(A) IN GENERAL.—Paragraph (1) shall not apply to any person described in paragraph (1)(A) or (1)(B) to the extent that such person is engaged in any activity which is not a customary and usual accounting activity described in paragraph (1)(A) or incidental thereto but which is the offering or provision of any consumer financial product or service, except to the extent that a person described in paragraph (1)(A) is engaged in an activity which is a customary and usual accounting activity described in paragraph (1)(A), or incidental thereto.

(B) NOT A CUSTOMARY AND USUAL ACCOUNTING ACTIVITY.—For purposes of this subsection, extending or brokering credit is not a customary and usual accounting activity, or incidental thereto.

(C) RULE OF CONSTRUCTION.—For purposes of subparagraphs (A) and (B), a person described in paragraph (1)(A) shall not be deemed to be extending credit, if such person is only extending credit directly to a consumer, exclusively for the purpose of enabling such consumer to purchase services described in clause (i) or (ii) of paragraph (1)(A) directly from such person, and such credit is—

(i) not subject to a finance charge; and

(ii) not payable by written agreement in more than 4 installments.

(D) OTHER LIMITATIONS.—Paragraph (1) does not apply to any person described in paragraph (1)(A) or (1)(B) that is otherwise subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H.

(e) EXCLUSION FOR PRACTICE OF LAW.—

(1) IN GENERAL.—Except as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law.

(2) RULE OF CONSTRUCTION.—Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 1002(5)—

(A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or

(B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

(3) EXISTING AUTHORITY.—Paragraph (1) shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or the authorities transferred under subtitle F or H.

(f) EXCLUSION FOR PERSONS REGULATED BY A STATE INSURANCE REGULATOR.—

(1) IN GENERAL.—No provision of this title shall be construed as altering, amending, or affecting the authority of any State insurance regulator to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by a State insurance regulator. Except as provided in paragraph (2), the Bureau shall have no authority to exercise any power to enforce this title with respect to a person regulated by a State insurance regulator.

(2) DESCRIPTION OF ACTIVITIES.—Paragraph (1) does not apply to any person described in such paragraph to the extent that such person is engaged in the offering or provision of any consumer financial product or service or is otherwise subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H.

(3) STATE INSURANCE AUTHORITY UNDER GRAMM-LEACH-BLILEY.—Notwithstanding paragraph (2), the Bureau shall not exercise any authorities that are granted a State insurance authority under section 505(a)(6) of the Gramm-Leach-Bliley Act with respect to a person regulated by a State insurance authority.

(g) EXCLUSION FOR EMPLOYEE BENEFIT AND COMPENSATION PLANS AND CERTAIN OTHER ARRANGEMENTS UNDER THE INTERNAL REVENUE CODE OF 1986.—

(1) PRESERVATION OF AUTHORITY OF OTHER AGENCIES.—No provision of this title shall be construed as altering, amending, or affecting the authority of the Secretary of the Treasury, the Secretary of Labor, or the Commissioner of Internal Revenue to adopt regulations, initiate enforcement proceedings, or take any actions with respect to any specified plan or arrangement.

(2) ACTIVITIES NOT CONSTITUTING THE OFFERING OR PROVISION OF ANY CONSUMER FINANCIAL PRODUCT OR SERVICE.—For purposes of this title, a person shall not be treated as having engaged in the offering or provision of any consumer financial product or service solely because such person is—

(A) a specified plan or arrangement;

(B) engaged in the activity of establishing or maintaining, for the benefit of employees of such person (or for members of an employee organization), any specified plan or arrangement; or

(C) engaged in the activity of establishing or maintaining a qualified tuition program under section 529(b)(1) of the Internal Revenue Code of 1986 offered by a State or other prepaid tuition program offered by a State.

(3) LIMITATION ON BUREAU AUTHORITY.—

(A) IN GENERAL.—Except as provided under subparagraphs (B) and (C), the Bureau may not exercise any rulemaking or enforcement authority with respect to products or services that relate to any specified plan or arrangement.

(B) BUREAU ACTION PURSUANT TO AGENCY REQUEST.—

(i) AGENCY REQUEST.—The Secretary and the Secretary of Labor may jointly issue a written request to the Bureau regarding implementation of appropriate consumer protection standards under this title with

H. R. 4173—626

respect to the provision of services relating to any specified plan or arrangement.

