## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ) | |
| MARIE ANN FUGES, on behalf of ) | |
| herself and all others similarly situated, ) | |
| ) | **Civil Action No. 09-699** |
| Plaintiff, ) | |
| ) | **CLASS ACTION** |
| v. ) | |
| ) | |
| SOUTHWEST FINANCIAL ) | |
| SERVICES, LTD., ) | |
| ) | |
| Defendant. ) | |
| ) | |

---

### PLAINTIFF MARIE ANN FUGES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SOUTHWEST FINANCIAL SERVICES, LTD.'S MOTION FOR SUMMARY JUDGMENT

---

**FRANCIS & MAILMAN, P.C.**
JAMES A. FRANCIS
JOHN SOUMILAS
ERIN A. NOVAK
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735-8600

## TABLE OF CONTENTS

I.   INTRODUCTION................................................................................................1

II.  SUMMARY OF FACTS....................................................................................4

   A. Southwest's November 13, 2008 Report "in re: Marie Fuges" ...................4

   B. The Purpose And Use Of The Report, Resulting In A Lost Credit Opportunity..........5

   C. Southwest's Procedures In Gathering And Selling Reports To Banks........................5

   D. Southwest's Deliberate Decisions Not To Comply With The FCRA..........................6

   E. Southwest Knows That Its Reports Contain Errors ........................................6

   F. Southwest Deliberately Conceals Its Role From Consumers ........................................7

III. SUMMARY JUDGMENT STANDARD ........................................................7

IV. ARGUMENT.......................................................................................................9

   A. Defendant's Reports About Plaintiff Are Squarely Covered By The FCRA And *Not* Exempt From The Act................................................................9

      1. The Plain Text Of The FCRA As Well As Court And Regulatory Guidance Clearly Establish That Southwest And Its Reports Are Covered By The FCRA ......................................................................9

      2. Defendant's Perceived Exemptions Do Not Exist ...........................................13

         a. Dodd-Frank Provides No FCRA Exemption For Southwest.............13

         b. The Report Here Was About Mrs. Fuges And Her Credit Worthiness, Not Simply About Her Residence.....................................16

         c. Southwest Maintains FCRA Files.....................................19

   B. There Is A Genuine Issue Of Material Fact As To Whether Defendant's Violations Of The FCRA Were Willful.........................................................22

      1. The FCRA Willfulness Legal Standards...........................................................23

      2. FCRA Recklessness Further Defined ...............................................................24

i

3.   Many Courts Have Held In FCRA Cases That The Jury Should Decide Whether A Defendant Acted With Reckless Disregard...................................26

4.   Willfulness In This Case Also Should Be Determined By A Jury ..................27

5.   *Safeco*'s "Reasonable Reading" Language Regarding The Term "Increase" Under FCRA Section 1681m Is Not Helpful To Southwest Here .................................................................................................................30

C.   Plaintiff Will Not Pursue Her Negligent Violation Claim............................................34

D.   Defendant's Challenge To Plaintiff's Section 1681h(c) Claim Fails ..........................35

V.  CONCLUSION .................................................................................................................37

Plaintiff Marie Ann Fuges respectfully submits this memorandum of law in support of her response in opposition to Defendant Southwest Financial Services, Ltd.'s (Southwest's) motion for summary judgment (Motion). (Dk. No. 47). For the reasons discussed below, Southwest's Motion must be denied.

## I.  INTRODUCTION

On November 13, 2008, Defendant prepared a report -- which it calls a "Current Owner Report -- "in re: Marie Fuges," the Plaintiff in this case. Defendant's own corporate representatives agreed in their depositions that Mrs. Fuges was the *subject* of the report and that the report *relates* to Mrs. Fuges. The report had information about Mrs. Fuges' alleged debts. Specifically, the report contained information about Plaintiff's marital status, the deed on her home property, her mortgage lender, the amount owed on the note, the amount of taxes allegedly owed on her home, the amount of alleged property tax "delinquencies," and an allegedly unsatisfied judgment owed to a creditor identified as Direct Merchant's Credit. Defendant sold the report to PNC Bank, in accordance with its usual practice, so that the bank could assess whether to extend a home equity line of credit and a related mortgage insurance product to Plaintiff. The bank declined to extend credit to Mrs. Fuges because the Southwest report (inaccurately) showed a tax delinquency, when Plaintiff, in fact, had no tax delinquencies of any kind.

The above facts leave no doubt that Defendant sells "consumer reports" and functions as a "consumer reporting agency" (CRA), as those terms are defined in the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 – 1681x (FCRA or Act). Plaintiff alleges that Defendant sold false information about her and, as a CRA, violated six distinct provisions of the FCRA -- FCRA sections 1681b, 1681e(a), 1681e(b), 1681e(c), 1681e(d) and 1681h(c). (*See* Dk. No. 44 at ¶ 62). Defendant now seeks summary judgment, contending its reports are "not subject to the FCRA."

Defendant would like this Court to find, as a matter of law, that its report related only to Plaintiff's property, but not to Plaintiff herself and that Defendant is somehow exempt from the FCRA.  This argument is like suggesting that traditional credit reports relate only to credit cards and mortgages or other loans, but not to the people who have taken on those credit obligations. No court has ever made such a ruling, which would effectively eviscerate the FCRA.  Moreover, such a ruling would be inapposite to well-established law and the actual facts of record in this case, which show that Southwest's report was about Mrs. Fuges, not just her residence, and that Southwest is an FCRA-regulated entity.  Defendant's other arguments for why its reports should somehow be exempt from the FCRA also fail, including its baseless speculation about a purported exemption recently created by Dodd-Frank, which exemption simply does not exist.

Defendant also would like this Court to believe that its reports are a novel product and that this case presents an issue of first impression.  Not so.  Reports like Defendant's, which focus on public records items (such as deeds, mortgages, tax liens and judgments), have long been regulated by the FCRA according to both federal courts and the Federal Trade Commission (FTC).  The fact that Defendant chooses to call its consumer reports "Current Owner Reports," and its lawyers now choose to call them "property reports," is of no moment.  As the Third Circuit has found, reports that contain "any" information bearing on a consumer's credit worthiness and are used for credit eligibility decisions are "consumer reports," regardless of what a defendant may choose to call them.  *Cortez v. Trans Union, LLC*, 617 F.3d 688, 707 (3d Cir. 2010) (to find for defendant "we would have to conclude that Congress did not mean what it said when it unequivocally defined 'consumer report' to include 'any communication of any information by a consumer reporting agency'"; finding FCRA liability where defendant called its reports "OFAC Advisor" screens).

As a back-up, Defendant argues that even if its reports are regulated by the FCRA, this Court should nevertheless find, as a matter of law, that Defendant did not willfully violate the FCRA here and that Plaintiff cannot establish one of her FCRA claims, under FCRA section 1681h(c).  These arguments are equally unavailing.  The clear-cut evidence of record, including Defendant's own admissions, establishes that Defendant intentionally chose not to comply with the FCRA and willfully failed to comply with the FCRA in any respect with respect to Plaintiff. Nor is this a case of mere carelessness or an oversight.  To this day -- thirty months into this litigation -- Defendant deliberately chooses not to comply with the FCRA in any way. Moreover, as will be discussed below, Plaintiff has proffered evidence to support her FCRA claim under FCRA section 1681h(c), the only claim that Defendant challenges on the merits.  As the Third Circuit and other courts have found, whether a defendant acts in willful violation of the FCRA is almost always a jury question.  This is such a case.  Thus, summary judgment is not appropriate.

Defendant's Motion is an example of the old adage "wanting to have your cake and eat it too."  Defendant would like to first argue that it is somehow "exempt" from the FCRA (even though the Act has no such exemption), but then have this Court find that even if Defendant is not exempt, its calculated and utter non-compliance with the FCRA based on *its belief that it was exempt* should mean that Plaintiff cannot set forth her FCRA claims.  Again, Third Circuit precedent teaches us that a defendant does not receive a free "pass" under the FCRA, even with respect to FCRA willfulness claims, simply because no court had previously found the defendant's *particular product* to be regulated by the FCRA as a consumer report.  *Cortez*, 617 F.3d at 722 (upholding willful FCRA violation for CRA which claimed that it did not believe that its new "OFAC Advisor" product was a "consumer report").