(ii) AGENCY RESPONSE.—In response to a request by the Bureau, the Secretary and the Secretary of Labor shall jointly issue a written response, not later than 90 days after receipt of such request, to grant or deny the request of the Bureau regarding implementation of appropriate consumer protection standards under this title with respect to the provision of services relating to any specified plan or arrangement.

(iii) SCOPE OF BUREAU ACTION.—Subject to a request or response pursuant to clause (i) or clause (ii) by the agencies made under this subparagraph, the Bureau may exercise rulemaking authority, and may act to enforce a rule prescribed pursuant to such request or response, in accordance with the provisions of this title. A request or response made by the Secretary and the Secretary of Labor under this subparagraph shall describe the basis for, and scope of, appropriate consumer protection standards to be implemented under this title with respect to the provision of services relating to any specified plan or arrangement.

(C) DESCRIPTION OF PRODUCTS OR SERVICES.—To the extent that a person engaged in providing products or services relating to any specified plan or arrangement is subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H, subparagraph (A) shall not apply with respect to that law.

(4) SPECIFIED PLAN OR ARRANGEMENT.—For purposes of this subsection, the term "specified plan or arrangement" means any plan, account, or arrangement described in section 220, 223, 401(a), 403(a), 403(b), 408, 408A, 529, or 530 of the Internal Revenue Code of 1986, or any employee benefit or compensation plan or arrangement, including a plan that is subject to title I of the Employee Retirement Income Security Act of 1974, or any prepaid tuition program offered by a State.

(h) PERSONS REGULATED BY A STATE SECURITIES COMMISSION.—

(1) IN GENERAL.—No provision of this title shall be construed as altering, amending, or affecting the authority of any securities commission (or any agency or office performing like functions) of any State to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by any securities commission (or any agency or office performing like functions) of any State. Except as permitted in paragraph (2) and subsection (f), the Bureau shall have no authority to exercise any power to enforce this title with respect to a person regulated by any securities commission (or any agency or office performing like functions) of any State, but only to the extent that the person acts in such regulated capacity.

(2) DESCRIPTION OF ACTIVITIES.—Paragraph (1) shall not apply to any person to the extent such person is engaged in the offering or provision of any consumer financial product or service, or is otherwise subject to any enumerated consumer

H. R. 4173—627

law or any law for which authorities are transferred under subtitle F or H.

(i) EXCLUSION FOR PERSONS REGULATED BY THE COMMISSION.—

(1) IN GENERAL.—No provision of this title may be construed as altering, amending, or affecting the authority of the Commission to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Commission. The Bureau shall have no authority to exercise any power to enforce this title with respect to a person regulated by the Commission.

(2) CONSULTATION AND COORDINATION.—Notwithstanding paragraph (1), the Commission shall consult and coordinate, where feasible, with the Bureau with respect to any rule (including any advance notice of proposed rulemaking) regarding an investment product or service that is the same type of product as, or that competes directly with, a consumer financial product or service that is subject to the jurisdiction of the Bureau under this title or under any other law. In carrying out this paragraph, the agencies shall negotiate an agreement to establish procedures for such coordination, including procedures for providing advance notice to the Bureau when the Commission is initiating a rulemaking.

(j) EXCLUSION FOR PERSONS REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION.—

(1) IN GENERAL.—No provision of this title shall be construed as altering, amending, or affecting the authority of the Commodity Futures Trading Commission to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Commodity Futures Trading Commission. The Bureau shall have no authority to exercise any power to enforce this title with respect to a person regulated by the Commodity Futures Trading Commission.

(2) CONSULTATION AND COORDINATION.—Notwithstanding paragraph (1), the Commodity Futures Trading Commission shall consult and coordinate with the Bureau with respect to any rule (including any advance notice of proposed rulemaking) regarding a product or service that is the same type of product as, or that competes directly with, a consumer financial product or service that is subject to the jurisdiction of the Bureau under this title or under any other law.