Plaintiff wishes to note, as will be discussed in detail *infra*, that she pled in the alternative that Defendant has violated the FCRA willfully and/or negligently.  Given the strength of the record in this case, Plaintiff now elects to pursue only her willful violation claims, and thus does not brief the one negligence-specific argument that Defendant raises, which now is rendered moot.  *See infra* section IV.C.  Further, Plaintiff does not require in this case, and now has elected not to rely upon, any expert opinion in this matter.  Thus, the expert report and testimony provided during discovery by expert Evan Hendricks is also a moot issue, and therefore the discussion below does not address Defendant's comments regarding Mr. Hendricks' opinions.

In sum, this case is simply not suitable for summary judgment.  Plaintiff has proffered material evidence to support her FCRA willfulness claims and Defendant is not entitled to judgment as a matter of law under that evidence and the well-known FCRA standards that apply to this case.

## II.   SUMMARY OF FACTS

Plaintiff's separately-filed Response To Defendant's Purportedly Uncontested Facts And Plaintiff's Counter-Statement Of Material Facts sets forth the factual record in detail.   In summary form, the facts most germane to Defendant's present Motion are as follows:

### A.   Southwest's November 13, 2008 Report "in re: Marie Fuges"

Mrs. Fuges applied to PNC Bank for an increase in her home equity line of credit (HELOC) and payment protection insurance for her credit line in or around November 2008. (Plaintiff Marie Ann Fuges' Response to Defendant Southwest Financial Services, Ltd.'s Purported Uncontested Facts and Plaintiff's Counter Statement of Material Facts (Facts) at ¶ 56). On November 13, 2008, PNC Bank, pursuant to its contract with Defendant, requested that Defendant provide a "Current Owner Report" in its evaluation of Mrs. Fuges creditworthiness

and eligibility for the credit extension and insurance product.  (Facts at ¶ 57).   Based upon the report itself and the testimony from the Defendant's corporate representatives there can be no dispute that the report *relates* to Mrs. Fuges and that Mrs. Fuges is the *subject* of the report. (Facts at ¶ 65).

### B.       The Purpose And Use Of The Report, Resulting In A Lost Credit Opportunity

Defendant specifically provides these current owner reports to its banking customers for the evaluation of a consumer applicant's creditworthiness when extending HELOC loans or second mortgages, and promotes its product as the "smart choice for lending."  (Facts at ¶¶ 58, 67 and 68).  Defendant admits that its customers use current owner reports "99% of the time" for HELOCs or second mortgages.  (*Id.*).  As a result of PNC Bank's reliance on the current owner report it purchased from Defendant, Mrs. Fuges was denied an opportunity to increase her HELOC.  (Facts at ¶ 70).  Specifically, PNC Bank denied Ms. Fuges because of Defendant's inaccurate reporting of allegedly delinquent taxes.  (*Id.*).

### C.       Southwest's Procedures In Gathering And Selling Reports To Banks

Defendant's subscribers use a website called Rapid Close, to provide Defendant with the name and address of the consumer about whom they requested a current owner report.  (Facts at ¶ 71).  Here, PNC requested a current owner report for Ms. Fuges from Defendant using her name and address, yet Defendant obtains no permissible purpose certificate prior to providing a bank with a current owner report, and Defendant's corporate representative has never even heard of such a certificate.   (Facts at ¶¶ 72 and 73).  In order for Defendant to prepare a current owner report, the users of its reports, generally banks, provide the name and address of the consumer. (Facts at ¶ 74).  Once Defendant receives a request for a current owner report, it provides the information to one of its contractors, so that they can collect select public records data about the

consumer. (Facts at ¶¶ 74 and 76). In Philadelphia, Defendant exclusively uses contractors at ARA-Merican (previously American Reports) to gather select public records information for inclusion in current owner reports by using a "customer's name and address" in the relevant public records databases. (Facts at ¶¶ 78 and 79). Despite ARA-Merican being Defendant's exclusive contractor in Philadelphia, corporate representatives of Defendant and ARA-Merican are unaware of, and have no policy to determine whether a taxpayer (such as Mrs. Fuges) is on, the installment plan in Philadelphia. (Facts at ¶¶ 80 and 81).

**D.     Southwest's Deliberate Decisions Not To Comply With The FCRA**

Southwest admittedly does nothing to comply with the FCRA in any way -- to this day. (Facts at ¶¶ 90-101). Nor does Defendant wish to take any corrective action. (Facts at ¶¶ 92 and 101). For some thirty months after Mrs. Fuges brought this lawsuit Defendant still uses the same faulty approach to reporting Philadelphia tax delinquencies to the detriment of thousands of Philadelphians on the installment plan. (Facts at ¶ 101). Unless Defendant is made to comply with the FCRA, its inaccurate reporting in this respect will go on unabated. (*Id.*).

**E.     Southwest Knows That Its Reports Contain Errors**

Defendant knows that the current owner reports it sells about consumer contain errors. (Facts at ¶ 102). Defendant admits that it receives hundreds of complaints form from its banking customers in any given month, and Defendant understands that banks sometimes cannot move forward with loan applications because a Southwest report contains inaccurate information about the applicant, as happened here. (Facts at ¶¶ 102, 103 and 105). The inaccuracies here occurred because Defendant has no procedure in place that would distinguish Philadelphians on the installment plan from those that are not on the installment plan. (Facts at ¶ 104). This inaccuracy occurred even though a procedure to find out if a Philadelphia resident is on the

installment plan is actually quite simple; the Philadelphia Department of Revenue provides upon request official records indicating whether a consumer is on the installment plan. (Facts at ¶ 105).

Further, Defendant's own research shows that between 18-24% of the sampling included at least one lien reporting on a consumer's current owner report that *did not* belong to the actual applicant. (Facts at ¶ 106). This was also the case with Mrs. Fuges' Southwest report, which listed her son's judgment even though the son had not applied for credit with PNC Bank and never had an ownership interest in Plaintiff's residence.

### F.    Southwest Deliberately Conceals Its Role From Consumers

Errors like the ones on Mrs. Fuges' report can easily be corrected. Defendant, however, does not comply with the FCRA and precludes consumers from knowing what is being reported about them, and alerting Defendant to any potential inaccuracies which it must reinvestigate and correct promptly. (Facts at ¶ 108). Further, Defendant takes deliberate steps to conceal its identity by contractually obligating the banks that use its reports to treat it as confidential. (Facts at ¶ 108). The effects of this can be seen in Mrs. Fuges' many requests, and PNC Bank's many denials, to provide her with a copy of her Southwest report before one employee at PNC Bank finally relented after multiple in-person visits by Mrs. Fuges to the branch. (*Id.*). In fact, the very basis of Defendant's relationship with the banks it provides current owner reports to relies upon the bank treating the report as "confidential." (Facts at ¶ 110).

### III.    SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c)(2), a motion for summary judgment will only be granted if:

> The pleadings, the discovery and disclosure material on file, and
> any affidavits show that there is no genuine issue as to any material

7

> fact and that the movant is entitled to a judgment as a matter of
> law.

Fed. R. Civ. P. 56(c)(2) (revised as of Dec. 1, 2009).  The Third Circuit has said that summary judgment may only be granted if the movant shows, by admissible evidence, that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party.  *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998); *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988), *cert. denied*, 488 U.S. 870 (1988).

A court may not, at the summary judgment stage, weigh evidence or make credibility decisions.  These tasks are left to the fact-finder.  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993), *cert. denied*, 510 U.S. 994 (1993).  To raise a genuine issue of material fact, the respondent need not match, item-for-item each piece of evidence proffered by the movant.  As the Third Circuit has explained:

> In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quality of the movant's evidence far outweighs that of its opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

*In re Unisys Savings Plan Litig.*, 74 F.3d 420, 433 n.10 (3d Cir. 1996).  If there are gaps in the pertinent materials submitted by the movant, without explanation, that justifies denial of the motion.  *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir. 1989).

In the case at bar, there exist genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.  Summary judgment, therefore, is inappropriate.

# IV.   ARGUMENT

## A.   Defendant's Reports About Plaintiff Are Squarely Covered By The FCRA And *Not* Exempt From The Act

Southwest's core defense in this action is that its "reports are not subject to the FCRA" (Def. Mem. at 4) and that its "activities have never been subject to the FCRA" (*Id.* at 5).   In effect, Defendant argues that Plaintiff is simply misguided in bringing any FCRA claim here because Southwest and its reports are exempt from the FCRA.   However, the FCRA's statutory text is clear, and the case law applying the FCRA leaves no doubt that the exemption that Defendant is searching for simply does not exist.