(k) EXCLUSION FOR PERSONS REGULATED BY THE FARM CREDIT ADMINISTRATION.—

(1) IN GENERAL.—No provision of this title shall be construed as altering, amending, or affecting the authority of the Farm Credit Administration to adopt rules, initiate enforcement proceedings, or take any other action with respect to a person regulated by the Farm Credit Administration. The Bureau shall have no authority to exercise any power to enforce this title with respect to a person regulated by the Farm Credit Administration.

(2) DEFINITION.—For purposes of this subsection, the term "person regulated by the Farm Credit Administration" means any Farm Credit System institution that is chartered and subject to the provisions of the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.).

(l) EXCLUSION FOR ACTIVITIES RELATING TO CHARITABLE CONTRIBUTIONS.—

H. R. 4173—628

(1) IN GENERAL.—The Director and the Bureau may not exercise any rulemaking, supervisory, enforcement, or other authority, including authority to order penalties, over any activities related to the solicitation or making of voluntary contributions to a tax-exempt organization as recognized by the Internal Revenue Service, by any agent, volunteer, or representative of such organizations to the extent the organization, agent, volunteer, or representative thereof is soliciting or providing advice, information, education, or instruction to any donor or potential donor relating to a contribution to the organization.

(2) LIMITATION.—The exclusion in paragraph (1) does not apply to other activities not described in paragraph (1) that are the offering or provision of any consumer financial product or service, or are otherwise subject to any enumerated consumer law or any law for which authorities are transferred under subtitle F or H.

(m) INSURANCE.—The Bureau may not define as a financial product or service, by regulation or otherwise, engaging in the business of insurance.

(n) LIMITED AUTHORITY OF THE BUREAU.—Notwithstanding subsections (a) through (h) and (l), a person subject to or described in one or more of such provisions—

(1) may be a service provider; and

(2) may be subject to requests from, or requirements imposed by, the Bureau regarding information in order to carry out the responsibilities and functions of the Bureau and in accordance with section 1022, 1052, or 1053.

(o) NO AUTHORITY TO IMPOSE USURY LIMIT.—No provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit applicable to an extension of credit offered or made by a covered person to a consumer, unless explicitly authorized by law.

(p) ATTORNEY GENERAL.—No provision of this title, including section 1024(c)(1), shall affect the authorities of the Attorney General under otherwise applicable provisions of law.

(q) SECRETARY OF THE TREASURY.—No provision of this title shall affect the authorities of the Secretary, including with respect to prescribing rules, initiating enforcement proceedings, or taking other actions with respect to a person that performs income tax preparation activities for consumers.

(r) DEPOSIT INSURANCE AND SHARE INSURANCE.—Nothing in this title shall affect the authority of the Corporation under the Federal Deposit Insurance Act or the National Credit Union Administration Board under the Federal Credit Union Act as to matters related to deposit insurance and share insurance, respectively.

(s) FAIR HOUSING ACT.—No provision of this title shall be construed as affecting any authority arising under the Fair Housing Act.

**SEC. 1028. AUTHORITY TO RESTRICT MANDATORY PRE-DISPUTE ARBITRATION.**

(a) STUDY AND REPORT.—The Bureau shall conduct a study of, and shall provide a report to Congress concerning, the use of agreements providing for arbitration of any future dispute

H. R. 4173—629

between covered persons and consumers in connection with the offering or providing of consumer financial products or services.

(b) FURTHER AUTHORITY.—The Bureau, by regulation, may prohibit or impose conditions or limitations on the use of an agreement between a covered person and a consumer for a consumer financial product or service providing for arbitration of any future dispute between the parties, if the Bureau finds that such a prohibition or imposition of conditions or limitations is in the public interest and for the protection of consumers. The findings in such rule shall be consistent with the study conducted under subsection (a).

(c) LIMITATION.—The authority described in subsection (b) may not be construed to prohibit or restrict a consumer from entering into a voluntary arbitration agreement with a covered person after a dispute has arisen.

(d) EFFECTIVE DATE.—Notwithstanding any other provision of law, any regulation prescribed by the Bureau under subsection (b) shall apply, consistent with the terms of the regulation, to any agreement between a consumer and a covered person entered into after the end of the 180-day period beginning on the effective date of the regulation, as established by the Bureau.