Southwest in fact functions as a "consumer reporting agency" (CRA) and sells "consumer reports" under the FCRA, as it did about Plaintiff.   Defendant is thus regulated by the FCRA, regardless of what name, heading or label it uses to sell its reports.   Defendant has avoided FCRA litigation in the past not because it is not regulated by the FCRA, but because it goes to great lengths to conceal its activities from consumers.   (*See* Facts at ¶¶ 108-110).   Thus, unlike a traditional credit report from Trans Union, for example, where a consumer is aware that he or she is being denied credit because of an inaccuracy, consumers simply have no idea what Southwest is reporting about them.   When Defendant's actual activities come to light   -- as they did in this case due to Plaintiff's persistence in determining why she was turned down for credit by PNC Bank in late 2008 -- it becomes abundantly clear that Southwest is an FCRA-regulated entity and its reports are FCRA-covered "consumers reports."

### 1.   The Plain Text Of The FCRA As Well As Court And Regulatory Guidance Clearly Establish That Southwest And Its Reports Are Covered By The FCRA

The best authority for a statute's applicability and meaning is the face of the statute itself. *United States v. Cheryl Schneider*, 14 F.3d 876, 879 (3d Cir. 1994).   The plain language of the

FCRA makes it clear that, when sold to potential creditors, information concerning a consumer's credit eligibility which is derived from public records squarely constitutes a "consumer report," requiring the CRA selling the information to comply with all applicable FCRA requirements.

The FCRA defines "consumer report" to include:

> [A]ny communication of ***any** information* by a consumer reporting agency *bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living* which is *used **or** expected to be used **or** collected in whole or in part for the purpose of serving as a factor* in establishing the consumer's eligibility for - -
>
> > (A)    credit [employment, insurance, or other permissible business purposes] . . . .

15 U.S.C. § 1681a(d)(1) (emphasis added).

In turn, the FCRA defines a consumer reporting agency as: "*any person* which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of *assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties,* and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f) (emphasis added).

It is well-settled that government public records that are sold in connection with credit-eligibility, employment, rental, insurance and other FCRA-regulated transactions are covered under the FCRA as consumer reports. *See Cortez*, 617 F.3d at 707 (certain Department of Treasury public records comprise FCRA-consumer report); *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996) (involving government tax lien records); *see also Dennis v. BEH-1, LLC*, 520 F.3d 1066 (9th Cir. 2007) (involving court judgment); *Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994) (same).

Federal courts and the FTC have found many different types of business models within the credit reporting industry to be CRAs, not just the well-recognized Big Three CRAs -- Equifax, Experian and Trans Union. *See Henson v. CSC Credit Servs.,* 29 F.3d 280 (7th Cir. 1994) (company that failed to verify accuracy of civil judgment about consumer that it sold to third party can be liable as CRA under FCRA); *Adams v. LexisNexis*, 2010 WL 1931135 *9 (D. N.J. 2010); *Poore v. Sterling Testing Systems, Inc.,* 410 F. Supp. 2d 557, 570-71 (E.D. Ky. 2006) (Sterling Testing is CRA and "issue of whether the agency failed to follow reasonable procedures will be a jury question in the overwhelming majority of cases"); *Lewis v. Ohio Professional Electronic Network LLC*, 190 F. Supp. 2d 1049, 1058 (S.D. Ohio 2002) (finding company that regularly sells public arrest records is CRA); 16 C.F.R. pt. 600 app. § 603(d)(5)(C) (broad definition of consumer reports). *See also* Sum, FTC Staff Opinion 9-15-99 (law firm that researches criminal records of job applicants for its clients is CRA); Vail, FTC Staff Opinion 4-5-99 (outside organization used by employer to assist in sexual harassment investigations is CRA); Leathers, FTC Staff Opinion 9-9-98 (company that provides information to fast food employers over telephone regarding prospective employees is CRA); LeBlanc, FTC Staff Opinion 6-9-98 (company that gathers criminal records for third parties is CRA).

In an opinion letter discussing the activities of a company which gathered *public records information* and sold it to third parties, like Southwest does along with selling other data, the FTC stated more than a decade ago:

> From your description of its activities, it appears that, at the very least, your company "assembles" information as this term is commonly understood (dictionary definitions include "to gather" or "to collect"). Your company's record searchers go to local courthouses to review the records to find information. If they find information on an individual, they forward either a brief abstract or copies of the docket information. At your headquarters, a report is prepared consisting of all the information reported by your agents

> from around the country.   We believe that the activities you
> describe are sufficient to meet the definitional requirements of a
> CRA.

FTC Staff Opinion letter dated June 9, 1998, from W. Haynes to Richard LeBlanc.

http://www.ftc.gov/os/statutes/fcra/leblanc.shtm.  Federal Trade Commission staff opinion letters

regarding the FCRA are advisory in nature.  16 C.F.R. § 1.72.  Courts rely on such letters as

persuasive authority in construing the FCRA.  *See Fischl v. General Motors Acceptance Corp.*,

708 F.2d 143, 149 n.4 (5th Cir. 1983).

The above-cited authority leads to a single, inescapable conclusion: when a business

regularly assembles public records information and sells it to a potential creditor who will use it

as a factor in determining in the consumer's eligibility for credit, that business functions as a

CRA selling consumer reports, and is thus covered by the FCRA.

That is precisely what Southwest did in this case according to the evidence of record.  It

regularly assembles reports that it calls "Current Owner Reports," as it did for Mrs. Fuges on

November 13, 2008.  The reports are about the "current owner" of a home (Mrs. Fuges) who is

seeking to obtain a home equity line of credit from a bank, such as PNC Bank.  Like in Mrs.

Fuges' case, the reports contain information about the applicant's marital status, the deed on her

home property, her mortgage lender, the amount owed on the note, the amount of taxes allegedly

owed on her home, the amount of alleged property tax "delinquencies," and any allegedly

unsatisfied judgments.  This information bears upon the applicant's credit worthiness.

The use and expected use of these reports is crucial.  Southwest is not simply compiling

data to be used for academic reasons, for census reasons, for advertising purposes or some other

non-FCRA purpose.  Rather, the express purpose of reports like the one on Mrs. Fuges is so that

a bank may determine whether to extend a home equity line of credit and a related insurance

product to her following her application for such credit and insurance. Precisely because Defendant knows that the information it compiles bears upon a consumer applicant's credit worthiness and eligibility for credit or insurance, and will be used in connection with a bank's lending decision, Southwest must comply with the FCRA. 15 U.S.C. § 1681a(d)(1) (defining consumer report as "any information . . . *used or expected to be used* or collected in whole or in part for the purpose of serving as *a factor* in establishing the consumer's eligibility for . . . credit") (emphasis added).

Defendant must, for example, provide certain FCRA-mandated disclosures to both consumers and to its banking customers, and it must follow procedures to assure the maximum possible accuracy of the information it sells. Per the FCRA, Defendant must also reinvestigate disputes from consumers and promptly correct errors in its records. Southwest profits from the sale of consumer reports, but refuses to take any FCRA compliance measures -- to this day. It thus systemically violates the FCRA. Defendant's belief that it is not subject to the FCRA is lacking any basis and is without merit.

### 2. *Defendant's Perceived Exemptions Do Not Exist*

#### a.   Dodd-Frank Provides No FCRA Exemption For Southwest

Tellingly, Southwest begins its analysis for why it is allegedly not subject to the FCRA not with the FCRA itself, nor the abundant case-law interpreting it, but rather with another statute, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (Dodd-Frank), which was not even enacted at the time this lawsuit was filed in 2009 and which was intended to regulate Wall Street. Defendant invites this Court into a maze of speculation, suggesting that in creating a new regulatory agency, the Consumer Financial Protection Bureau (CFPB), Dodd-Frank somehow intended to carve out an exemption

within the FCRA for Southwest and companies like it.  If Defendant has chosen to lead its discussion with its best argument, its best argument is really a stretch.

For starters, Congress did not amend the FCRA when it adopted Dodd-Frank, and did not even hint at such an amendment.  If Congress sought to create an FCRA exemption for Southwest, or companies like it, it knew how to do so.  Congress took no such action in enacting Dodd-Frank or otherwise.