**SEC. 1029. EXCLUSION FOR AUTO DEALERS.**

(a) SALE, SERVICING, AND LEASING OF MOTOR VEHICLES EXCLUDED.—Except as permitted in subsection (b), the Bureau may not exercise any rulemaking, supervisory, enforcement or any other authority, including any authority to order assessments, over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.

(b) CERTAIN FUNCTIONS EXCEPTED.—Subsection (a) shall not apply to any person, to the extent that such person—

(1) provides consumers with any services related to residential or commercial mortgages or self-financing transactions involving real property;

(2) operates a line of business—

(A) that involves the extension of retail credit or retail leases involving motor vehicles; and

(B) in which—

(i) the extension of retail credit or retail leases are provided directly to consumers; and

(ii) the contract governing such extension of retail credit or retail leases is not routinely assigned to an unaffiliated third party finance or leasing source; or

(3) offers or provides a consumer financial product or service not involving or related to the sale, financing, leasing, rental, repair, refurbishment, maintenance, or other servicing of motor vehicles, motor vehicle parts, or any related or ancillary product or service.

(c) PRESERVATION OF AUTHORITIES OF OTHER AGENCIES.— Except as provided in subsections (b) and (d), nothing in this title, including subtitle F, shall be construed as modifying, limiting, or superseding the operation of any provision of Federal law, or otherwise affecting the authority of the Board of Governors, the Federal Trade Commission, or any other Federal agency, with respect to a person described in subsection (a).

(d) FEDERAL TRADE COMMISSION AUTHORITY.—Notwithstanding section 18 of the Federal Trade Commission Act, the Federal Trade

H. R. 4173—630

Commission is authorized to prescribe rules under sections 5 and 18(a)(1)(B) of the Federal Trade Commission Act. in accordance with section 553 of title 5, United States Code, with respect to a person described in subsection (a).

(e) COORDINATION WITH OFFICE OF SERVICE MEMBER AFFAIRS.—The Board of Governors and the Federal Trade Commission shall coordinate with the Office of Service Member Affairs, to ensure that—

(1) service members and their families are educated and empowered to make better informed decisions regarding consumer financial products and services offered by motor vehicle dealers, with a focus on motor vehicle dealers in the proximity of military installations; and

(2) complaints by service members and their families concerning such motor vehicle dealers are effectively monitored and responded to, and where appropriate, enforcement action is pursued by the authorized agencies.

(f) DEFINITIONS.—For purposes of this section, the following definitions shall apply:

(1) MOTOR VEHICLE.—The term "motor vehicle" means—

(A) any self-propelled vehicle designed for transporting persons or property on a street, highway, or other road;

(B) recreational boats and marine equipment;

(C) motorcycles;

(D) motor homes, recreational vehicle trailers, and slide-in campers, as those terms are defined in sections 571.3 and 575.103 (d) of title 49, Code of Federal Regulations, or any successor thereto; and

(E) other vehicles that are titled and sold through dealers.

(2) MOTOR VEHICLE DEALER.—The term "motor vehicle dealer" means any person or resident in the United States, or any territory of the United States, who—

(A) is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of motor vehicles; and

(B) takes title to, holds an ownership in, or takes physical custody of motor vehicles.

**SEC. 1029A. EFFECTIVE DATE.**

This subtitle shall become effective on the designated transfer date, except that sections 1022, 1024, and 1025(e) shall become effective on the date of enactment of this Act.

# Subtitle C—Specific Bureau Authorities

**SEC. 1031. PROHIBITING UNFAIR, DECEPTIVE, OR ABUSIVE ACTS OR PRACTICES.**

(a) IN GENERAL.—The Bureau may take any action authorized under subtitle E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.

(b) RULEMAKING.—The Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful

H. R. 4173—631

unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. Rules under this section may include requirements for the purpose of preventing such acts or practices.

(c) UNFAIRNESS.—

(1) IN GENERAL.—The Bureau shall have no authority under this section to declare an act or practice in connection with a transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—

(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

(B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition.

(2) CONSIDERATION OF PUBLIC POLICIES.—In determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

(d) ABUSIVE.—The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of—

(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

(B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

(e) CONSULTATION.—In prescribing rules under this section, the Bureau shall consult with the Federal banking agencies, or other Federal agencies, as appropriate, concerning the consistency of the proposed rule with prudential, market, or systemic objectives administered by such agencies.