Second, in conferring authority to the CFPB to regulate any "financial product or service," Dodd-Frank does nothing to redefine FCRA "consumer reports."  Defendant is simply guessing when it suggest that the "carve out" to the "catch-all" of the definition of  "financial product or service" must have been meant to exclude from the CFPB's reach consumer reports like Southwest's because they consist of public records.  The mere fact that the CFPB received some jurisdiction over the FCRA simply does not mean that the definition of "financial product or service," including the "catch all" and "carve out," says anything about the FCRA's coverage of Southwest or the FCRA's definition of "consumer report."   Indeed, the most straightforward reading of Dodd-Frank is that products such as Southwest's "Current Owner Reports" are regulated as "activities subject to the FCRA" (*see* § 1002(15)(A)(ix)) because they are used "in connection with any decision regarding the offering or provision of a consumer financial product or service . . . ."  (*Id.*).  Thus, there is no need to speculate about what *other products and services* (among the thousands regulated by the CFPB, as Defendant admits) are contemplated within the "catch all" or the "carve out" to the CFPB's jurisdiction.

Nor is there any basis to conclude -- if one where include to speculate about the "carve-out" -- that Southwest's reports are merely "providing public records information retrieval," as used in the "carve-out."  Southwest is not simply a courier that retrieves public records; nor is

Southwest's "Current Owner Report" product simply a photocopying or retrieval service. Southwest obtains only distilled, limited information about public records (not the public records themselves) second-hand from other companies such as ARA-Merican and then assembles that information in customized reports that it sells to banks about individual applicants who seek a home equity line of credit or second mortgage. Thus there is no reason to conclude that any Southwest product or service is contemplated by the carve-out.

Even if Defendant's conjecture about the scope of the CFPB's regulatory reach is somehow correct (which it is not), that does not mean that Southwest, or companies like it, are exempt from the FCRA. It simply means that the CFPB may not have jurisdiction over them with respect to that agency's regulatory powers under Dodd-Frank. But this is not a regulatory enforcement action brought by the CFPB. This is a private cause of action brought by an individual consumer under the FCRA. Defendant's Dodd-Frank and CFPB analysis is therefore ultimately irrelevant here.

Finally, Defendant's argument suggests that Dodd-Frank created some type of exemption to the FCRA for companies like Southwest in 2010 because no such exemption existed prior to that time. Naturally, no exemption would have been necessary in 2010 had Southwest not been covered by the FCRA in the first place. Of course, as discussed *supra*, Dodd-Frank creates no such exemption. But Southwest's argument goes to show the length to which Defendant will go to manufacture a justification after the fact as to why it did not have to comply with the FCRA when it violated Mrs. Fuges' rights in 2008, and why it continues to violate the rights of other consumers to this day through its intentional refusal to comply in any way with the FCRA.

In sum, the FCRA has no exemption for Southwest, and Dodd-Frank did not create any such exemption.

b.      <u>The Report Here Was About Mrs. Fuges And Her Credit Worthiness, Not Simply About Her Residence</u>

Next, Defendant argues that its reports are not subject to the FCRA because they are only "reports on properties, not consumers." (Def. Mem. at 11). Defendant provides no authority in support of this argument, which fails for multiple reasons.

First, this argument squarely contradicts the face of Southwest's own report, which identifies Plaintiff by name (not just address) and which is called a "current *owner*" report. This defense argument also contradicts the testimony of Southwest's own witnesses who agreed in their deposition testimony that Mrs. Fuges was the *subject* of the report and that the report *relates* not only to the property on which the home equity line of credit in sought, but also the owner of that property, who has to pay back the loan.   For example, Southwest's CEO Gregory Schroeder testified as follows with reference to the report:

```
20    Q.    Then on the top right-hand side it's says, "In
21          Re:  Marie Fuges." Do you see that?
22    A.    I do, sir.
23    Q.    And then there's an address, a Philadelphia
24          address, underneath that; correct?
                            15
 1    A.    That's correct, sir.
 2    Q.    And would that be the person about whom the
 3          report relates?
 4    A.    That would be the customer and also their --
 5          their -- their customer, yes, sir, it would.
```

(Ex. E, Schroeder Dep. at 14:20-15:5; *see generally* 14:20-16:2) (emphasis added).   Another Southwest corporate representative, Theodore Mullucey, testified as follows:

```
15    A.    We worked with this lender.  This is their
16          consumer lend -- loan center, and 99 percent of the time
17          they're asking for current owner searches for home
18          equity line of credit or a second mortgage.
19    Q.    And that would make sense to you in that the
20          current owner is looking to either refinance their
21          existing mortgage or take out some home equity line of
```

```
22                credit or a loan; correct?
23      A.        Correct.
24      Q.        All right.  And that's what these current owner

                              20
 1                title reports are prepared for?
 2      A.        Correct.
 3      Q.        And the subject of the reports would always be
 4                the current owner of that property; correct?
 5      A.        Correct.
```

(Ex. H, Mullucey Dep. at 19:15-20:5) (emphasis added).

Further, Defendant's characterization of the report as only about "property" (not the owner of the property) would effectively eviscerate the FCRA.  By Defendant's logic, employment screening consumer reports with criminal records information would simply be "reports on crime," not on the persons committing those crimes; traditional credit reports would be "reports on credit cards" or "reports on loans," not on the persons who have those credit obligations; and insurance consumer reports would simply be "reports on car accidents," not on the persons with that negative driving history.

Defendant's attempt to separate judgments, tax liens and other debts reflected in public records data from the *debtors* who allegedly owe those obligations is illogical.  No court has recognized such a separation, and this Court should not be the first to do so.  As noted above, reports with public records information sold to potential creditors in connection with consumer credit applications have always been found to be consumer reports.  *See Cortez*, *Philbin*, *Dennis*, *Henson*, *supra*.  A separation between debts and debtors, like the one Defendant suggests, would create a massive loophole in the FCRA, and allow virtually every company that is presently regulated as a CRA to avoid compliance by simply inventing creative names and descriptions for their products as suggested above.  Such a construction of the FCRA would be contrary to the

Act's remedial purpose. *Cortez v. Trans Union, LLC*, 617 F.3d at 706 (FCRA is a consumer protection statute to be liberally construed in favor of consumers).

The Third Circuit in *Cortez v. Trans Union, LLC*, was faced with a similar argument when the defendant there argued that its "OFAC Advisor" report was not an FCRA-regulated "consumer report" because it was simply comprised of public records information used in connection with PATRIOT Act compliance. *Id.* The *Cortez* court rejected this argument and found that when a report with public records data about suspected criminal activity is used, even in part, as a factor in extending credit for a car loan that report is a consumer report covered by the FCRA. Thus, in *Cortez*, the "OFAC Advisor" product was found to be a consumer report subject to the FCRA even though it *also* served another purpose, namely PATRIOT Act compliance. Similarly, here Southwest's "Current Owner Reports" are consumer reports even though they may also serve the function of providing information about the quality of property's title which would secure Mrs. Fuges home equity line of credit.

Southwest's alarmist concerns that a ruling against it in this case will lead to "calamitous consequences" is unfounded. (Def. Mem. at 17). First, Plaintiff is not arguing that every title report or any report concerning any property should be subject to the FCRA. There are many types of reports about properties that typically do not implicate the FCRA -- from MLS listings about a property for sale, to inspection reports about the condition of a property, to title reports concerning the seller of a property or the property to be sold, to all types of commercial and government reports and transactions about commercial and government properties that are not regulated by the FCRA. But when reports about a consumer's judgments and liens are prepared and sold to banks in connection with that same consumer's eligibility for credit, like Southwest's reports here, those reports are "consumer reports" and are subject to the FCRA.

Second, and contrary to Defendant's suggestion, FCRA compliance for companies like Southwest which sell consumer reports is not onerous.  Southwest, for example, must institute reasonable procedures to assure the maximum possible accuracy of the information it sells to banks  -- per FCRA section 1681e(b).  In that way Southwest would refrain from selling inaccurate information about consumers such as Mrs. Fuges who pay their taxes on time through Philadelphia's installment plan, instead of through one lump-sum payment.  Southwest would also need to disclose to (instead of concealing from) consumers the reports it sells in connection with their credit applications -- per FCRA section 1681g.  This way if an error is made, a consumer can see it quickly and dispute it with Southwest directly, which should reinvestigate and correct the error within thirty days -- per FCRA section 1681i.

Southwest's failure to comply with the FCRA results in a situation the FCRA sought to remedy -- harmful credit errors going unchecked and uncorrected.  Consumers like Mrs. Fuges can lose credit opportunities and banks like PNC can lose potential customers.  That is certainly not the FCRA's purpose, which was intended to meet "the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b).