(f) CONSIDERATION OF SEASONAL INCOME.—The rules of the Bureau under this section shall provide, with respect to an extension of credit secured by residential real estate or a dwelling, if documented income of the borrower, including income from a small business, is a repayment source for an extension of credit secured by residential real estate or a dwelling, the creditor may consider the seasonality and irregularity of such income in the underwriting of and scheduling of payments for such credit.

**SEC. 1032. DISCLOSURES.**

(a) IN GENERAL.—The Bureau may prescribe rules to ensure that the features of any consumer financial product or service, both initially and over the term of the product or service, are

H. R. 4173—632

fully, accurately, and effectively disclosed to consumers in a manner that permits consumers to understand the costs, benefits, and risks associated with the product or service, in light of the facts and circumstances.

(b) MODEL DISCLOSURES.—

(1) IN GENERAL.—Any final rule prescribed by the Bureau under this section requiring disclosures may include a model form that may be used at the option of the covered person for provision of the required disclosures.

(2) FORMAT.—A model form issued pursuant to paragraph (1) shall contain a clear and conspicuous disclosure that, at a minimum—

(A) uses plain language comprehensible to consumers;

(B) contains a clear format and design, such as an easily readable type font; and

(C) succinctly explains the information that must be communicated to the consumer.

(3) CONSUMER TESTING.—Any model form issued pursuant to this subsection shall be validated through consumer testing.

(c) BASIS FOR RULEMAKING.—In prescribing rules under this section, the Bureau shall consider available evidence about consumer awareness, understanding of, and responses to disclosures or communications about the risks, costs, and benefits of consumer financial products or services.

(d) SAFE HARBOR.—Any covered person that uses a model form included with a rule issued under this section shall be deemed to be in compliance with the disclosure requirements of this section with respect to such model form.

(e) TRIAL DISCLOSURE PROGRAMS.—

(1) IN GENERAL.—The Bureau may permit a covered person to conduct a trial program that is limited in time and scope, subject to specified standards and procedures, for the purpose of providing trial disclosures to consumers that are designed to improve upon any model form issued pursuant to subsection (b)(1), or any other model form issued to implement an enumerated statute, as applicable.

(2) SAFE HARBOR.—The standards and procedures issued by the Bureau shall be designed to encourage covered persons to conduct trial disclosure programs. For the purposes of administering this subsection, the Bureau may establish a limited period during which a covered person conducting a trial disclosure program shall be deemed to be in compliance with, or may be exempted from, a requirement of a rule or an enumerated consumer law.

(3) PUBLIC DISCLOSURE.—The rules of the Bureau shall provide for public disclosure of trial disclosure programs, which public disclosure may be limited, to the extent necessary to encourage covered persons to conduct effective trials.

(f) COMBINED MORTGAGE LOAN DISCLOSURE.—Not later than 1 year after the designated transfer date, the Bureau shall propose for public comment rules and model disclosures that combine the disclosures required under the Truth in Lending Act and sections 4 and 5 of the Real Estate Settlement Procedures Act of 1974, into a single, integrated disclosure for mortgage loan transactions covered by those laws, unless the Bureau determines that any proposal issued by the Board of Governors and the Secretary of Housing and Urban Development carries out the same purpose.

H. R. 4173—633

**SEC. 1033. CONSUMER RIGHTS TO ACCESS INFORMATION.**

(a) IN GENERAL.—Subject to rules prescribed by the Bureau, a covered person shall make available to a consumer, upon request, information in the control or possession of the covered person concerning the consumer financial product or service that the consumer obtained from such covered person, including information relating to any transaction, series of transactions, or to the account including costs, charges and usage data. The information shall be made available in an electronic form usable by consumers.

(b) EXCEPTIONS.—A covered person may not be required by this section to make available to the consumer—

(1) any confidential commercial information, including an algorithm used to derive credit scores or other risk scores or predictors;

(2) any information collected by the covered person for the purpose of preventing fraud or money laundering, or detecting, or making any report regarding other unlawful or potentially unlawful conduct;

(3) any information required to be kept confidential by any other provision of law; or

(4) any information that the covered person cannot retrieve in the ordinary course of its business with respect to that information.