### c.    Southwest Maintains FCRA Files

Finally, Defendant argues that its reports are not subject to the FCRA because it does not maintain files on consumers.  (Def. Mem. at 17).  First, this defense argument again is contradicted by the testimony of Southwest's witnesses.  For example, Southwest Gregory Schroeder testified as follows:

```
14     Q.     Okay.  Now, once the report is communicated to
15            the bank either electronically or in some other fashion,
```

19

| | | |
|---|---|---|
| 16 | | if they so wish, what does Southwest do with the data, |
| 17 | | the information, that would comprise the report? |
| 18 | A. | **The data is held in <u>an electronic file</u> for** |
| 19 | | **that -- for that particular customer**. |
| 20 | Q. | For how long? |
| 21 | A. | We -- we hold everything forever. |

(Ex. E, Schroeder Dep. at 47:14-21) (emphasis added).  Similarly, Southwest's corporate

representative Gregg Erbaugh testified as follows:

| | | |
|---|---|---|
| 13 | Q. | Okay.  So the Phoenix database is actually the |
| 14 | | computer database that generates a report that ends up |
| 15 | | looking something like Exhibit A[1] when it's printed out? |
| 16 | A. | Yes. |
| 17 | Q. | |

26

| | | |
|---|---|---|
| 1 | Q. | Would that data be stored within the abstractor |
| 2 | | database? |
| 3 | A. | Yes, it would. |
| 4 | Q. | Would that -- once it's in the abstractor |
| 5 | | database, does it stay there forever? |
| 6 | A. | No. |
| 7 | Q. | How long does it stay within the abstractor |
| 8 | | database? |
| 9 | A. | **Right now we retain records back five years at** |
| 10 | | **least, I believe**.  I do not have a finite time right now |
| 11 | | where we automatically purge or destroy that old data. |
| 12 | | Sometimes we will remove proofing records of statistics, |
| 13 | | much like time stamps, you know, that have accumulated |
| 14 | | over time because it's deemed unnecessary. |
| 15 | | But a attachment, a deed, much as you referenced, |
| 16 | | that would be there, and that would be visible and |
| 17 | | possibly delivered if the customer required it. |
| | | . . . |
| 24 | Q. | Do you -- what will happen to the data that |

27

| | | |
|---|---|---|
| 1 | | becomes more than five years old? |
| 2 | A. | **We tend to retain that in an archive fashion** just |
| 3 | | due to Ohio laws as far as what we must retain and keep |
| 4 | | for whatever, so we really have records going back much |
| 5 | | further, maybe not necessarily for -- at this type of |
| 6 | | abstractor data and how we have dealt with contractors. |

---

[1]    Exhibit A here refers to Exhibit A to the Complaint in this matter, which is Southwest's
November 13, 2008 report on Mrs. Fuges.

20

```
                         . . .
18        BY MR. SOUMILAS:
19        Q.    Okay.  I -- I appreciate that clarification.  So
20              five years is there by virtue of how long you've been
21              keeping the data, not because that's the cutoff you
22              created?
23        A.    No, sir.  Yes; that's correct.  I'm sorry.
24        Q.    So you do agree with me, that that's just a

                             28
1               length of period that you have of data?
2         A.    Yes, sir.
```

(Ex. J, Erbaugh Dep., June 17, 2010, at 25:13-28:2; *see generally* 24:2-28:2).  This testimony

alone presents a genuine issue of fact as to whether Southwest maintains consumer files.

Further, Defendant is simply mistaken in arguing that it cannot be subject to the FCRA,

as a matter of law, unless it maintains "files."  A "consumer reporting agency" (CRA) is defined

by the act as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis,

regularly engages in whole or in part in the practice of *assembling* or *evaluating* consumer credit

information or other information on consumers for the purpose of furnishing consumer reports to

third parties . . . ."  15 U.S.C. § 1681a(f).  As the FTC found, any business that "assembles" (or

"gathers") information on consumers from public records to be placed on consumer reports is a

CRA, subject to the FCRA.  FTC Staff Opinion letter dated June 9, 1998, from W. Haynes to

Richard LeBlanc.  http://www.ftc.gov/os/statutes/fcra/leblanc.shtm.  Moreover, the FCRA

expressly defines a "reseller" *as a CRA* that "*does not maintain* a database of the assembled or

merged information from which new consumer reports are produced."  15 U.S.C. § 1681u

(emphasis added).  A business like Southwest, therefore, can be subject to the FCRA even if it

does not maintain files on consumers.

Finally, and most importantly, in *Cortez v Trans Union, LLC* the Third Circuit has

already rejected virtually the same argument that Defendant is making here.  In *Cortez,* the

defendant argued that it did not maintain files on consumers since the information for its reports was kept by one of its vendors offsite and not within that defendant's database, which may be used again and again to prepare multiple reports. 617 F.3d at 711-12. The Third Circuit rejected this argument and found that, minimally, an FCRA "file" includes "all information furnished or that might be furnished in a consumer report." *Id.* at 711 (citing *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007) and 16 C.F.R. pt. 600, app. § 603).[2] Thus, because Southwest prepared and sold a "consumer report" about Plaintiff, it minimally prepared a "file" for her as well, just like the defendant in *Cortez* had a file on that Plaintiff because it prepared a report about her.

The record evidence here is that Southwest prepared several consumer reports about Plaintiff through the years (in addition to the November 13, 2008 report) and recorded and retained those reports in its computer database for at least five years. (Ex. H, Mullucey Dep. at 17:17-18:3; Ex. E, Schroeder Dep. at 47:14-21; Ex. J, Erbaugh Dep., June 17, 2010, at 24:2-28:2). Defendant therefore maintains files on consumers such as Mrs. Fuges, but would be subject to the FCRA even if it did not because maintaining consumers' files is simply not a prerequisite for a business to be subject to the FCRA.

In sum, there is no FCRA-exemption for Defendant, and it cannot now conjure up one. Southwest is covered by the FCRA and must comply with that Act.

**B.    There Is A Genuine Issue Of Material Fact As To Whether Defendant's Violations Of The FCRA Were Willful**

Defendant next argues that even if its reports are subject to the FCRA, Plaintiff cannot proceed to a jury with her claims that Southwest's FCRA non-compliance was willful. (Def.

---

[2]    Defendant's citation to *Nunnally v. Equifax Info. Servs., LLC*, 451 F.3d 768, 773 (11th Cir. 2006) is not inconsistent with *Cortez* or *Gillespie, supra. Nunnally* simply provides that an FCRA "file" can contain more information that what is in a "consumer report." But minimally, the "file" must contain what is in the "consumer report."

Mem. at 19).  With the exception of Plaintiff's claim under FCRA section 1681h(c) (which will

be discussed *infra*, at section IV(D)), Defendant does not challenge the merits of Plaintiff's

FCRA claims, as it reasonably cannot.  Thus there is no controversy for purposes of this Motion

as to whether Plaintiff has shown a violation of FCRA sections 1681b, 1681e(a), 1681e(b),

1681e(c), and 1681e(d).  (*See* Dk. No. 44 at ¶ 62).  Indeed, violations of those five statutory

duties are assumed by Southwest, and the record is clear that Defendant took no measures to

comply with these five separate statutory duties, or any provision of the FCRA for that matter.

Defendant's only argument with respect to these five violations is that Plaintiff allegedly cannot

show that Southwest's non-compliance was "willful."  This argument fails for several reasons,

not the least of which is that willfulness determinations in this Circuit are almost always

questions for a jury, and thus not appropriate for summary judgment.

### 1.      *The FCRA Willfulness Legal Standards*

The FCRA does not define the term "willfully" and does not give any guidance as to how

a defendant "willfully fails to comply with any requirement" of the Act.  *See* 15 U.S.C. §§ 1681a

& 1681n.  In its only decision on the subject, the U.S. Supreme Court held that Congress

intended the term "willfully" within the FCRA to have its "common law usage."  *See Safeco*, 551

U.S. at 57.  The High Court said that the common law "treated actions in 'reckless disregard' of

the law as 'willful' violations."  *Id.*  It thus concluded that "[t]he standard civil usage thus

counsels reading the phrase 'willfully fails to comply' in § 1681n(a) as reaching reckless FCRA

violations."  *Id.* (emphasis added).