(c) NO DUTY TO MAINTAIN RECORDS.—Nothing in this section shall be construed to impose any duty on a covered person to maintain or keep any information about a consumer.

(d) STANDARDIZED FORMATS FOR DATA.—The Bureau, by rule, shall prescribe standards applicable to covered persons to promote the development and use of standardized formats for information, including through the use of machine readable files, to be made available to consumers under this section.

(e) CONSULTATION.—The Bureau shall, when prescribing any rule under this section, consult with the Federal banking agencies and the Federal Trade Commission to ensure, to the extent appropriate, that the rules—

(1) impose substantively similar requirements on covered persons;

(2) take into account conditions under which covered persons do business both in the United States and in other countries; and

(3) do not require or promote the use of any particular technology in order to develop systems for compliance.

**SEC. 1034. RESPONSE TO CONSUMER COMPLAINTS AND INQUIRIES.**

(a) TIMELY REGULATOR RESPONSE TO CONSUMERS.—The Bureau shall establish, in consultation with the appropriate Federal regulatory agencies, reasonable procedures to provide a timely response to consumers, in writing where appropriate, to complaints against, or inquiries concerning, a covered person, including—

(1) steps that have been taken by the regulator in response to the complaint or inquiry of the consumer;

(2) any responses received by the regulator from the covered person; and

(3) any follow-up actions or planned follow-up actions by the regulator in response to the complaint or inquiry of the consumer.

(b) TIMELY RESPONSE TO REGULATOR BY COVERED PERSON.—
A covered person subject to supervision and primary enforcement
by the Bureau pursuant to section 1025 shall provide a timely
response, in writing where appropriate, to the Bureau, the pruden-
tial regulators, and any other agency having jurisdiction over such
covered person concerning a consumer complaint or inquiry,
including—

(1) steps that have been taken by the covered person to
respond to the complaint or inquiry of the consumer;

(2) responses received by the covered person from the con-
sumer; and

(3) follow-up actions or planned follow-up actions by the
covered person to respond to the complaint or inquiry of the
consumer.

(c) PROVISION OF INFORMATION TO CONSUMERS.—

(1) IN GENERAL.—A covered person subject to supervision
and primary enforcement by the Bureau pursuant to section
1025 shall, in a timely manner, comply with a consumer request
for information in the control or possession of such covered
person concerning the consumer financial product or service
that the consumer obtained from such covered person, including
supporting written documentation, concerning the account of
the consumer.

(2) EXCEPTIONS.—A covered person subject to supervision
and primary enforcement by the Bureau pursuant to section
1025, a prudential regulator, and any other agency having
jurisdiction over a covered person subject to supervision and
primary enforcement by the Bureau pursuant to section 1025
may not be required by this section to make available to the
consumer—

(A) any confidential commercial information, including
an algorithm used to derive credit scores or other risk
scores or predictors;

(B) any information collected by the covered person
for the purpose of preventing fraud or money laundering,
or detecting or making any report regarding other unlawful
or potentially unlawful conduct;

(C) any information required to be kept confidential
by any other provision of law; or

(D) any nonpublic or confidential information,
including confidential supervisory information.

(d) AGREEMENTS WITH OTHER AGENCIES.—The Bureau shall
enter into a memorandum of understanding with any affected Fed-
eral regulatory agency regarding procedures by which any covered
person, and the prudential regulators, and any other agency having
jurisdiction over a covered person, including the Secretary of the
Department of Housing and Urban Development and the Secretary
of Education, shall comply with this section.

**SEC. 1035. PRIVATE EDUCATION LOAN OMBUDSMAN.**

(a) ESTABLISHMENT.—The Secretary, in consultation with the
Director, shall designate a Private Education Loan Ombudsman
(in this section referred to as the "Ombudsman") within the Bureau,
to provide timely assistance to borrowers of private education loans.

(b) PUBLIC INFORMATION.—The Secretary and the Director shall
disseminate information about the availability and functions of
the Ombudsman to borrowers and potential borrowers, as well

H. R. 4173—635

as institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in private education student loan programs.