The U.S. Supreme Court in *Safeco* did not state that a reckless violation is the only one

that can be willful under the FCRA: "If, on the other hand, 'willfully' covers both knowing and

reckless disregard of the law, knowing violations are sensibly understood as a more serious

subcategory of willful ones." *Id.* at 59 (*citing U.S. v. Menasche*, 348 U.S. 528, 538-539 (1955) (" '[G]ive effect, if possible, to every clause and word of a statute' ") (*quoting Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

Our circuit court in *Cushman v. Trans Union* had, ten years earlier, correctly held that willful FCRA violations can be "knowing" or ones that show a "reckless disregard" for consumer rights. 115 F.3d 220, 227 (3d Cir. 1997). The *Cushman* court also observed that a defendant may willfully violate the FCRA by actions that are "on the same order as willful concealments or misrepresentations." *Id.*

Perhaps Congress intended "willfully" to mean other things as well, but as clarified by precedent, willful FCRA violations can be: (1) knowing; (2) reckless; *or* (3) on the same order as willful concealments or misrepresentations.

## 2.   *FCRA Recklessness Further Defined*

With respect to the lowest of these standards, "recklessness," the U.S. Supreme Court in *Safeco* observed that "[a]lthough efforts have been made to distinguish" the terms "willful," "wanton," and "reckless," "such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit." *Id*. at 57 (*citing* W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 34, p. 212 (5th ed. 1984)) (hereinafter PROSSER AND KEETON). The High Court further noted that "While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known *or so obvious that it*

*should be known.' " Id.* at 68 (emphasis added) (*quoting Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also* PROSSER AND KEETON § 34, at 213-214.[3]

Although the Court in *Safeco* describes recklessness as an "objective" standard, that finding is entirely consistent with previous U.S. Supreme Court pronouncements in similar contexts which have emphasized that "recklessness" determinations are fact-bound inquiries that must typically be answered by a jury. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (U.S. 1991) (in defamation cases, "the evidence creates a jury question whether [defendant] published the statements with knowledge or reckless disregard."); *Time, Inc. v. Hill*, 385 U.S. 374, 394 (1967) ("Where either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood."); *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co.*, 312 U.S. 410, 420-21 (1941) (in fraud case, "[t]he question of respondent's recklessness was thus submitted to the jury and we think properly so.").[4]

---

[3]     The *Safeco* Court also cited to the RESTATEMENT (SECOND) OF TORTS, which defined recklessness with respect to a person's physical safety as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, *knowing or having reason to know* of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Id*. at 69 (emphasis added) (*quoting* RESTATEMENT (SECOND) OF TORTS § 500, p.587 (1963-1964)).

[4]     The Third Circuit agrees that recklessness determinations are usually reserved for the jury. *See Frett v. Government of Virgin Islands*, 839 F.2d 968, 978 (3d Cir. 1988) (in Section 1983 case, "we have no difficulty in upholding the district court's conclusion that recklessness was a jury question."); *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 650 (3d Cir. 1980) (in securities action, "there was a jury question as to whether these four defendants acted recklessly"); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 146 (3d Cir. 1973) (in product liability case, "whether [defendant's conduct] would constitute a reckless indifference to the public's safety, are, we think, questions which the jury should have been allowed to pass upon.").

3.      *Many Courts Have Held In FCRA Cases That The Jury Should Decide Whether A Defendant Acted With Reckless Disregard.*

In applying the reckless disregard standard to the facts of FCRA cases, many courts have found that, even though recklessness is an objective *legal* standard, the question of whether a particular set of actions or omissions shows a "reckless disregard" of consumer rights is usually a fact-bound inquiry and thus presents a question for the jury.

The Third Circuit, for example, reversed and remanded a trial court judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a), and instructed the trial court to consider the plaintiff's FCRA willfulness claim in light of the reckless disregard standard. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 223, 227 (3d Cir. 1997) (case settled after remand) (*citing Millstore v. O'Haleron Reports, Inc.*, 528 F.2d 829, 834 (8th Cir. 1976) (upholding FCRA willfulness finding by jury and punitive damages verdict)).   More recently, the Third Circuit found that it was within the jury's prerogative to find that a defendant willfully violated the FCRA when it argued that its conduct was not willful because it believed (erroneously) that its "OFAC Advisor" product was not a consumer report and thus not subject to the FCRA.  *Cortez*, 617 F.3d at 722 (upholding willful FCRA violation for CRA which claimed that it did not believe that its new "OFAC Advisor" product was a "consumer report").

Several trial courts in the Eastern District of Pennsylvania have rejected motions for summary judgment by CRAs in FCRA willfulness cases, finding that the reckless disregard determination should be left for the jury.  *See Abusaab v. Equifax Info. Servs., LLC*, 2006 WL 1214782, at *2 (E.D. Pa. May 4, 2006) (Bartle, C.J.) (denying summary judgment to CRA for FCRA willfulness claim); *Lawrence v. Trans Union, LLC*, 296 F. Supp. 2d 582, 590 (E.D. Pa. 2003) (Brody, J.) (same); *Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 321 (E.D. Pa. 2003) (Dalzell, J.) (same); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, 2003 WL 22844198, at *8

(E.D. Pa. Nov. 25, 2003) (Davis, J.) (same); *Sheffer v. Experian Info. Solutions, Inc.*, 2003 WL 21710573, at *3 (E.D. Pa. July 24, 2003) (Schiller, J.) (same); *see also Dixon-Rollins v. Trans Union, LLC*, 2010WL 3749454, at *6-9 (E.D. Pa. Sep. 23, 2010) (finding in a post-trial Fed. R Civ. P. 50 motion that it was within the jury's prerogative to find a willful FCRA violation).[5]

These cases also demonstrate that the reckless disregard standard is usually a fact-bound inquiry, a concept that our Circuit just recently reiterated. *See Whitfield v. Radian Guaranty, Inc.*, 501 F.3d 262, 271 (3d Cir. 2007). Indeed, in *Whitfield* the Third Circuit, in a post-*Safeco* FCRA decision, reversed a grant for summary judgment on an FCRA willfulness claim and held that the issue of willfulness was for the jury to decide. *Id.* The Third Circuit stated:

> We do not suggest that a factfinder could not or would not determine that [the defendant] did not act willfully. Instead, *we hold that whether it did so is a factual issue, not a question of law, and it therefore cannot be decided either on appeal or by the District Court as a matter of law.*

*Id.* at 271) (emphasis added) (vacated on mootness grounds, 2008 WL 2329934 (U.S. 2008)).

### 4.    *Willfulness In This Case Also Should Be Determined By A Jury*

Here, like in most FCRA cases, the issue of willfulness is for the jury. Plaintiff has proffered a detailed record of not only reckless, but deliberate and intentional non-compliant conduct by Southwest.

---

[5]    Cases from other federal courts have also held that consumers may proceed to trial with their FCRA willfulness claims based upon conduct similar to what courts within the Third Circuit have found could constitute a willful violation of the law. *See, e.g.*, *Reynolds v. Hartford Fin. Servs. Group*, 435 F.3d 1081, 1097-99 (9th Cir. 2006) (discussing meaning of "willfully" with CRA and relying on *Cushman*) (reversed by *Safeco* on other grounds, but affirmed by *Safeco* as to willfulness standard); *Apodaca v. Discover Fin. Servs. et al.*, 417 F. Supp. 2d 1220, 1229-34 (D.N.M. 2006) (denying CRA's motion for partial summary judgment and permitting consumer to proceed to trial with her willfulness claim stemming from improper procedures); *Sampson v. Equifax Info. Servs. LLC*, Civ. No. 04-187 (S.D. Ga. Aug. 29, 2005) (denying CRA's motion for summary judgment and permitting consumer to proceed to trial with willfulness claim).

For example, Defendant follows no procedure at all to assure the accuracy of property tax obligations in Philadelphia for those persons on the installment plan, in violation of FCRA 1681e(b).  Southwest and its agent ARA-Merican do not even know about the installment plan or the records available at the Philadelphia Department of Revenue which show which Philadelphians are on that plan.  Defendant thus reports consumers like Mrs. Fuges as "delinquent" on their taxes when there are no taxes past due.  If Southwest wants to be in the business of selling reports about Philadelphians to banks who wish to extend credit to those Philadelphians, then it must either follow some procedure to assure accuracy of property tax information for those consumers on the installment plan or not sell that type of public record information at all to banks in its Current Owner Reports.

Nor does Defendant wish to take any corrective action.  For some thirty months after Mrs. Fuges brought this lawsuit Defendant still uses the same faulty approach to reporting Philadelphia tax delinquencies to the detriment of thousands of Philadelphians on the installment plan.  Unless Defendant is made to comply with the FCRA, its inaccurate reporting in this respect will go on unabated.