(c) FUNCTIONS OF OMBUDSMAN.—The Ombudsman designated under this subsection shall—

(1) in accordance with regulations of the Director, receive, review, and attempt to resolve informally complaints from borrowers of loans described in subsection (a), including, as appropriate, attempts to resolve such complaints in collaboration with the Department of Education and with institutions of higher education, lenders, guaranty agencies, loan servicers, and other participants in private education loan programs;

(2) not later than 90 days after the designated transfer date, establish a memorandum of understanding with the student loan ombudsman established under section 141(f) of the Higher Education Act of 1965 (20 U.S.C. 1018(f)), to ensure coordination in providing assistance to and serving borrowers seeking to resolve complaints related to their private education or Federal student loans;

(3) compile and analyze data on borrower complaints regarding private education loans; and

(4) make appropriate recommendations to the Director, the Secretary, the Secretary of Education, the Committee on Banking, Housing, and Urban Affairs and the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Financial Services and the Committee on Education and Labor of the House of Representatives.

(d) ANNUAL REPORTS.—

(1) IN GENERAL.—The Ombudsman shall prepare an annual report that describes the activities, and evaluates the effectiveness of the Ombudsman during the preceding year.

(2) SUBMISSION.—The report required by paragraph (1) shall be submitted on the same date annually to the Secretary, the Secretary of Education, the Committee on Banking, Housing, and Urban Affairs and the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Financial Services and the Committee on Education and Labor of the House of Representatives.

(e) DEFINITIONS.—For purposes of this section, the terms "private education loan" and "institution of higher education" have the same meanings as in section 140 of the Truth in Lending Act (15 U.S.C. 1650).

**SEC. 1036. PROHIBITED ACTS.**

(a) IN GENERAL.—It shall be unlawful for—

(1) any covered person or service provider—

(A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

(B) to engage in any unfair, deceptive, or abusive act or practice;

(2) any covered person or service provider to fail or refuse, as required by Federal consumer financial law, or any rule or order issued by the Bureau thereunder—

(A) to permit access to or copying of records;

(B) to establish or maintain records; or

H. R. 4173—636

(C) to make reports or provide information to the Bureau; or

(3) any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder, and notwithstanding any provision of this title, the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided.

(b) EXCEPTION.—No person shall be held to have violated subsection (a)(1) solely by virtue of providing or selling time or space to a covered person or service provider placing an advertisement.

**SEC. 1037. EFFECTIVE DATE.**

This subtitle shall take effect on the designated transfer date.

# Subtitle D—Preservation of State Law

**SEC. 1041. RELATION TO STATE LAW.**

(a) IN GENERAL.—

(1) RULE OF CONSTRUCTION.—This title, other than sections 1044 through 1048, may not be construed as annulling, altering, or affecting, or exempting any person subject to the provisions of this title from complying with, the statutes, regulations, orders, or interpretations in effect in any State, except to the extent that any such provision of law is inconsistent with the provisions of this title, and then only to the extent of the inconsistency.

(2) GREATER PROTECTION UNDER STATE LAW.—For purposes of this subsection, a statute, regulation, order, or interpretation in effect in any State is not inconsistent with the provisions of this title if the protection that such statute, regulation, order, or interpretation affords to consumers is greater than the protection provided under this title. A determination regarding whether a statute, regulation, order, or interpretation in effect in any State is inconsistent with the provisions of this title may be made by the Bureau on its own motion or in response to a nonfrivolous petition initiated by any interested person.

(b) RELATION TO OTHER PROVISIONS OF ENUMERATED CONSUMER LAWS THAT RELATE TO STATE LAW.—No provision of this title, except as provided in section 1083, shall be construed as modifying, limiting, or superseding the operation of any provision of an enumerated consumer law that relates to the application of a law in effect in any State with respect to such Federal law.

(c) ADDITIONAL CONSUMER PROTECTION REGULATIONS IN RESPONSE TO STATE ACTION.—

(1) NOTICE OF PROPOSED RULE REQUIRED.—The Bureau shall issue a notice of proposed rulemaking whenever a majority of the States has enacted a resolution in support of the establishment or modification of a consumer protection regulation by the Bureau.

(2) BUREAU CONSIDERATIONS REQUIRED FOR ISSUANCE OF FINAL REGULATION.—Before prescribing a final regulation based upon a notice issued pursuant to paragraph (1), the Bureau shall take into account whether—