Further, Defendant does not believe that there is anything inaccurate about placing on Mrs. Fuges' report a judgment that was taken against her son by Direct Merchants Credit, even though the son was not applying for credit with PNC Bank and never had any property interest in Mrs. Fuges residence.  Indeed, pursuant to it usual practice, Defendant will place the judgments of non-applicants on the report of the person applying for a home equity line of credit or second mortgage.  (Facts at ¶ 31).  According to its own data, Defendant does this 18-24% of the time.  (Ex. S; and Facts at ¶106).  There can be no doubt that such a practice has been deemed by the Third Circuit to violate the FCRA.  *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996)

28

(finding basis for FCRA liability in CRA's reporting of father's government tax lien record on son's report).

Defendant also admits that as a matter of course it never obtains a permissible purpose certification at all to assure that the data it sells is not misused, despite the requirements of FCRA section 1681e(a) and 1681b. *See also Pintos v. Pacific Creditor's Assn.*, 605 F.3d 665, 677 (9th Cir. 2010), *cert denied*, 131 S. Ct. 900 (Jan. 10, 2011) (CRA must assume permissible purpose for the sale of each report, and cannot even rely on a blanket certification). Here, Defendant's corporate representative does not even know what a permissible purpose certificate is. (*See* Facts at ¶ 73). As with its other violations, Defendant's conduct is not merely careless or a result of an oversight. Defendant's conduct is reckless, intentional and deliberate.

Defendant also engages in conduct "on the same order as willful concealments or misrepresentations." *Cushman v. Trans Union,* 115 F.3d 220, 227 (3d Cir. 1997). By contract, it advises its banking customers to keep the data that it sells them "confidential," including "Current Owner Repots." Indeed, the report on Mrs. Fuges provided on its face a "caution" to PNC Bank that the report was "strictly confidential." (Facts at ¶¶ 88, 89, 108 and 110). Mrs. Fuges was told by PNC Bank repeatedly (before one bank employee relented) that she could not know who was reporting that she was delinquent on her taxes due to confidentiality. (Facts at ¶ 89). The FCRA, however, requires disclosure and transparency, not confidentiality and secret databases. *See* 15 U.S.C. §§ 1681e(c), 1681e(d), and 1682g(a).

Importantly, the Third Circuit has held that it is not an excuse or a defense to an FCRA willfulness claim for a defendant to state that it believed that its product was not subject to the FCRA when that product clearly falls within the definition of "consumer report." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 707 (3d Cir. 2010) (to find for defendant "we would have to

conclude that Congress did not mean what it said when it unequivocally defined 'consumer report' to include 'any communication of any information by a consumer reporting agency'"; finding willful FCRA violations where defendant called its reports "OFAC Advisor" screens). Thus Defendant's purported ignorance is not a defense.

Moreover, this is clearly not a case of mere negligence. Southwest is either willfully in non-compliance of the FCRA or willfully correct that it should not be regulated by the FCRA. Defendant is a sophisticated corporate actor that has made deliberate and calculated decisions about it refusal to comply with the FCRA, both before this lawsuit had been brought and following it, including through Plaintiff's Amended Complaint and Second Amended Complaint, alleging even more violations. Southwest cannot now claim that if it is subject to the FCRA its repeated and systemic violations of the Act were merely negligent.

Since, under the plain reading of the FCRA, and under *Cortez*, Defendant is subject to the Act, a reasonable jury can easily find recklessness and a willful violation given the facts of this case. Indeed it is difficult to imagine the circumstances in which a willfulness finding in an FCRA case would be more appropriate.

### 5. *Safeco's "Reasonable Reading" Language Regarding The Term "Increase" Under FCRA Section 1681m Is Not Helpful To Southwest Here*

Defendant argues that the same defense that prevailed for the insurance company defendant in *Safeco* allows it to obtain judgment in its favor as to Plaintiff's willfulness claims in this case. *See* Def. Mem. at 19-23. This argument fails.

It is true that *Safeco* used the phrase "reasonable reading" in finding for the defendant on a willfulness claim under FCRA section 1681m, the FCRA provision at issue in that case. But that part of the *Safeco* decision is not helpful to Defendant here.

In *Safeco*, the Court construed not only the meaning of the word "willfully" under FCRA section 1681n (as discussed above), but also the meaning of the word "increase" under FCRA section 1681m. Safeco had argued that it believed that it was not required to send an "adverse action" notice to first-time customers who were not offered the best insurance rates due to their credit reports. Safeco contended that FCRA section 1681m requires such notices for insurance companies only when there is an "increase" in "any charge or insurance," and consumers who do not *already* have insurance with the company cannot suffer an "increase." *Safeco*, 551 U.S. at 60-61. The Court disagreed: "We therefore hold that the 'increase' required for 'adverse action,' . . . speaks to a disadvantageous rate *even with no prior dealing*; the term reaches initial rates for *new applicants*." *Id*. at 63 (emphasis added).

But because the statutory meaning of the term "increase" under FCRA section 1681m was unclear on its face, and also because there was no FTC guidance or appellate court decision on that issue prior to the *Safeco* case, the U.S. Supreme Court concluded that: "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. The Court thus found that Safeco could not be in willful noncompliance with FCRA section 1681m, relating to adverse action notices for insurance companies, under those circumstances. *Id.*

This part of the *Safeco* decision provides no defense for Defendant here. It goes without saying that the Defendant in this case is not an insurance company; this case involves no "adverse action" notices or claims; and no "increase" of insurance rates is at issue.

31

Importantly, this is also not a case where there is any threshold inquiry about the "reading" of any FCRA section or provision.  Plaintiff specifically sought in discovery whether Southwest had any such "reading" here.  Defendant objected on the basis of the attorney-client privilege, and failed to produce any witness or document that could support a reasonable reading defense.  (*See* Facts at ¶ 93; *see also* Ex. R at No. 33) (in responding to Plaintiff's written discovery Defendant objected that providing any "reasonable reading" defense because would violate the attorney-client privilege and refused to produce such a reading because Plaintiff allegedly sought "the fruits of legal research, or arguments to be made in legal submissions.").  Southwest cannot fairly object to discovery on the basis of privilege and then try to make a "reasonable reading" defense.[6]

Nor could Defendant now manufacture such a "reading."  Southwest has never identified any language within any part of the FCRA that it finds unclear or ambiguous.  Unlike the meaning of the word "increase" under FCRA section 1681m at issue in *Safeco*, there is nothing

---

[6]     Defendant appears to take the position in this litigation that only its attorneys know Defendant's "reasonable reading" of the FCRA which allegedly condones its practices.  Surely, no witness had evidence of any reasonable reading of the FCRA.  But despite that defense, Defendant refused to provide any information on such a "reading" on the basis of the attorney-client privilege.  That is improper and should preclude Defendant from making any *Safeco* "reading" argument.

Recently, in *Claffey v. River Oaks Hyundai, Inc.*, a federal court clearly stated in an FCRA case where the defendant sought to make a *Safeco* "objective reading" defense: "Allowing [defendant] to introduce such evidence and still maintain its attorney-client privilege would enable it to use the privilege as both a shield and a sword, which is not permitted."  494 F. Supp. 2d 976, 977 (N.D. Ill. 2007).  Thus the court advised the defendant that it "cannot have it both ways, [it] cannot seek refuge in consultation with counsel as evidence of [its] good faith yet prevent [plaintiff] from discovering the contents of the communication." *Id.* at 978.  *See also Dorr-Oliver v. Fluid-Quip, Inc.*, 834 F. Supp. 1008, 1012 (N.D. Ill. 1993).

Similarly in this case, Defendant cannot have it both ways.  If it had a "reasonable reading" of the FCRA provisions at issue here based upon the advice of its counsel, it should have permitted Plaintiff to take discovery on such a reading.  Having refused such discovery on the basis of the attorney-client privilege, Defendant cannot now use the purported "reading" as a sword.  Defendant should be precluded from making any "reasonable reading" argument in opposition to Plaintiff's FCRA willfulness claims, either at summary judgment or at trial.

"less than pellucid" about the legal standards at issue here.  Multiple Courts of Appeals have construed FCRA basic duties to assure accuracy (*Philbin, Cortez, Dennis and Henson*, *supra*) and permissible purpose (*Pintos, supra*) to cover companies that sell public records and other consumer data in reports to potential creditors.

Contrary to Defendant's arguments, in addition to the above Courts of Appeals, the FTC has also given guidance to companies that sell public records data, like Southwest, advising them that they are covered by the FCRA:

> From your description of its activities, it appears that, at the very least, your company "assembles" information as this term is commonly understood (dictionary definitions include "to gather" or "to collect").  Your company's record searchers go to local courthouses to review the records to find information.  If they find information on an individual, they forward either a brief abstract or copies of the docket information.  At your headquarters, a report is prepared consisting of all the information reported by your agents from around the country.  We believe that the activities you describe are sufficient to meet the definitional requirements of a CRA.

FTC Staff Opinion letter dated June 9, 1998, from W. Haynes to Richard LeBlanc. http://www.ftc.gov/os/statutes/fcra/leblanc.shtm.

As our Circuit found in *Cortez*, there is nothing confusing about the definitions of "consumer reporting agency" and "consumer report" in the FCRA that would prevent a corporate actor from readily realizing that when it is selling public records information about a consumer to a potential creditor who will determine that consumer's eligibility for credit, that corporate actor must comply with the FCRA.  *Cortez v. Trans Union, LLC,* 617 F.3d 688, 707 (3d Cir. 2010).  The case at bar is no different.[7]

---

[7]      This Court may also wish to note that other companies which sell reports that include public records data to banks in connection with home equity lines of credit, second mortgages and other home loans publicly admit on their websites that they are subject to the FCRA.  *See, e.g*, Landsafe Inc. http://www.landsafe.com/landsafe/notice/index.html   and   http://www.landsafe.com/landsafe/index.html;

Thus this is not the case of a defendant searching for court or administrative guidance as to the meaning of a particular statutory duty.   This is a case of deliberate and reckless noncompliance.  The record here provides more than sufficient evidence on which a jury could reasonably make a willfulness or reckless disregard finding.  Accordingly, Southwest's Motion should be denied.

### C.     Plaintiff Will Not Pursue Her Negligent Violation Claim

Plaintiff pled in the alternative that Defendant willfully and/or negligently violated the FCRA.  (Dk. No. 44 at ¶ 62).  As set forth above, given the strength of the record here including Defendant's own admissions, Plaintiff now elects to pursue only her *willful* violation claim and statutory damages.    Thus, Defendant's argument (which is mistaken) regarding Plaintiff's alleged inability to show actual damages under a negligent violation theory is moot, and should be denied as moot.   (*See* Def. Mem. at 23).

Since Plaintiff will show in this case that Defendant's FCRA violations were willful, she does not have the burden of showing any actual damages at summary judgment or at trial.  *See* 15 U.S.C. § 1681n; *Beaudry v. Telecheck Servs., Inc.*, 579 F.3d 702, 705-06 (6th Cir. 2009) (with respect to willfulness claim in FCRA section 1681e(b) case, holding that: "Because 'actual damages' represent an alternative form of relief and because the statute permits a [statutory damages] recovery when there are no identifiable or measurable actual damages, this subsection [1681n] implies that a claimant need not suffer (or allege) consequential damages to file a claim."); *see also Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 496, 499-500 (E.D. Pa. 2009) (in FCRA class action, consumers may seek statutory damages under section 1681n for

---

Kroll   Factual   Data   Inc.   http://www.krollfactualdata.com/Services/Collateral-and-property   and http://www.krollfactualdata.com/consumer.

willful violations without any proof of actual damages).[8]   Thus, this Court need not address Defendant's argument as to actual damages since Plaintiff may proceed to trial in this case will her willful violation claims and elect statutory damages of $100-$1,000 in lieu of actual damages.

### D.      Defendant's Challenge To Plaintiff's Section 1681h(c) Claim Fails

Finally, Defendant argues that Mrs. Fuges cannot set forth a claim under FCRA section 1681h(c), allegedly because she never attempted to contact Southwest.  (Def. Mem. at 24).  This argument was already been rejected by this Court in its ruling on Defendant's second motion to dismiss (Dk. No. 23 at p.3), and is without merit.

FCRA section 1681h(c) provides:

> (c) Trained personnel
>
> Any consumer reporting agency shall provide trained personnel to explain to the consumer any information furnished to him pursuant to section 1681g of this title.

15 U.S.C. § 1681h(c).

Contrary to Defendant's argument, FCRA section 1681h(c) does not require on its face that a consumer attempt to contact a CRA.  This very claim was briefed as part of Defendant's second motion to dismiss in this case (Dk. Nos. 19 at p.8 and 20-3 at p.4) and this Court has already found that "Plaintiff sufficiently pleads a claim based on a violation of 15 U.S.C. § 1681h(c)."  (Dk. No. 23 at p.3).

---

[8]      *See also Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952-54 (7th Cir. 2006) (consumer may recover FCRA statutory damages even in case of no actual damages); *Follman v. Village Squire, Inc*., C.A. No. 07-C-3767, 2007 WL 4522614, at *5 (N.D. Ill. Dec. 18, 2007) (in FCRA class action, finding that "[t]he only reasonable interpretation of section 1681n is . . . a showing of actual harm is not necessary to pursue statutory damages"); *Williams v. LexisNexis Risk Mgmt. Inc.*, Civ. No. 06-241, 2007 WL 2439463, at *9 (E.D. Va. Aug. 23, 2007) (statutory damages case against CRA); *Blanco v. El Pollo Loco, Inc.*, Civ. No. 07-54, 2007 WL 1113997, at *2 (C.D. Cal. Apr. 3, 2007) ("section 1681n contains no such requirement" of actual harm).

Discovery in this case has confirmed the allegations in Plaintiff's Amended Complaint, and amendment thereto, which are identical to the Amended Complaint with respect to the FCRA section 1681h(c) claim.  Defendant does not aim to comply with any part of the FCRA, including section 1681h(c).  (Ex. M, Cole Dep. June 17, 2010, at 17:3-17:7; and 20:16-20; Ex. H, Mullucey Dep. at 23:23-24:3; Ex. E, Schroeder Dep. at 24:11- 25:4; and Ex. O, Stipulation of Facts, p.2).  Defendant also does not, in fact, have trained personnel to explain to a consumer any information furnished on his or her Southwest report or file.  (Ex. M, Cole Dep. June 17, 2010, at 35:3-38:16).

The fact that Plaintiff did not proffer evidence of attempting to contact Southwest, which she never alleged in her Complaint and which *is not required* under FCRA section 1681h(c), does not invalidate Plaintiff's claim.  Unlike other CRAs, such as Equifax in the *Gagliardi* trial court decision that Defendant cites, Defendant failed to identify itself as a CRA, failed to advise Plaintiff that she had a right to dispute any inaccuracy in her Southwest report, and did not have any FCRA reinvestigation process or trained personnel to address FCRA consumer questions or complaints in any event.  (Facts at ¶ 99).  Not knowing what to do (because of Southwest's deliberate concealments), Plaintiff worked with PNC Bank to try to solve the problem that Southwest's report created, but was notably frustrated when the bank gave her the run-around and was unable to help her even after she went back to the branch several times.  (Facts at ¶¶ 56 and 64).  None of these facts changes the legal analysis or conclusion that this Court has already reached -- that under the facts here as plead (and now of record) Plaintiff has stated a claim under FCRA section 1681h(c).  Thus under the law of the case doctrine, this Court may again reject Defendant's argument concerning Plaintiff's claim under FCRA section 1681h(c).[9]

---

[9]     Once an issue is decided in litigation, the law of the case doctrine directs courts to refrain from re-deciding those issues.  *Pub. Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*,

## V.  <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff respectfully requests that this Court deny Southwest Financial Services, Ltd.'s Motion for Summary Judgment.

Respectfully submitted,

**FRANCIS & MAILMAN, P.C.**

BY:   <u>/s/ John Soumilas</u>
JAMES A. FRANCIS
JOHN SOUMILAS
ERIN A. NOVAK
FRANCIS & MAILMAN, P.C.
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA  19110
(215) 735-8600

Date:  September 12, 2011                    Attorneys for Plaintiff

---

123 F.3d 111, 116-17 (3d Cir. 1997) (citing *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817, 108 S. Ct. 2166, 2178 (1988)) (under the law of the case doctrine courts should only revisit prior decisions in "extraordinary circumstances" which in the Third Circuit are new evidence, a supervening new law, or if the earlier decision was clearly erroneous and would create manifest injustice).